1  ROBERT M. YASPAN, SBN 051867
2  JOSEPH G. McCARTY, SBN 151020
   DEBRA R. BRAND, SBN 162285
3  LAW OFFICES OF ROBERT M. YASPAN
   21700 Oxnard Street, Suite 1750
4  Woodland Hills, California 91367
5  Telephone: (818) 905-7711 Facsimile: (818) 501-7711
   *Attorney for Plaintiffs Consul Group RE Dos Mil Veintiuno Sociedad de*
6  *Responsabilidad Limitada, etc. and Wise Network, S.A.*
7
8
                    **UNITED STATES DISTRICT COURT**
9
            **CENTRAL DISTRICT OF CALIFORNIA – WESTERN DIVISION**
10
11  CONSUL GROUP RE DOS MIL          )   CASE NO.:
12  VEINTIUNO SOCIEDAD DE            )
    RESPONSABILIDAD LIMITADA AKA     )   COMPLAINT FOR:
13  CONSUL GROUP RE 2021 S.R.L. AKA  )
14  CONSUL GROUP RE 2021, LTDA, a    )   1. CONSPIRACY TO
    Costa Rican limited liability company and )      DEFRAUD;
15  WISE NETWORK, S.A., a Costa Rican )   2. FRAUD;
16  corporation,                     )   3. CONVERSION;
                                     )   4. CONSTRUCTIVE TRUST;
17                 Plaintiffs,       )   5. RESULTING TRUST;
18          v.                       )   6. BREACH OF FIDUCIARY
                                     )      DUTY;
19  LIDIA ZINCHENKO aka LIDIYA       )   7. BREACH OF CONTRACT;
    ZINCHENKO, an individual and dba )   8. NEGLIGENCE;
20  RAINIER AG; RAINIER AG, a        )   9. ACCOUNTING;
21  purported Swiss trust company; RAINIER )  10. INJUNCTIVE RELIEF;
    ADVISORY GROUP, LTD., an England )   11. DECLARATORY RELIEF;
22  and Wales Company; MICHAEL GUSS  )   12. PROMISSORY FRAUD;
23  AKA MICHAEL GAUSS AKA            )   13. RESCISSION FOR FRAUD;
    MIKHAIL GASS AKA MICHAEL I       )   14. RESCISSION FOR FAILURE
24  GUSS AKA MICHAEL I. SYROEJINE    )      OF CONSIDERATION;
25  AKA MIKHAIL IVAN SYROJINE AKA    )   15. IN THE ALTERNATIVE,
    MICHAEL SYROJESCHIN, AKA         )      BREACH OF CONTRACT
26  MIKHAIL SYROETINE, an individual, )   **DEMAND FOR JURY TRIAL**
27  and dba EMBLES FINANCIAL;        )
    GREGORY MANCUSO aka GREG         )
28

                                    1

1  MANCUSO, an individual; THE BANK  )
2  OF NEW YORK MELLON  )
   CORPORATION aka BNY MELLON, a  )
3  Delaware corporation; PERSHING, LLC,  )
4  a Delaware corporation; CASEIS BANK,  )
   S.A.; BAADER BANK; and DOES 1-50,  )
5  inclusive,  )
6  )
   )
7              Defendants.  )

8        Plaintiffs Consul Group RE Dos Mil Veintiuno Sociedad de

9
10 Responsabilidad Limitada  (translated to English as Consul Group RE 2021

11 S.R.L).aka Consul Group RE 2021, Ltda ("CONSUL"), and Wise Network, S.A.

12 ("WISE"), (referred to together as "Plaintiffs") state as follows:

13
14                 **JURISDICTION AND VENUE**

15      1.     This Court has jurisdiction of this action pursuant to 28 U.S.C.

16 Section 1332(a)(b). There is complete diversity between all of the Plaintiffs on the

17 one hand, and all defendants on the other.  There is more than $75,000 in

18
19 controversy, exclusive of interest and costs.

20      2.     Venue lies in this district pursuant to 28 U.S.C. Section 1391(a)

21
22                    **PARTIES**

23      3.     Plaintiff CONSUL is a limited liability company organized and

24 existing under the laws of Costa Rica, where it has its principal place of business.

25      4.     For all times herein relevant, the Manager of CONSUL is, and has

26
27 been, Mauricio Lara ("LARA"), an attorney in Costa Rica, who is also its only

28

1   member/shareholder.

2       5.      Plaintiff WISE is a corporation organized and existing under the laws

3

4   of Costa Rica, where it has a principal place of business.  LARA is an officer of

5   WISE.

6       6.      Plaintiffs are informed and believe and thereupon allege that

7

8   Defendant Lidia Zinchenko aka Lidiya Zinchenko, dba Rainier AG ("LIDIA") is,

9   and has been, a resident of Santa Barbara County, State of California.  On or about

10  May 16, 2017 LIDIA recorded a "fictitious business name" statement numbered as

11

12  2017-0001472 in the County of Santa Barbara under the name of "Rainier AG"

13  (the "RAINIER DBA").  The business type is listed on the RAINIER DBA as an

14  "individual".  A true and accurate copy of the abstract of the RAINIER DBA filed

15

16  with the County of Santa Barbara is attached as Exhibit 1.

17      7.      Plaintiffs are informed and believe and thereupon allege that the

18  Defendant LIDIA registered the fictitious business name statement so that she

19

20  could impersonate RAINIER in the United States to unwitting third-party

21  customers and investors such as CONSUL and WISE.   Plaintiffs are informed and

22  believe and thereupon allege that the Defendant LIDIA usurped and impersonated

23

24  the identity of RAINIER, either consensually or not, for the purpose of theft and

25  misrepresentation.

26      8.      Plaintiffs are informed and believe and thereupon allege that the

27

28

COMPLAINT

Defendant Rainier AG claims to be a Swiss trust company, formed in or around March 1, 1971 ("RAINIER"). Among other things, Plaintiff is informed and believes that RAINIER does business as a shareholder in Petlife Pharmaceuticals, Inc. ("PETLIFE"), a corporation that operates in Los Angeles County, State of California. Plaintiffs are also informed and believe and thereupon allege that the Defendant RAINIER may use as its own bank accounts, the bank accounts of co-Defendant LIDIA who does business under the name of Rainier AG through the RAINIER DBA, and Ezbanc Corp. ("Ezbanc"), a Florida corporation with its principal place of business in the County of Santa Barbara, State of California.

9.     Plaintiffs are informed and believe and thereupon allege that the Defendant Rainier Advisory Group, Ltd., ("RAG") is a corporation formed in the United Kingdom as Company Number 11456266 on July 10, 2018. RAG claims to be a subsidiary of RAINIER, which it falsely claims is regulated by Swiss banking and fiduciary authorities.

10.     Plaintiffs are informed and believe and thereupon allege that Defendant Michael Guss dba Embles Financial ("GUSS") is a resident of either Santa Barbara County and/or Los Angeles County. Plaintiffs are informed and believe and thereupon allege that GUSS is an individual who does business under several aliases. He is also known as ("aka") Michael Gauss aka Mikhail Gass aka Michael I Guss aka Michael I. Syroejine aka Mikhail Ivan Syrojine aka Michael

Syrojeschin, aka Mikhail Syroetine.  GUSS does business in and around Los

Angeles and its environs including the buying and selling of companies and their

shares.  GUSS has been convicted of money laundering in 1996 in which he

cooperated with federal prosecutors to testify against members of a Russian

organized crime syndicate.  In a NASD proceeding in 2007 GUSS was convicted

of managing a broker dealer while an unregistered control person.

11.    GUSS (under his alias of Gauss) executed the purchase contract of

PETLIFE in or around February 2017 on behalf of RAINIER as its authorized

agent.

12.    Plaintiffs are informed and believe and thereupon allege that LIDIA

and GUSS are related and/or married and/or previously married.

13.    On or about September 4, 2015, GUSS recorded a fictitious business

name statement numbered as 2015-0002643 in the County of Santa Barbara under

the name of "Embles Financial" with its "business address" listed as being in

"Santa Barbara, California".  A true and accurate copy of the abstract of the

fictitious business name filed with the County of Santa Barbara is attached as

Exhibit 2.

14.    GUSS is also an officer of Ezbanc, which is an alleged owner of at

least one of the bank accounts used by RAINIER.  Ezbanc lists as its agent of

service of process in California "Embles Financial, Inc.", although no such

corporation exists in California and "Embles Financial" is a fictitious business, or "dba", of GUSS.

15. Notably, Ezbanc was reinstated in May 2018 in Florida by the Florida Secretary State after not being compliant under Florida law for approximately six years and co-Defendant Gregory Mancuso aka Greg Mancuso ("MANCUSO"), a claimed (by MANCUSO) account representative for RAINIER, signed the corporate reinstatement as the registered agent for Ezbanc. Ezbanc Corp. transferred USD $300,000 (a part payment of funds owing) to plaintiff allegedly on behalf of RAINIER or LIDIA as a part of the fraudulent scheme hereupon alleged.

16. Plaintiffs are informed and believe and thereupon allege that MANCUSO is an individual who acted as the account manager for the CONSUL Account on behalf of RAINIER, who has his residence in the City of Austin, State of Texas and does business in the County of Santa Barbara, State of California.

17. Specifically, Plaintiffs are informed and believe that since in or about July 2017, MANCUSO is a control person and primary owner of Heritage Equity Management, LLC that is located at 330 Spaulding Drive, Penthouse 1, Beverly Hills, California 90212 with a mailing address of 1187 Coast Village Road, #1-465, Montecito, California 93108.

18. Plaintiffs are informed and believe and thereupon allege that LIDIA

COMPLAINT

held herself out falsely as RAINIER in order to induce CONSUL to invest funds with RAINIER.  In this endeavor LIDIA was aided and abetted by GUSS, acting under the names of Embles Financial and Ezbanc, and MANCUSO who falsely represented himself to be the "President" of Embles Financial when Embles Financial in reality is nothing more than GUSS under another name.  In fact, Embles Financial, Inc. was a corporation that was formed in the British Virgin Islands ("BVI") on or about November 7, 2014 with LIDIA as its sole director. The corporation known as Embles Financial, Inc. was subsequently was stricken from the Register of Companies as of December 1, 2015 and is no longer in good standing.

19.     Neither RAINIER nor LIDIA under Swiss law can hold equity securities in their own name; rather they must hold customers' assets in depositary accounts with recognized clearinghouses.  Two of such clearinghouses are maintained by Defendant The Bank of New York Mellon Corporation dba BNY Mellon ("BNY") and its subsidiary Defendant Pershing LLC variously also known as Pershing Corp., BNY's Pershing and BNY/Pershing ("PC").

20.     Plaintiff is informed and believes that Defendant BNY is a Delaware corporation that maintains offices in the County of Los Angeles, State of California.

21.     Plaintiff is informed and believes that PC is a Delaware corporation

that maintains offices in the County of Los Angeles, State of California.

22.   Plaintiffs are informed and believe and thereupon allege that either RAINIER or LIDIA (acting in her role as an impersonator), or both, has a direct (i.e., in their own name) or indirect (i.e., in some other entity's name) depositary account at either BNY or PC (the DEPOSITARY ACCOUNT(S)).   Said DEPOSITARY ACCOUNT(S) are either in the name of RAINIER or LIDIA, or held for the benefit of RAINIER or LIDIA by either Caceis Bank, S.A., or Baader Bank.  Plaintiffs are informed and believe and thereupon allege that BNY or PC, to the extent that either holds CONSUL's shares, it does so as a trustee or constructive trustee for the true owner of the shares, i.e. CONSUL.

23.   Plaintiffs are informed and believe and thereupon allege that either EZBANC, GUSS or LIDIA, or some combination thereof, has a direct (i.e., in their own name) or indirect (i.e., in some other entity's name) bank account in which funds sent by Plaintiffs have been received.   Plaintiffs are informed and believe and thereupon allege that EZBANC, GUSS  or LIDIA, to the extent that any or all hold CONSUL's monies, they do so as a trustee or constructive trustee for the true owner of the funds, i.e., Plaintiffs.

24.   Defendant Caceis Bank, S.A. ("CACEIS") is a member of Groupe Credit Agricole aka Credit Agricole, S.A. ("GCA") and is a part of its "asset management" division.  CACEIS describes itself on its website as "…the asset

servicing banking group of Credit Agricole, S.A. dedicated to asset manager, bank institutional and corporate clients".  CACEIS has a United States office at 1301 Avenue of the Americas, New York, NY 10019.  GCA has additional offices in the United States in New York City, Chicago, IL and Houston, TX.  CACEIS further does business with BNY and PC in the United States through the maintenance of clearinghouse accounts in the United States for the benefit of itself and its GCA customers.   Plaintiffs are informed and believe and thereupon allege that CACEIS, to the extent that it holds CONSUL's shares, it does so as a trustee or constructive trustee for the true owner of the shares.

25.    Defendant Baader Bank ("BAADER") is a German bank with an international presence.  It does business in the United States in New York City and Boston, MA through its wholly owned subsidiary (according to its website) Baader Helvea, Inc.   BAADER further does business with BNY and PC in the United States through the maintenance of clearinghouse accounts in the United States for the benefit of itself and its customers.  Plaintiffs are informed and believe and thereupon allege that BAADER, to the extent that it holds CONSUL's shares, it does so as a trustee or constructive trustee for the true owner of the shares.

26.    CACEIS, BAADER, BNY and PC are jointly referred to as the "BANK DEFENDANTS".

COMPLAINT

27.     Plaintiffs are informed and believe and thereupon allege that the

BANK DEFENDANTS presently holds in excess of 2,000,000 shares of Gopher

Protocol, Inc., CUSIP 38268V108 ("GOPH") belonging to CONSUL; and in

excess of 8,300,000 shares of Mobiquity Networks, CUSIIP 60743F102,

("MOBQ") belonging to CONSUL.

28.     The true names, identities and capacities of the defendants named as

Does 1 through 35, inclusive (each a **"Doe Defendant"** and, collectively, the

**"Doe Defendants"**), are unknown to the Plaintiffs at the present time.  However,

Plaintiffs are informed and believes and thereon allege that each of these fictitious

defendants is/are in some manner responsible for the events and damages to

Plaintiffs as alleged in this Complaint.  Plaintiffs will seek leave from this Court to

amend this Complaint to include the true names, identities and/or capacities of

these fictitious defendants when they are ascertained.

29.     Plaintiffs are informed and believes. and thereon allege, that at the

times mentioned herein the Doe Defendants, and each of them, were the agents,

shareholders, officers, directors,  employees, servants, independent contractors,

partners, joint venturers, alter egos, successors in interest, and/or representatives

of each of the other defendants, and each of them, and  conspired with each other,

or some of them, in some manner which caused the damages suffered by Plaintiffs

as alleged herein and/or are the alter ego of the corporate defendants such that they

10

should be determined to be liable with said defendants.

## ALTER EGO ALLEGATIONS

30.     Plaintiffs are informed and believes, and on that basis alleges, that there exists, and at all times herein mentioned there existed, a unity of interest in ownership between defendants RAINIER, RAG, GUSS and LIDIA and DOES 1-15 such that individuality and separateness between defendants RAINIER, RAG, GUSS and LIDIA and DOES 1-15 has ceased, and that defendants RAINIER, GUSS, RAG and LIDIA and DOES 1-15 are alter egos of each other.

31.     Plaintiffs are informed and believe and thereupon allege that RAINIER, GUSS and/or LIDIA direct and control all activities relating to RAG, including the actions at issue in this matter.  On information and belief, RAINIER, GUSS and/or LIDIA exercise control over RAG's daily activities, including all business-related matters.

32.     Plaintiffs are informed and believe that RAINIER, GUSS and/or LIDIA have transferred money between RAG and RAINIER, GUSS and/or LIDIA without the consent of the customers and to further their fraudulent acts.

33.     Plaintiffs are further informed and believe that RAG did not have a website and email addresses of its own, but relied on that of RAINIER, LIDIA and/or GUSS's website and email addresses.

34.     Plaintiffs are further informed and believes that RAG was

undercapitalized in light of the work it was supposed to perform; i.e., only GBP 200.

35. All of RAG's portals had the RAINIER name on it.

36. RAG's contracts also included RAINIER and the alleged employees who were soliciting clients for RAG where the same alleged employees as RAINIER.

37. Moreover, on information and belief, RAINIER, GUSS and/or LIDIA directs, controls, or acts in concert with RAG to control the accounts of RAG.

38. RAG did not have an office, but rather used an "address service" as a business address.

39. Plaintiffs are further informed and believe that at all times herein mentioned RAINIER and RAG were mere shells and sham without capital, assets or stock. RAINIER and RAG were conceived, intended and used by LIDIA, GUSS and DOES 1-15 as a device to avoid individual liability and for the purpose of substituting a financially insolvent corporation in the place of LIDIA, GUSS and DOES 1-15. RAINIER and RAG are, and at all times herein mentioned was, so inadequately capitalized that, compared with the business to be done by RAINIER and RAG, and the risks of loss attendant thereto, its capitalization was illusory.

40. Adherence to the fiction of the separate existence of RAINIER,

GUSS, LIDIA and/or RAG and DOES 1-15 would permit the abuse of the corporate privilege and would sanction fraud and would result in an injustice to Plaintiffs.

## **GENERAL ALLEGATIONS**

41.     In late April 2018, LARA on behalf of Plaintiffs, contacted Hernan Castro ("Castro") of AGM Technology, Inc., a financial broker in Costa Rica to find a company that could trade GOPH stock on behalf of a third-party company not otherwise involved herein ("COMPANY ONE").  LARA submitted an application to Castro on or about April 26, 2018.

42.     Castro was aware that GOPH was considered at the time as a "penny stock" (which meant that its shares typically traded at less than USD $5.00 per share).

43.     On or about May 8, 2018, Castro told LARA that he was talking with different clearing Firms and that three of them were able to receive the GOPH shares for trading   On May 24, 2018, COMPANY ONE was told that an account with a company known as RAINIER was approved with an account number ending in xxxx7188 ("ACCOUNT").  Plaintiff is now informed and believes and thereupon alleges that Castro has known GUSS for approximately 20 years and was referred to RAINIER from GUSS.

44.     On May 28, 2018, LARA received an email from Castro providing

the wire information for RAINIER.  Plaintiffs and LARA were unaware that the

wire transfer information was for the bank account of LIDIA in her deceptive role

of "doing business" as "Rainier AG".  The information provided by Castro was:

>ABA 026009593
>Bank Account XXXXX2918

45.    Plaintiff is informed and believes and thereupon alleges that GUSS,

LIDIA and/or MANCUSO provided the deceptive wire transfer information to

Castro.

46.    On June 1, 2018, non-defendant Philippe Herrmann aka Philippe

Hermann ("HERRMANN"), the Manager of the so-called "Compliance

Department" of RAINIER sent an email to Castro which was forwarded to LARA

on behalf of CONSUL, that explained the procedures regarding the fees, deposits

and withdrawals.   HERRMANN concealed the fact that the wire transfer

information that RAINIER had forwarded to LARA was not that of RAINIER

residing allegedly in Zug, Switzerland, but rather that of LIDIA, an individual in

Santa Barbara, California.

47.    On June 4, 2018, Castro forwarded to LARA an email from

HERRMANN, and copied it to MANCUSO, which stated that RAINIER had not

heard any updates regarding the ACCOUNT (i.e., an opening transfer of funds to

account).  HERRMANN wrote:

>"We shall not be opening any new accounts without carefully scrutinizing

the clients' financial position including but not limited to proof of funds intended for deposit as well as going through additional requisite compliance procedures to ensure the viability of the potential clients."

48. HERRMANN threatened to close the ACCOUNT, but when Plaintiff CONSUL agreed to work with Plaintiffs, the account was "reopened" with no further required documentation by RAINIER.

49. Between June 5, 2018 and early October 2018, by telephone, MANCUSO on behalf of RAINIER contacted LARA as a representative of Plaintiffs. In said telephone conversations, MANCUSO represented to LARA that RAINIER had been in existence since 1971 in Switzerland, was a member of FINMA and compliant with FINMA's rules and all Swiss banking regulations, and that RAINIER had an experienced brokerage house (RAG) that could also handle a public offering for certain cryptocurrency security tokens.

50. In addition, between June 5, 2018 and early October 2018, in telephone conversations with LARA, MANCUSO on behalf of RAINIER and the other Defendants, represented to Plaintiff CONSUL:

A. That RAINIER was a licensed broker and would follow Plaintiff CONSUL's instructions;

B. With respect to the money and stock entrusted to RAINIER, such stock would be sold only with RAINIER's knowledge and consent, and money would only be transferred upon CONSUL's instructions.

15

C.    RAINIER and its alleged employees would act as fiduciaries and trustees for the stock and monies being held on behalf of CONSUL and would safeguard CONSUL's assets.

51.    MANCUSO, on behalf of RAINIER, also authorized Plaintiff CONSUL to use the ACCOUNT that had previously been set up for COMPANY ONE without getting first the approval of COMPANY ONE.

52.    On October 3, 2018, MANCUSO, on behalf of RAINIER, sent wire transfer instructions to representatives of the entities that were transferring their stockholdings, and funds, to CONSUL.  The email stated:

"Wire Info for $125,000
Rainier AG
ABA 026009593
Account XXXXX2918

Address
Rainier AG
Swiss Asset Management
Neugasse 15
CH-6301 Zug
Switzerland

DWAC INFO: [for securities]
Interactive Brokers LLC
DTC # 0534
Accoubt [sic]: XXXX8219
Account Name: Rainier AG

[signed]
Greg Mancuso
Rainier AG
Swiss Asset Management

16

Neugasse 15
CH-6301 Zug
Switzerland"

See Exhibit 3 (the "MANCUSO EMAIL").

53.   Unbeknownst to Plaintiffs, the bank account for funds transfer listed in the MANCUSO EMAIL for "Rainier AG" in Exhibit 3 was LIDIA's bank account.  The DWAC information for shares transfer specified Interactive Brokers LLC ("IBL") a brokerage house in the United States.   On October 5, 2018, MANCUSO instructed CONSUL to use a different broker than IBL

54.   Following MANCUSO's instructions allegedly on behalf of RAINIER, CONSUL, through a consultant of CONSUL, wire-transferred USD $100,000 on or about October 3, 2018 and USD $25,000 on October 4, 2018 to what it thought was RAINIER's bank account.  A copy of the transactions from the bank statement is attached hereto as Exhibit 4.

55.   MANCUSO's instructions, as set forth above, state that RAINIER's bank is in Switzerland but the code for the bank transfer, as published by the American Bankers Association, shows that the code is attributable to a Bank of America branch in New York City.  See Exhibit 5.

56.   Following MANCUSO's instructions CONSUL caused to be transferred 2,244,839 shares in Gopher Protocol Inc. ("GOPH") on or about October 6, 2018, to what it thought was RAINIER's clearinghouse account at

COMPLAINT

BNY.   See Exhibit 6.

57.    On October 9, 2018, MANCUSO sent to a consultant of CONSUL a "New Account Forms Corporate" as a "formality" on the already-opened ACCOUNT.

58.    On October 12, 2018, Brian Barthlow ("Barthlow") of Empire Stock Transfer Inc. ("Empire") spoke to MANCUSO at RAINIER.  Barthlow checked the DWAC system and the share were not out there ready for trading.  Barthlow was told by MANCUSO that the European broker was a bit dense.  On October 15, 2018, the stock was still not in the DWAC system.  MANCUSO represented that he or the representative from RAINIER that handles the clearing house would contact Empire to finalize the transaction.

59.    On October 15, 2018, the shares had to be canceled because the broker did not reference the account name of RAINIER AG or its account number.

60.    Following MANCUSO's instructions CONSUL caused to be transferred a further 2,400,000 shares in GOPH on October 19, 2018, to what it thought was RAINIER's clearinghouse account.   Said shares were transferred by DWAC pursuant to an irrevocable stock power to "BNY FBO Caceis S.A. FBO Rainier AG Baader Bank-Rainier AG Acct."  See Exhibit 7.

61.    On or about October 26, 2018, LARA, for CONSUL, filled out and sent in to RAINIER a series of forms entitled as "Account Opening

Documentation." ("RAINIER DOCS"). The address of RAINIER was given as Neugasse 15, CH-6301 Zug, Switzerland on the forms.  LARA signed for application forms as the Manager for CONSUL.

62.    On October 29, 2018 RAINIER sent a statement of account to CONSUL and admitted that it was holding USD $639,783.33 for the benefit of CONSUL.  See Exhibit 8.

63.    On October 29, 2018 CONSUL requested a withdrawal of USD $300,000 from the ACCOUNT supposedly at RAINIER.  MANCUSO, for no good reason, rejected the request, but he then stated that he would approve a withdrawal of USD $265,000 from the ACCOUNT which was to be sent to a third party for the benefit of CONSUL.  CONSUL resubmitted a withdrawal request of USD $265,000.  See Exhibit 9.

64.    Instead on November 9, 2018, there was a transfer of USD $165,000 that was not sent by RAINIER, but rather Ezbanc Corp., the recently reinstated corporation of GUSS, with a notation that it was a loan from MANCUSO to CONSUL's consultant. (See Exhibit 10).  Although sent by Ezbanc Corp., the statement of CONSUL's ACCOUNT with LIDIA or RAINIER is shown as a debit on October 29, 2018 of USD $265,000 (See Exhibit 11), even though no such amount was ever paid out to CONSUL or to the third party.

65.    Neither of the Plaintiffs had any account with Ezbanc or

MANCUSO; nor to the best of their knowledge do either of the plaintiffs have any credit or debit balance with Ezbanc or MANCUSO.  In short, they do not know why said funds were received from either Ezbanc or MANCUSO.

66.    On November 9, 2018, Castro sent to CONSUL additional forms that needed to be filled out by CONSUL for the alleged sale of MOBQ shares.

67.    Based upon the representations by MANCUSO that RAG was experienced with public offerings and was the wholly-owned subsidiary of RAINIER, on or about November 9, 2018 Plaintiff WISE sent an alleged agreement entitled as an "Advisory and STO Origination Agreement" ("WISE AGT") to Defendant RAG.  See Exhibit 12.

68.    On November 14, 2018, MANCUSO was sent documentation relating to WISE for comments by RAG.  Such was never done.

69.    WISE contends that the WISE AGT was not executed by RAG and that RAG did not perform any services on behalf of WISE.

70.    On or before November 28, 2018, CONSUL sent a request for funds to RAINIER, i.e., to be sent funds from the account that had already cleared.  On November 29, 2018, RAINIER "declined" the request by claiming that the email was sent from an email account not on file with RAINIER.

71.    Thereafter on December 6, 2018, LARA sent another request for a wire transfer for the total amount of USD $500,000.  CONSUL instructed in an

email that of the USD $500,000, USD $200,000 was to be sent for the balance of the RAG alleged agreement and USD $300,000 was to be sent to the consultant or CONSUL.

72.    On December 7, 2018, "Ezbanc Corp" sent USD $300,000 to a consultant of CONSUL with a notation that it was a "loan disbursement" to MANCUSO. See Exhibit 13. Although sent by Ezbanc Corp., the debit from CONSUL's ACCOUNT with LIDIA or RAINIER is shown on the statement attached as Exhibit 14. The statement reflects a debit of USD $500,000, but does not itemize the transaction showing that USD $200,000 was sent to RAG.

73.    It was with the understanding that RAINIER and RAG were going to perform pursuant to the WISE AGT, CONSUL authorized the aforementioned transfer of USD $200,000, which brought the total amount paid to WISE USD $250,000. The USD $250,000 was the deposit for the tokenization offering which WISE did nothing to earn.

74.    During this period of time where Defendants, and each of them, were refusing to allow Plaintiffs access to their money, Plaintiffs first discovered that the CONSUL funds were sent not to a RAINIER bank account in Switzerland, but rather to a bank account owned by Lidia Zinchenko acting as a "sole proprietor". The MANCUSO EMAIL quoted above in Exhibit 3 directs that funds be sent to account number "XXXX2918". Yet while the wire transfer out went to

"RAINIER", the bank acknowledgment that was issued in mid-November 2018 shows that the beneficiary on the account was LIDIA.  See Exhibit 4.

75.   Plaintiffs are informed and believes, and thereon alleges, that the only way for the bank to be able to accept a wire transfer directed to RAINIER into an individual account in the name of LIDIA is because the bank was given the false fictitious business statement filed by LIDIA which alleges she was doing business as "Rainier AG".  See Exhibit 1.  This was a willful intentional act of deception and fraud committed by the Defendants.

76.   Plaintiffs further discovered that even though CONSUL did not do business with Ezbanc, it transferred money to CONSUL.  Plaintiffs are informed and believes. and thereon allege, that based on the continuous set of deceptions practiced by GUSS and LIDIA, CONSUL's funds were not held by RAINIER but rather by GUSS and LIDIA through their maze of entities some of which are sued herein.

77.   As of December 12, 2018, RAINIER or LIDIA sent a statement to CONSUL admitting that it owed USD $703,245.28 in cash to CONSUL.  See Exhibit "11" being labelled as a "Cash Statement".  Said statement is incorrect in, among other things, the reference to a USD $265,000 withdrawal on October 29, 2018 is incorrect in that only USD $165,000 was sent to CONSUL.  Thus, the amount held for the benefit of CONSUL as of December 12, 2018 was actually

USD $868,245.28.

78.     As of December 18, 2018, RAINIER sent a statement to CONSUL admitting that it held 2,000,498 shares of Gopher Protocol, Inc. GOPH stock and 8,363,028 shares of MOBQ stock for the benefit of CONSUL. See Exhibit 14 being labelled as a "trading statement".  On January 16, 2019 a snapshot of CONSUL's ACCOUNT as found on the Internet reiterated the same numbers of shares on hand supposedly with RAINIER.  See Exhibit 15.

79.     The shares of both GOPH and MOBQ were originally sent by CONSUL through the DWAC process to The Bank of New York Mellon Corporation ("BNY").  Plaintiffs are informed and believes. and thereon allege, RAINIER or LIDIA either maintains an account with BNY or BNY's clearinghouse subsidiary ("PC") or is a customer of BAADER or CACEIS which itself maintains such a clearinghouse account.

80.     BNY has continuously reported to the Depository Trust Company ("DTC"),, as required  by law, that it (or its wholly owned corporate subsidiary, PC) holds for the benefit of its customers, at least 2,000,498 shares of GOPH  (i.e., the lowest intermediate balance) in its name since November 2018, the first date that CONSUL sent GOPH shares to BNY.  As of the last reporting date of February 8, 2019 PC reported that it held 2,148,413 shares of GOPH and BNY reported that it held 2,218,498 shares of GOPH.  The DTC report (redacted) for

the relevant periods of time is attached as Exhibit 16.

81.    Title to said number of GOPH shares resides in CONSUL; and BNY or PC holds these shares in trust for the benefit of CONSUL.

82.    BNY has continuously reported to the DTC, as required by law, that it holds for the benefit of its customers, at least 8,363,028 shares of MOBQ (i.e., the lowest intermediate balance) per the Rainier statement as of Wednesday January 16, 2019 (Exhibit 15).  As of the last reporting date of February 8, 2019 BNY reported that it held 8,397,588 shares of MOBQ.   The redacted DTC reports for the relevant periods of time are attached as Exhibit 17.  Defendants have not accounted for the missing USD $34,550 MOBQ shares.

83    Title to said number of MOBQ shares resides in CONSUL; and BNY holds these shares in trust for the benefit of CONSUL.

84.    On January 10, 2019, LARA sent an email to HERRMANN stating that he was going to be in Switzerland and wanted to meet with HERRMANN while he was there.  Although the email was not timely sent by HERRMANN to LARA, HERRMANN responded that all questions should be directed to MANCUSO regarding the ACCOUNT and that RAINIER did not hold client meetings in its "compliance and back office divisions."  HERRMANN also claimed to have suspended the ACCOUNT, which was wrongful.  Plaintiffs could no longer even access their ACCOUNT on the internet.

85.     On January 16, 2019, LARA sent an email to HERRMANN and MANCUSO terminating Plaintiffs' alleged contracts with RAINIER and RAG.

86.     On January 21, 2019, the attorney for CONSUL demanded the release of its cash and shares.   See Exhibit 18.  On January 23, 2019 RAINIER replied by email refusing to comply.  See Exhibit 19.  On January 23, 2019 CONSUL, by LARA, its manager and Costa Rican attorney, made a further demand; yet, there has been no reply by RAINIER.  See Exhibit 23.

87.     On or about January 22, 2019, WISE cancelled any alleged contract with RAG and demanded the return of the USD $250,000 that RAG received as a deposit.   WISE has not received the USD $250,000 it demanded.

88.     On or about January 25, 2019, LARA, Pablo Gonzales and the Nominated Chairman of the Board of COMPANY ONE, and the former President of Costa Rica, Jose Maria Figueres, went to the RAINIER offices at the address on its website in Zug, Switzerland, and found the doors locked, and no one there. LARA called the telephone number listed for RAINIER and reached an answering service which stated that it would provide a message to HERRMANN. HERRMANN then called LARA.  On that date, HERRMANN and MANCUSO, on behalf of RAINIER, admitted that the funds and shares were due but that CONSUL "…had to give them [RAINIER] time to give us [CONSUL] the funds…"  As of the date of the filing of this complaint, Plaintiffs' monies and

25

shares have not been returned to CONSUL.

89.    After Plaintiffs terminated Defendants, and each of them, Defendants refused to turn over Plaintiff CONSUL's stock and money that was contained in its ACCOUNT and the monies that were improperly paid to RAG on behalf of WISE.  Defendants also cut off Plaintiffs' access to its ACCOUNT.

90.    Furthermore, Defendants, and each of them, commingled Plaintiffs' assets with their own.

91.    On or about February 14, 2019, Plaintiffs, by their counsel, made a demand on the banks to return and/or freeze the assets pending further court order. A copy of the letter with redacted exhibits that was sent is attached hereto as Exhibit 21.

## FIRST CLAIM OF RELIEF
### (CONSPIRACY TO DEFRAUD)
### BY PLAINTIFF CONSUL AGAINST ALL DEFENDANTS EXCEPT THE BANK DEFENDANTS

92.    Plaintiff CONSUL incorporates by reference all of the allegations contained in Paragraphs 1 through 91, above, as though set forth herein.

93.    Plaintiffs have subsequently discovered the following regarding Defendants, and each of them.

A.    As discussed in a decision dated February 12, 2007, appealed from a Hearing Panel's December 29, 2005 decision of the National Adjudicatory Council for the NASD, a copy of which is attached to Exhibit 21 as Exhibit "12"

("NASD DECISION"), involving Sterling Scott Lee ("Lee") and Dennis Todd Lloyd Gordon ("Gordon"), Complaint No. C06040027 Plaintiffs discovered that in 1996, GUSS pled guilty and was convicted in the United States of money laundering.  GUSS cooperated with federal prosecutors and testified against members of a Russian organized crime group in exchange for avoiding jail time. As a result of the 1996 conviction, GUSS was disqualified from registration.  -

B.     As further discussed in the NASD DECISION, in a way to circumvent his disqualification from registration in the security industry, GUSS used his ex-wife, Kathia Santiago, Lee and Gordon and others to operate a company or its holding company, which GUSS controlled.  In or about 2007, Lee and Gordon were barred in all capacities for permitting an unregistered, statutorily disqualified individual to function as a principal of the company.  In addition, there was a finding that the company charged retail customers fraudulently excessive markups.

C.     This ruling did not prevent GUSS from advancing to his next scam. With the NASD DECISION coming down in or about January 22, 2007, GUSS and Ajene Odeluga ("AJENE") were listed as officers and directors of EzBanc when neither had been before.

D.     On September 18, 2007, in a press release for the OTCBB:UCHB, UC Hub Group, Inc. ("UCH") announced that it intended on changing its name to

ezBanc, Corp.  Larry Wilcox, the President of UCH stated the "new corporate

name will serve the purpose of our aggressive branding policy as the leading

developer of projects related to electronic and virtual financial services."  In

addition, UCH announced that AJENE, who is also known as Ajene Watson

would be joining UBH as a successful entrepreneur, well-established authority on

securities-collateralized lending".

     E.     In February 2010, GUSS acquired 80,000,000 shares of Omni

Ventures, Inc. ("OMNI").  OMNI is a Kansas corporation.  GUSS then transferred

75,317,955 shares to Globanc Corp., a company that according to OMNI's 10-k

filed on January 12, 2012 with the SEC was controlled by GUSS.  OMNI was

accused on many websites as participating in pump and dump schemes.  In 2012,

GUSS also became a director of OMNI.  January 2013 was the last time that

OMNI filed any reports with the SEC and at that time the stock was trading at less

than $0.01 per share.  The stock is still on the OTC and is selling for less than

$0.01 per share.

     F.     The OMNI corporation was also forfeited in for failure to file an

annual report in 2014 by the State of Kansas.  However, on December 27, 2017,

Annual Reports for the years of 2014-2016 were filed on behalf of OMNI.  The

principal office and address were listed at 1187 Coast Village Road, 1-465, Santa

Barbara, California 93108.  The CEO, Secretary and CFO were listed as a person

named Philippe Hermann in Zug, Switzerland.   A man named "Philippe

Hermann" (HERRMANN defined above) in Zug, Switzerland is also a

representative and principal of RAINIER.  The telephone number of

HERRMANN listed on the Kansas Secretary of State Annual Report was 805-

845-7177, which is a telephone number for LIDIA.

   G.  On June 17, 2016, Heritage Equity Fund LP was organized pursuant

to the laws of Delaware.  On November 1, 2017, filed with the California

Secretary of State a Foreign Limited Partnership Application for Registration.

LIDIA was listed as one of the General Partners with an address of 123-A El

Paseo, Santa Barbara, California.  PRVCY.com Inc., a New York corporation, was

listed as the other General Partner with an address of 1187 Coast Village Road,

Suite 1-465, Santa Barbara, California – the same address used by OMNI, LIDIA

and GUSS.

**B.**  **Formation and Operation of the Conspiracy.**

   94.  Plaintiff CONSUL is informed and believes that Defendants, and

each of them, started the conspiracy as early as December 2016, if not earlier.

Plaintiffs are informed and believe that as part of the conspiracy with RAINIER

purchased 3,850,000 shares of stock in Petlife Pharmaceuticals, Inc.  GUSS (under

the last name of Gauss) executed the Private Stock Purchase Agreement as the

"Authorized Agent" for RAINIER.

COMPLAINT

95.     Plaintiffs are informed and believe that in or about December 2016, GUSS attempted to negotiate a sale of RAINIER shares.  At that time, Plaintiff is informed and believes that there were only 300 shares issued and outstanding at par value CHF 1,000 per share.  The share capital was allegedly fully paid in and the RAINIER's shares are/were "bearer shares".   Plaintiffs are informed and believe that GUSS, either in his individual capacity as a shareholder, or a representative of RAINIER, attempted to sell shares of RAINER for USD $100,000 and that he was fully authorized to present the bearer of the respective amount of shares and could enter into binding agreements on behalf of that person as well as accept payment on that person's behalf.   The shares being offered were issued in or about January 2016.  Plaintiffs are informed and believe that the proposed investor did not purchase any shares of RAINIER.   Plaintiffs contend that RAINIER was merely a shell company.

96.     Plaintiff is informed and believes that in or about December 2016, the main activity of RAINIER was to be a brokerage in US OTC Markets securities to non-US based clients and RAINIER was intending on changing its offices.

97.     According to the corporate records of Switzerland, on or about May 3, 2017, the RAINIER address changed to Neugasse 15, 6300 Zug.

98.     Prior to November 8, 2017, RAINIER's statutory purpose was:

"Development, production and trading of equipment and systems, in particular for order processing systems for general cargo, collection, billing

30

COMPLAINT

and sorting; can acquire, encumber and sell real estate."

99.   On November 8, 2017, a new statutory "purpose" of the corporation was added as follows:

> "Provision of services throughout Switzerland in the areas of asset and investment advisory, financial and organizational planning, management services, all kinds of administrative work and provision of support services in the area of general financial and investment advisory services, and assumption of mandates in these areas, activities which require a license as a bank or securities dealer are expressly excluded;
> Offering payment products and virtual currencies, operating a block chain, providing cash and paperless payment services, facilitating cashless payments and substituting cash for cash, notably new payment systems, promoting paperless electronic payments, including development, processing and distribution of Products, services and systems for the settlement of payments and billing and related ancillary services, acquisition and management of investments and associated financial transactions;
> Acquisition, administration, brokering and transfer of patents, trademarks, licenses and technical knowledge; complete purpose description according to the Articles of Association."

100.   Nonetheless, RAINIER held itself out as a corporation that provided services in the areas of asset and investment advisory, financial and organizational planning, management services since 1971 when RAINIER was only in such areas since the latter part of 2017.

101.   Plaintiff is also informed and believes that RAINIER's license in Switzerland is only as an "asset manager" and RAINIER is not authorized in Switzerland to take custody of clients' funds.

102.   Concurrently while RAINIER was changing its office's address, on

31

COMPLAINT

May 16, 2017, LIDIA registered with the County of Santa Barbara a fictitious business name of "Rainier AG". Thereafter, LIDIA opened a bank account with Bank of America. This would allow LIDIA to receive and hold funds for RAINIER thereby circumventing RAINIER's own licensing restrictions as imposed by Switzerland.

103. As set forth above, on or about December 27, 2017, HERRMANN, the compliance officer of RAINIER, was listed as officer for OMNI when it was reinstated. Plaintiffs are informed and believe that the reinstatement for OMNI was part of the fraudulent activities of Defendants where they used RAINIER to perform their fraudulent actions.

104. After COMPANY ONE submitted the application to Castro, on or about May 4, 2018, MANCUSO (the account representative at RAINIER) reinstated Ezbanc, a company that had been administratively dissolved and listed as inactive since on or about September 28, 2012. GUSS -- at the address of 1187 Coast Village Road, PMB 1-465, Montecito, California -- was the agent for service of process. The listed registered agent for service of process is a former BVI corporation that is now non-existent at the same address by the name of Embles Financial, Inc. However, GUSS filed a fictitious business name statement in the name of "Embles Financial".

105. After Ezbanc was reinstated, Defendants and each of them could

commit their fraudulent acts. Each of the Defendants herein knew that they were acting on behalf of the common purpose.

## C. Wrongful Acts in Furtherance of the Conspiracy.

106. Since LARA had known Castro for approximately seven years, Defendants and each of them had LARA act as a middleman to help solicit Plaintiff. Castro told Plaintiff that he had a prior relationship with RAINIER. LARA checked the website for RAINIER, which in essence stated the following:

> "Rainier AG was founded in 1971 and is headquartered in Zug, Switzerland. It is a privately owned, independent Swiss asset management firm offering wealth management, fiduciary and securities trading services to clients world-wide. In working with our international clients we strive to find a perfect balance between the centuries-old Swiss tradition of privacy and reliability in financial services with modern compliance requirements and technological advances. Rainier AG account-holders enjoy all the modern amenities offered by our major international custodian banks, along with the unparalleled personal attention of their private wealth managers.
> • Manage assets on behalf of customers
> • Trade in securities (stocks and shares and value rights) as well as their derivatives, banknotes and coins, money market instruments, precious metals, commodities
> • Open FX, CFD and commodity trading accounts for customers
> • Hold securities on deposit or manage securities' portfolios.
> Rainier AG is a Member firm of ARIF - Association Romande des Intermédiaires Financiers (www.arif.ch), an SRO officially recognized by the Swiss Financial Market Supervisory Authority (FINMA), with dual supervision pursuant to (1) independent asset management and; (2) the Anti-Money Laundering Act (AMLA). Founded in Geneva on March 15th 1999, ARIF is a private non-profit association of public utility, whose purpose is to assist in the prevention of and fight against money laundering in relation with the Swiss Federal Act on Combating Money Laundering and Terrorist Financing in the Financial Sector (MLA). ARIF is an SRO recognized by the Swiss Federal State according to Article 24 of the MLA. In 2009, the Swiss Financial Market Supervisory Authority

(FINMA) recognized the self-regulatory provisions of ARIF (Code of Deontology) for independent asset managers, such as Rainier AG."

107.   Based upon RAINIER's representations online of these seemingly strong credentials, and the longevity of RAINIER that was represented online, Plaintiffs thought that Defendants were a legitimate long-standing brokerage company.  In addition, MANCUSO, on behalf of RAINIER stated many of the same claims as set forth in the preceding paragraph, as follows:

A.   Between June 5, 2018 and early October 2018, by telephone, MANCUSO on behalf of RAINIER contacted LARA as a representative of Plaintiffs.  In said telephone conversations, MANCUSO represented to LARA that: (a)   RAINIER had been in existence since 1971 in Switzerland, was a member of FINMA (a SWISS regulatory agency not to be confused with the "FINRA" entity in the United States); (b) RAINIER was compliant with FINMA's rules and all Swiss banking regulations,  (c)  RAINIER was experienced as a brokerage house and (d)  could also handle a public offering for certain cryptocurrency security tokens.

B.   In addition, between June 5, 2018 and early October 2018, in telephone conversations with LARA, MANCUSO on behalf of RAINIER and other Defendants, represented to Plaintiff CONSUL:

(i).   That RAINIER was a licensed broker and would follow Plaintiff CONSUL's instructions;

(ii).    With respect to the money and stock entrusted to RAINIER, such stock would be sold only with RAINIER's knowledge and consent, and money would only be transferred upon CONSUL's instructions.

(iii).   RAINIER and its alleged employees would act as fiduciaries and trustees for the stock and monies being held on behalf of CONSUL and would safeguard CONSUL's assets.

(iv)    That CONSUL should transfer money to RAINIER's brokerage accounts, which it represented were in Switzerland.

(v)     That RAINIER would follow CONSUL's instructions with regard to the wire transfers and the stock trades, including promptly returning all of CONSUL's assets upon demand.

C.      MANCUSO, on behalf of RAINIER, also authorized Plaintiff CONSUL to use the ACCOUNT that had been set up for COMPANY ONE without getting first the approval of COMPANY ONE.

108.    Furthermore, Defendants, and each of them, concealed from Plaintiffs that:

A.      GUSS was in control of RAINIER, and that his girl friend or wife LIDIA had a bank account in RAINIER's name.

B.      GUSS was a convicted felon that was unregistered and unqualified in the United States.

C.     That RAINIER did not have a bank or brokerage account in Switzerland to hold any of the monies or stock.  Rather, any monies sent to RAINIER were actually being sent to LIDIA who had an account as the RAINIER DBA, and the stocks were sent to either CACEIS or BAADER

D.     That the stock was being held at BNY and PERSHING, and not in an account in Switzerland.

E.     That money would be held and/or transferred from an account that was not a RAINIER account, but from Ezbanc, an entity where GUSS and MANCUSO are officers, directors and/or representatives.

109.   Each of the Defendants was part of the conspiracy to defraud and intended to defraud Plaintiff for a common purpose with the intent of converting Plaintiff's stock shares ad money.

110.   Other fraudulent activities by Defendants are alleged in the Second Claim of Relief, which is incorporated herein by reference.

**D.     Resulting Damages**

111.   As a direct and proximate result of the conspiracy to defraud, Plaintiff was damaged in amount to be determined as trial, but which is estimated to be in excess of USD $3,500,000, including in the following respects, among others:

(a)     Losses due to the conversion of Plaintiff's money in the ACCOUNT.

COMPLAINT

(b)     Losses of the GOPH stock and their value; and

(c)     Losses of the MOBQ stock and their value.

112.   In engaging in the conspiracy to defraud, Defendants, and each of them, acted fraudulently, oppressively, maliciously and with a willful and conscious disregard of Plaintiff's rights.  Accordingly, Plaintiff is entitled to exemplary and punitive damages in an amount to be proven.

## SECOND CLAIM OF RELIEF
### (FRAUD)
**BY PLAINTIFF CONSUL AGAINST ALL DEFENDANTS EXCEPT THE BANK DEFENDANTS**

113.   Plaintiff CONSUL incorporates by reference all of the allegations contained in Paragraphs 1 through 112, above, as though set forth herein.

114.   On the RAINIER website and their Linkedin page, RAINIER represented to Plaintiff as follows:

"Rainier AG was founded in 1971 and is headquartered in Zug, Switzerland. It is a privately owned, independent Swiss asset management firm offering wealth management, fiduciary and securities trading services to clients world-wide. In working with our international clients we strive to find a perfect balance between the centuries-old Swiss tradition of privacy and reliability in financial services with modern compliance requirements and technological advances. Rainier AG account-holders enjoy all the modern amenities offered by our major international custodian banks, along with the unparalleled personal attention of their private wealth managers.
• Manage assets on behalf of customers
• Trade in securities (stocks and shares and value rights) as well as their derivatives, banknotes and coins, money market instruments, precious metals, commodities
• Open FX, CFD and commodity trading accounts for customers
• Hold securities on deposit or manage securities' portfolios.

37

COMPLAINT

Rainier AG is a Member firm of ARIF - Association Romande des Intermédiaires Financiers (www.arif.ch), an SRO officially recognized by the Swiss Financial Market Supervisory Authority (FINMA), with dual supervision pursuant to (1) independent asset management and; (2) the Anti-Money Laundering Act (AMLA). Founded in Geneva on March 15th 1999, ARIF is a private non-profit association of public utility, whose purpose is to assist in the prevention of and the fight against money laundering in relation with the Swiss Federal Act on Combating Money Laundering and Terrorist Financing in the Financial Sector (MLA). ARIF is an SRO recognized by the Swiss Federal State according to Article 24 of the MLA. In 2009, the Swiss Financial Market Supervisory Authority (FINMA) recognized the self-regulatory provisions of ARIF (Code of Deontology) for independent asset managers, such as Rainier AG."

115.   In addition, MANCUSO, on behalf of RAINIER stated many of the same claims as set forth in the preceding paragraph, as follows:

A.     Between June 5, 2018 and early October 2018, by telephone, MANCUSO on behalf of RAINIER contacted LARA as a representative of Plaintiffs.  In said telephone conversations, MANCUSO represented to LARA that RAINIER had been in existence since 1971 in Switzerland, was a member of FINMA and compliant with FINMA's rules and all Swiss banking regulations, and that RAINIER was experienced as a brokerage house and could also handle a public offering for certain cryptocurrency security tokens.

B.     In addition, between June 5, 2018 and early October 2018, in telephone conversations with LARA, MANCUSO on behalf of RAINIER and other Defendants, represented to Plaintiff CONSUL:

(i).     That RAINIER was a licensed broker and would follow Plaintiff

CONSUL's instructions;

(ii).    With respect to the money and stock entrusted to RAINIER, such stock would be sold only with RAINIER's knowledge and consent, and money would only be transferred upon CONSUL's instructions.

(iii).    RAINIER and its alleged employees would act as fiduciaries and trustees for the stock and monies being held on behalf of CONSUL and would safeguard CONSUL's assets.

(iv)    That CONSUL should transfer money to RAINIER's brokerage accounts, which it represented were in Switzerland.

(v)    That RAINIER would follow CONSUL's instructions with regard to the wire transfers and the stock trades, including promptly returning all of CONSUL's assets upon demand.

C.    MANCUSO, on behalf of RAINIER, also authorized Plaintiff CONSUL to use the ACCOUNT that had been set up for COMPANY ONE without getting first the approval of COMPANY ONE.

D.    That RAG was a subsidiary of RAINIER and had substantial experience in public offerings and could handle the token offering on behalf of WISE.

116.    The above representations were made pursuant to a design and scheme by Defendants to defraud Plaintiff.  At the time the misrepresentations were made,

1  Plaintiff was ignorant of their falsity and believed them to be true.

2      117.   Plaintiff is informed and believes and thereupon alleges that

3

4  Defendants were aware of the actual facts which were, without limitation, the

5  following:

6      A.     Even though the company was founded in 1971, the "brokerage

7

8  services" which Plaintiff was being solicited to transfer money and stock, was in

9  existence for less than a year.

10     B.     That RAINIER was not registered with FINMA, but instead was only

11

12 a "self-regulated" organization.

13     C.     That RAINIER was not a licensed broker in Switzerland, or anywhere

14 else.  Plaintiff is also informed and believes that RAINIER's license in Switzerland

15 is only as an "asset manager" and RAINIER is not authorized in Switzerland to

16

17 take custody of clients' funds.

18     D.     That the GOPH and MOBQ stock would be held in banks in the

19 United States because RAINIER was not

20

21     E.     That bank accounts did not exist in the name of RAINIER in

22 Switzerland, but instead under the name of LIDIA using the RAINIER DBA and

23

24 held in the United States.

25     F.     That Ezbanc was somehow the recipient of moneys and that

26 disbursements would be made from it.

27

28

COMPLAINT

G.     That RAINIER would convert the assets of Plaintiff by refusing to follow Plaintiff CONSUL's instructions and turn over its assets.

H.     RAINIER and its alleged employees would not safeguard Plaintiff's assets.

I.     That RAG was only in existence since July 10, 2018, RAG did not have any experience with public offerings, the employees operated on behalf of both RAG and RAINIER, the company was undercapitalized and RAG did not even have an office.

118.   Furthermore, Defendants, and each of them, concealed from Plaintiff that:

A.     GUSS was a convicted felon that was unregistered and unqualified in the United States and was involved with RAINIER.

B.     That RAINIER did not have an account in Switzerland to hold any of the monies or stock.  Rather, any monies sent to RAINIER were actually being sent to LIDIA who had an account as the RAINIER DBA.

C.     That the stock was being held at BNY and PERSHING, and not in an account in Switzerland.

D.     That money would be held and/or transferred from an account that was not a RAINIER account, but from Ezbanc, an entity where GUSS and MANCUSO are officers, directors and/or representatives.

41

COMPLAINT

119.  In reasonable reliance on the misrepresentations made by Defendants, and each of them, and the failure of them to disclose all material facts, Plaintiff deposited into the brokerage ACCOUNT money and stock.

120.  As a direct and proximate result of Defendants' fraudulent misrepresentations and concealments as set forth above, Plaintiffs have been damaged in an amount in excess of USD $3,500,000.

121.  In engaging in the conspiracy to defraud, Defendants, and each of them, acted fraudulently, oppressively, maliciously and with a willful and conscious disregard of Plaintiff's rights.  Accordingly, Plaintiff is entitled to exemplary and punitive damages in an amount to be proven.

### THIRD CLAIM OF RELIEF
### (CONVERSION)
### BY PLAINTIFF CONSUL AGAINST ALL DEFENDANTS EXCEPT THE BANK DEFENDANTS

122.  Plaintiff CONSUL incorporates by reference all of the allegations contained in Paragraphs 1 through 121, above, as though set forth herein.

123.  Defendants, and each of them, converted CONSUL's stock, USD $125,000 in monies and proceeds from the sale of stock that Defendants were required to transfer from the ACCOUNT.  Defendants have wrongfully exercised dominion and control over the ACCOUNT after Plaintiff CONSUL made a demand upon Defendants to return the property in the ACCOUNT

124.  As a proximate result of Defendants' wrongful conduct, they have

COMPLAINT

converted Plaintiff CONSUL's 2,244,839 shares of stock in GOPH and 8,397,588 shares in MOBQ.

125.   The value of the converted funds at the time of the conversion was an amount in excess of USD $868,245.28 and Plaintiff is entitled to an award in said amount.

126.   In engaging in the conspiracy to defraud, Defendants, and each of them, acted fraudulently, oppressively, maliciously and with a willful and conscious disregard of Plaintiff's rights.  Accordingly, Plaintiff is entitled to exemplary and punitive damages in an amount to be proven.

## FOURTH CLAIM OF RELIEF
### (CONSTRUCTIVE TRUST)
### BY PLAINTIFF CONSUL AGAINST ALL DEFENDANTS

127.   Plaintiff CONSUL incorporates by reference all of the allegations contained in Paragraphs 1 through 126, above, as though set forth herein.

128.   This Claim for Relief seeks the return of shares of MOBQ and GOPH shares as described in this Complaint as presently held by the BANK DEFENDANTS for some or all of the other defendants.  In addition, this Claim for Relief seeks the return of monies held by the defendants other than the BANK DEFENDANTS that are the proceeds of deposits made by the Plaintiffs or the proceeds of stock sales conducted by the Plaintiffs.

129.   This is an action seeking equitable redress for Defendants' illegal

43

COMPLAINT

conduct in converting Plaintiff's assets of money and stock, including, but not limited to as a broker, custodian and/or trustee. Plaintiff seeks the return of the its stock and monies and seeks return of it.

130. A constructive trust is an equitable device by which a court adjudges specific restitution of a received benefit. Constructive trusts may be imposed when a defendant has acquired legal title to property or money that they may not be in good conscience retain the beneficial interest in the property, and in such situation, equity converts the legal titleholder into a trustee holding the title for the benefit of those entitled to the ownership. Since Defendants have hidden who has the property and are playing a shell game, all Defendants are being named herein.

131. A constructive trust should be imposed for the purpose of preventing unjust enrichment by the Defendants for the loss of the value of the stock and money.

132. Plaintiffs believe and allege that Defendants have deposited funds, which, as alleged above, were fraudulently and illegally obtained from Plaintiff, in a bank account or accounts held in the name of one or more of the Defendants.

133. Defendants will gain an unconscionable advantage in the retention of the income from Plaintiff's property if they do not pay the value of the property. A constructive trust should be imposed to prevent unjust enrichment.

134. By reason of the wrongful manner in which Defendants obtained said

COMPLAINT

funds, the banks maintaining the deposited funds are involuntary trustees holding

said funds in constructive trust for Plaintiffs, with the duty to reconvey the same

forthwith.

135.   Among the assets against which a constructive trust should be

imposed are the assets consisting of: (a) 8,397,588 shares of MOBQ stock

presently held by the BNY and/ or PC clearinghouses; and (b) 2,000,498 shares of

GOPH stock presently held by the BNY and/or PC clearinghouses.

136.   In such event that it is found that said assets no longer exist in a bank

account held by the Defendants, after having traced the funds, the entity,

individual, person, group, organization, financial institution or agency shall be

deemed an involuntary trustee holding said funds for the benefit of Plaintiffs, with

the duty to reconvey the same forthwith.

137.   In the event said stocks were sold or funds were used to purchase a

product, home, stock or any other tangible or intangible item (hereinafter "item"),

Defendants are constructive trustees of said items holding it for the benefit of the

Plaintiffs, with the duty to reconvey the same forthwith.

138.   By virtue of Defendants' wrongful conduct and breaches of fiduciary

duties in wrongfully taking, retaining, and converting the stock and monies that

belong to Plaintiff, the stock, any compensation paid if the stocks were sold, and

the monies that belong to Plaintiff, but in the name of any of the Defendants, will

COMPLAINT

be held in constructive trust for the benefit of Plaintiff.

139.   Demand has and will further be made for the turnover of said shares of GOPH and MOBQ.  The demands thus far made have been refused and ignored.  Said shares should be turned over to CONSUL as proven under law.

### FIFTH CLAIM OF RELIEF
### (RESULTING TRUST)
### BY PLAINTIFF CONSUL AGAINST ALL DEFENDANTS

140.   Plaintiff CONSUL incorporates by reference all of the allegations contained in Paragraphs 1 through 139, above, as though set forth herein.

141.   Plaintiffs believe and allege that Defendants have deposited funds, which, as alleged above, were fraudulently and illegally obtained from Plaintiff, in a bank account or accounts held in the name of one or more of the Defendants.

142.   By reason of the wrongful manner in which Defendants obtained said funds, the banks maintaining the deposited funds are involuntary trustees holding said funds in constructive trust for Plaintiffs, with the duty to reconvey the same forthwith.

143.   In such event that it is found that said funds no longer exist in a bank account held by the Defendants, after having traced the funds, the entity, individual, person, group, organization, financial institution or agency shall be deemed an involuntary trustee holding said funds for the benefit of Plaintiffs, with the duty to reconvey the same forthwith.

144.   In the event said funds were used to purchase a product, home, stock or any other tangible or intangible item (hereinafter "item"), Defendants are resulting trustees of said items holding it for the benefit of the Plaintiffs, with the duty to reconvey the same forthwith.

### SIXTH CLAIM OF RELIEF
### (BREACH OF FIDUCIARY DUTY)
### BY PLAINTIFF CONSUL AGAINST ALL DEFENDANTS EXCEPT THE BANK DEFENDANTS

145.   Plaintiff CONSUL incorporates by reference all of the allegations contained in Paragraphs 1 through 144, above, as though set forth herein.

146.   As Plaintiff's broker, custodian and trustee, Defendants owed Plaintiff a duty of care.

147.   Defendants breached their duty of care by engaging in the above pled wrongful conduct, including refusing to return Plaintiff's stock and monies in its brokerage ACCOUNT.

148.   At all times relevant hereto, Defendants, and each of them, owed Plaintiff fiduciary duties, including: (a) the duty of undivided loyalty; (b) the duty to exercise due care; (c) the duty to make full disclosure; and (d) the duty to maintain client confidences.

149.   Beginning in or about May 2018, Defendants, and each of them, breached their fiduciary duties to Plaintiff by, among other things:

A.   Making false and misleading representations and false promises, as

47

COMPLAINT

described above.

     B.    Concealing, withholding and failing to disclose material facts, as described above.

     C.    Refusing to allow Plaintiff access to its money and stock.

     D.    Refusing to return Plaintiff's money and stock after Plaintiff terminate the brokerage agreement.

     E.    Not keeping Plaintiff's money in a RAINIER account that is insured and protected.

     F.    Using bank accounts of third persons that was not disclosed to Plaintiff.

     G.    Representing that RAINIER was a licensed broker in Switzerland, when it was not.

     H.    Failing to account for all monies and stock held in Plaintiff's ACCOUNT.

     I.    Refusing Plaintiff access to its money and stock.

     150.   As a direct and proximate result of these breaches of fiduciary duty, Plaintiff was damaged in an amount to be determined at trial, but which is estimated to be in excess of USD $3,500,000.

     151.   By virtue of Defendants' breaches of fiduciary duties, Defendants and each of them, acted fraudulently oppressively, maliciously and with a willful

COMPLAINT

and conscious disregard of Plaintiff's rights.  Accordingly, Plaintiff is entitled to exemplary and punitive damages in an amount to be proven.

### SEVENTH CLAIM OF RELIEF
### (BREACH OF CONTRACT)
### BY PLAINTIFF CONSUL AGAINST RAINIER, LIDIA AND DOES 1-15

152.   Plaintiff CONSUL incorporates by reference all of the allegations contained in Paragraphs 1 through 91, above, as though set forth herein.

153.   In order to open the brokerage account, Defendants orally and in writing agreed to act as a broker in holding the stock and money and to return and pay upon demand, all monies and stock that were kept in Plaintiff's ACCOUNT. Defendants also orally and in writing agreed to safeguard Plaintiff's assets and follow Plaintiff's instructions on the disposition of the assets.  Defendant also agreed to provide statements and account for the disposition of the stock and money.

154.   Plaintiff has performed all obligations which they were required to perform under the parties' agreement, except for such obligations which they have been prevented or excused from performing as a result of Defendants' breaches as alleged herein.

155.   Defendants, and each of them, breached the written and partly oral agreement with Plaintiff, including without limitation, as follows:

A.     Not holding Plaintiff's money in an account in Switzerland on behalf

49

COMPLAINT

of Plaintiff.

   B.   Not following Plaintiff's instructions, including but not limited to disbursing the stock and money that was held in the account.

   C.   By refusing to return to Plaintiff the assets in its ACCOUNT consisting of stock and money after the ACCOUNT was terminated.

   D.   Failing to provide accurate and complete financial and accounting records of Plaintiff.

   E.   By converting monies and stock that belongs to Plaintiff.

   156.   As a direct and proximate result of Defendants' breaches of contract as set forth above, Plaintiff has been damaged in excess of USD $3,500,000.

## EIGHTH CLAIM OF RELIEF
### (NEGLIGENCE)
### BY PLAINTIFF CONSUL AGAINST RAINIER, LIDIA AND DOES 1-15

   157.   Plaintiff CONSUL incorporates by reference all of the allegations contained in Paragraphs 1 through 91 and 152 through 156, above, as though set forth herein, save those, if any that they elect to omit so that he can plead this matter in the alternative.

   158.   Plaintiffs are informed and believe and thereon allege that Defendants, and each of them, as pled above, have negligently failed to use reasonable care in controlling, and/or handling, and/or maintaining, and or disposing of Plaintiffs' assets and funds.

159. Said Defendants, and each of them, were under a duty to exercise ordinary care in controlling, and/or handling, and/or maintaining, and or disposing of Plaintiffs' assets and funds.

160. As a direct and proximate result of Defendants, and each of them, Plaintiff has been damaged in excess of USD $3,500,000.

## NINTH CLAIM OF RELIEF
### (ACCOUNTING)
### BY PLAINTIFF CONSUL ALL DEFENDANTS

161. Plaintiff CONSUL incorporates by reference all of the allegations contained in Paragraphs 1 through 160, above, as though set forth herein.

162. Plaintiff is informed and believes that Defendant commingled Plaintiff's assets with their own.

163. Defendants were Plaintiff's brokers, custodians, fiduciaries and trustees from 2018 to the present.

164. Defendants refuse to provide Plaintiff with a complete accounting.

165. An accounting of all funds transferred, deposited, credited and/or debited to the accounts and an accounting of the sale of any stock is uncertain because Defendants refuse to provide the disposition of the ACCOUNT.

166. Therefore, the Court should order Defendants to provide Plaintiff with a complete and accurate accounting of the ACCOUNT, including the money and securities.

COMPLAINT

# TENTH CLAIM OF RELIEF
## (INJUNCTIVE RELIEF)
### BY PLAINTIFF CONSUL AGAINST ALL DEFENDANTS

167.   Plaintiff CONSUL incorporates by reference all of the allegations contained in Paragraphs 1 through 166, above, as though set forth herein.

168.   As set forth above, Defendants, and each of them, have devised a scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations or promises.

169.   Defendants, and each of them, had Plaintiff transfer to it stock and money that belongs to Defendant, but being held by Defendants in trust.

170.   An injunction is needed to prevent the Defendants or others acting in concert with Defendants from transferring Plaintiff's property.

171.   Plaintiff is enti6teld to a permanent injunction enjoining Defendants, or anyone acting in concert with them or under their control, from transferring or disposing of any Plaintiff's stock, money or any other asset.

172.   Plaintiff seeks an order from this Court, granting a permanent injunction enjoying Defendants, and anyone acting in concert with them or under their control, from transferring or disposing of any Plaintiff's stock, money or any other asset, and granting such other and further relief as this Court deems just and proper.

COMPLAINT

## ELEVENTH CLAIM OF RELIEF
### (DECLARATORY RELIEF)
### BY PLAINTIFF CONSUL AGAINST ALL DEFENDANTS

173.   Plaintiff CONSUL incorporates by reference all of the allegations contained in Paragraphs 1 through 172, above, as though set forth herein.

174.   A dispute has arisen, and an actual controversy exists, between Plaintiff, on the one hand, and Defendants, and each of them, on the other hand, concerning the respective rights, duties, and obligations relating to the ACCOUNT.  Plaintiff contends that money and stock that were earmarked for the ACCOUNT belong to it.  Defendants contend that Plaintiff is not entitled to the money and stock in the ACCOUNT and is refusing to turn it over.

175.   Plaintiff desires a judicial determination of the respective rights and duties of Plaintiff and Defendants with respect to the ACCOUNT and the ownership of the money and stock earmarked for the account.

## TWELFTH CLAIM OF RELIEF
### (PROMISSORY FRAUD)
### BY PLAINTIFF WISE AGAINST RAINIER, RAG AND DOES 35-50

176.   Plaintiff WISE incorporates by reference all of the allegations contained in Paragraphs 1 through 91, above, as though set forth herein.

177.   On or about November 9, 2018, WISE entered into the WISE AGT with Defendants, attached as Exhibit 12 and incorporated herein by reference. Defendants were supposed to assist WISE in its private and public offerings that were to occur as early as January 2019.  WISE was not provided any services with

regard to the public offerings.  In fact, the only thing that Defendants did was create a Google document and ask Plaintiff to fill it out and provide disclosures. This did not benefit Plaintiff because no other work was done by Defendants.

178.   WISE contends that the WISE AGT was not executed by RAG, but CONSUL authorized a transfer of deposits for a total paid of USD $250,000.

179.   Defendants, and each of them, were supposed to perform advisory, underwriting and management services relating to the token offering, and to assist them in the token offering.

180.   On November 14, 2018, MANCUSO was sent documentation relating to WISE for comments by RAG.  Such was never done.  As an inducement to enter into the WISE AGT, Defendants made a promise that they would perform work for the payment.  Defendants knew that the private offerings were to commence in January 2019 and MANCUSO on behalf of Defendants orally promised that they would assist in doing such.   However, Defendants, and each of them, did not perform any services for Plaintiff, even though they were paid to assist Plaintiff in its tokenization offering.

181.   In fact, Defendants did not, and never intended to, do any work for Plaintiff.  Defendants never signed the contract and RAINIER transferred the money directly from the ACCOUNT to RAG's account.

182.   The foregoing promises by Defendants were false at the time they

were made.  In fact, Defendants were aware that they were never going to provide any services relating to the Security Token Offering at the time of the WISE AGT. Defendants did not have any experience in the token offering business and created a Google Document that was supposedly to help with the regulators, but none of the work for the regulators was done.  Plaintiff is informed and believes that Defendants have never done a token offering and did not disclose this fact and in fact only existed since July 10, 2018.

183.   Defendants were fully aware that their promises were false and that they could not fulfill them at the time they made them.

184.   As a proximate and actual result of the fraud and deceit set forth herein and Defendants' false and fraudulent promises Plaintiff has suffered damages in an amount in excess of USD $250,000, including at least USD $10,000 in promotional materials that WISE prepared with the contemplation of the public offering.

185.   Defendants, and each of them, acted fraudulently, oppressively, maliciously and with a willful and conscious disregard of Plaintiff's rights. Accordingly, Plaintiff is entitled to exemplary and punitive damages in an amount to be proven.

## THIRTEENTH CLAIM OF RELIEF
### (RESCISSION FOR FRAUD)
### BY PLAINTIFF WISE AGAINST RAINIER, RAG AND DOES 35-50

186.   Plaintiff WISE incorporates by reference all of the allegations contained in Paragraphs 1 through 91 and 176-185, above, as though set forth herein.

187.   As set forth specifically in the Tenth Claim of Relief, Plaintiff was entitled to rely on Defendants make a full disclosure of the material facts and not make false representations.  Had Plaintiff known of the facts that Defendants failed to disclose and/or misrepresented, Plaintiff would not have entered into the WISE AGT.

188.   As a result, Plaintiff's consent to the contract was not free and Plaintiff is entitled to rescind the contract.  Plaintiff cancelled the contract and demanded its money back on or about January 22, 2019.   Defendants are further giving notice of the rescission by this Complaint herein.  Defendants have failed and refuse to restore to Plaintiff the consideration furnished to them to Defendants.

## FOURTEENTH CLAIM OF RELIEF
### (RESCISSION FOR FAILURE OF CONSIDERATION)
### BY PLAINTIFF WISE AGAINST RAINIER, RAG AND DOES 35-50

189.   Plaintiff WISE incorporates by reference all of the allegations contained in Paragraphs 1 through 91 and 176-188, above, as though set forth

COMPLAINT

herein.

190.   There has been a material failure in the consideration received by Plaintiff with regard to the WISE AGT.  Plaintiff has not received any services for Defendants even though that the first private offering was taking place in January 2019 and Defendants received USD $250,000 deposit on services.  This rendered the TRANSACTIONS without consideration.

191.   As a result of these failures, Plaintiffs have been deprived of the benefits of their bargain and have sustained damages amounting to at least USD $250,000 plus monies WISE expended on promotional materials in a sum not less than USD $10,000.

192.   As a result, Plaintiff's consent to the contract was not free and Plaintiff is entitled to rescind the contract.  Plaintiff cancelled the contract and demanded its money back on or about January 22, 2019.   Defendants are further giving notice of the rescission by this Complaint herein.  Defendants have failed and refuse to restore to Plaintiff the consideration furnished to them to Defendants.

**FIFTEENTH CLAIM OF RELIEF**
**(IN THE ALTERNATIVE, BREACH OF CONTRACT)**
**BY PLAINTIFF WISE AGAINST RAINIER, RAG AND DOES 35-50**

193.   Plaintiff WISE incorporates by reference all of the allegations contained in Paragraphs 1 through 93 and 176-192, above, as though set forth

57

herein. save those, if any that they elect to omit so that he can plead this matter in the alternative.

194.  In the alternative, if a contract is found to exist, Plaintiffs entered into the WISE AGT with Defendants, whereby Defendants agreed to assist Plaintiff with their tokenization offerings.

195.  Plaintiff fully performed its duties under the WISE AGT, excepting the performance of that which was excused or otherwise relieved.

196.  Defendants breached the agreement by failing and refusing to perform any work on the tokenization offering.

197.  As a direct and proximate result of Defendants' breaches of the WISE AGT, Plaintiff has been damaged in the sum of USD $250,000 plus interest. Plaintiff also has damages for promotional materials that were prepared and are were rendered useless in a sum in excess of USD $10,000.   Plaintiff may also have additional damages if the token offering is delayed in a sum to be proven at trial.

WHEREFORE, Plaintiff prays for judgment against Defendants, and each of them, as follows:

ON THE FIRST CLAIM FOR RELIEF:

1.     For compensatory and special damages in a sum in excess of USD $3,500,000.

2.    For punitive and exemplary damages.

ON THE SECOND CLAIM FOR RELIEF:

3.    For compensatory and special damages in a sum in excess of USD $3,500,000.

4.    For punitive and exemplary damages.

ON THE THIRD CLAIM FOR RELIEF:

5.    The value of the funds converted with interest and the value of the stock converted, in amount sufficient to compensate Plaintiff CONSUL for its losses in a sum in excess of USD $3,500,000.

6.    For punitive and exemplary damages.

7.    For fair compensation for the time and money that Plaintiffs have expended in pursuing the return and recovery of their converted funds and stock.

ON THE FOURTH CLAIM FOR RELIEF:

8.    That the funds held by Defendants in their bank account(s) acquired from the Plaintiff be determined to be held in constructive trust for the benefit of Plaintiff and returned to Plaintiff.

9.    That the stock held by Defendants in their bank account(s) acquired from the Plaintiff be determined to be held in constructive trust for the benefit of Plaintiff and returned to Plaintiff.

10.    That in the event the funds and/or stock are not in Defendants' bank

account(s)  that said funds and/or stock be traced and that the individual person, group, organization, financial institution or agency holding said funds be determined to be holding said funds in constructive trust for the benefit of the Plaintiff, with the duty to reconvey it forthwith.

11.     That in the event the funds and/or stock proceeds were used to purchase a tangible or intangible item, Defendants be held as constructive trustees of said item, holding it for the benefit of Plaintiff, with the duty to reconvey it forthwith.

ON THE FIFTH CLAIM FOR RELIEF:

12.     That the funds held by Defendants in their bank account(s) acquired from the Plaintiff be determined to be held in resulting trust for the benefit of Plaintiff and returned to Plaintiff.

13.     That the stock held by Defendants in their bank account(s) acquired from the Plaintiff be determined to be held in resulting trust for the benefit of Plaintiff and returned to Plaintiff.

14.     That in the event the funds and/or stock are not in Defendants' bank account(s)  that said funds and/or stock be traced and that the individual person, group, organization, financial institution or agency holding said funds be determined to be holding said funds in resulting trust for the benefit of the Plaintiff, with the duty to reconvey it forthwith.

COMPLAINT

15.   That in the event the funds and/or stock proceeds were used to purchase a tangible or intangible item, Defendants be held as resulting trustees of said item, holding it for the benefit of Plaintiff, with the duty to reconvey it forthwith.

ON THE SIXTH CLAIM FOR RELIEF:

16.   For general, special, and compensatory damages in an amount to be proven in excess of USD $3,500,000.

17.   For punitive and exemplary damages.

ON THE SEVENTH CLAIM FOR RELIEF:

18.   For general, special, and compensatory damages in an amount to be proven in excess of USD $3,500,000.

19.   For interest.

20.   For attorney's fees, if any enforceable written contract so provides.

ON THE EIGHTH CLAIM FOR RELIEF:

21.   For general and compensatory damages in an amount to be proven in excess of USD $3,500,000.

ON THE NINTH CLAIM FOR RELIEF:

22.   For an order requiring the accountings as described in the Ninth Claim for Relief.

COMPLAINT

ON THE TENTH CLAIM FOR RELIEF:

23.   For an order requiring that Defendants, and each of them, show cause, if any, why they should not be enjoined as hereinafter set forth during the pendency of this action;

24.   For further orders issue from this court for a temporary restraining order, a preliminary injunction, and a permanent injunction, enjoining and restraining Defendants, and each of them, their agents, servants, and employees, and all persons acting under, in concert with, or for them, from transferring, assigning, selling, conveying, encumbering, hypothecating, or otherwise disposing of the property, funds, and/or assets acquired by said Defendants.

ON THE ELEVENTH CLAIM FOR RELIEF:

25.   For a declaration regarding the respective rights, duties, and obligations of Plaintiffs, and each of them, with respect to the ACCOUNT and the ownership of the money and stock earmarked for the account.

ON THE TWELFTH CLAIM FOR RELIEF:

26.   For compensatory and special damages in a sum in excess of USD $260,000.

27.   For punitive and exemplary damages.

ON THE THIRTEENTH CLAIM FOR RELIEF:

28.   An order and judgment of rescinding the WISE AGT.

COMPLAINT

29.     Restoration of all consideration played paid by Plaintiff, together with interest at the legal rate;

30.     General and Special damages, in an amount according to proof in excess of USD $260,000.

31.     For attorneys' fees according to proof.

ON THE FOURTEENTH CLAIM FOR RELIEF:

32.     An order and judgment of rescinding the WISE AGT.

33.     Restoration of all consideration played paid by Plaintiff, together with interest at the legal rate;

34.     General and Special damages, in an amount according to proof in excess of USD $260,000.

35.     For attorneys' fees according to proof.

ON THE FIFTEENTH CLAIM FOR RELIEF (IN THE ALTERNATIVE):

36.     For general damages according to proof in an amount in excess of USD $260,000.

37.     For attorneys' fees according to proof.

ON ALL CLAIMS FOR RELIEF:

50.     For costs of suit;

51.     For attorneys' fees and costs as are appropriate and proper under each relevant cause of action;

COMPLAINT

1    52.    For such other and further relief as the Court deems just and proper.

2

3                         **DEMAND FOR JURY TRIAL**

4         Plaintiffs hereby requests a jury trial on all issues properly triable to a jury.

5

6    Dated:  February 19, 2019          LAW OFFICES OF ROBERT M. YASPAN

7

8                                    By _____

9                                       ROBERT M. YASPAN
                                        JOSEPH G. McCARTY
10                                      DEBRA R. BRAND
                                        Attorneys for Plaintiffs
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

                                       64

# EXHIBIT 1



Home | Clerk-Recorder | Assessor | Elections | Forms | Data | About | Contact Us

Certificates | Fee Schedule | Fictitious Business Names | Grantor-Grantee Index | Marriage Licenses/Ceremonies | Forms | News |
Contact Us | Email Us | About

Text size: A A A

Clerk-Recorder > Fictitious Business Name > Fictitious Business Name Enquiry > FBN's Detail

Latest News

##  Fictitious Business Name Detail

If you wish to order a copy of a particular Fictitious Business Name (FBN) statement, or if you wish to pay for an
official search of a FBN, please click here.

|                        |                        |
|------------------------|------------------------|
| **FBN Number :**       | 2017-0001472           |
| **Business Address :** | MONTECITO, CA 93108    |
| **Filed :**            | 5/16/2017              |
| **Commencement Date :**|                        |
| **Expiration Date :**  | 5/16/2022              |
| **Publication Date :** |                        |

| Business Name(s): | Registrant Name(s): |
|-------------------|---------------------|
| RAINIER AG        | ZINCHENKO, LIDIA    |

Department Home | Business Hours and Location | Employment | County Home | Questions or Feedback
The Official Site of the Santa Barbara County's Clerk-Recorder, Assessor and Elections Department. Copyright©2001 County of Santa Barbara. All rights reserved.
The data provided on this site is for information purposes only and should not be used as the authoritative record; please contact the Assessor's office if you have any questions or concerns.
Disclaimer

# EXHIBIT 2



**The Office of Joseph E. Holland**
County Clerk, Recorder and Assessor
Registrar of Voters

| Home | Clerk-Recorder | Assessor | Elections | Forms | Data | About | Contact Us |

Certificates | Fee Schedule | Fictitious Business Names | Grantor-Grantee Index | Marriage Licenses/Ceremonies | Forms |
News | Contact Us | Email Us | About

Text size: A A A

 Clerk-Recorder > Fictitious Business Name > Fictitious Business Name Enquiry > FBN's Detail

Latest News

# Fictitious Business Name Detail

If you wish to order a copy of a particular Fictitious Business Name (FBN) statement, or if you wish to pay for an official search of a FBN, please click here.

| | |
|---|---|
| **FBN Number :** | 2015-0002643 |
| **Business Address :** | SANTA BARBARA, CA 93101 |
| **Filed :** | 9/4/2015 |
| **Commencement Date :** | 9/3/2015 |
| **Expiration Date :** | 9/4/2020 |
| **Publication Date :** | |

| Business Name(s): | Registrant Name(s): |
|---|---|
| EMBLES FINANCIAL | GUSS, MICHAEL |

Department Home | Business Hours and Location | Employment | County Home | Questions or Feedback
The Official Site of the Santa Barbara County's Clerk-Recorder, Assessor and Elections Department. Copyright©2001 County of Santa Barbara. All rights reserved.
The data provided on this site is for information purposes only and should not be used as the authoritative record; please contact the Assessor's office if you have any questions or concerns.
Disclaimer

# EXHIBIT 3

/2019                                    iCloud Mail

# Re: Fwd:

October 03, 2018 at 10:13 PM

From Greg Mancuso

To Mo

Received  and I will help with dwac, it is omnibus and in name of Rainier  You will still be able to see the stock in your acct.

---
Greg Mancuso
**RAINIER AG**
**SWISS ASSET MANAGEMENT**
`Neugasse 15`
`CH-6301 Zug`
`Switzerland`
`Direct: +1.781.367.5428 (USA)`
`Tel: +41 43 508 26 70`
`Fax: +41 44 274 2749`
`Greg@rainier.ch`

On 10/03/2018 15:41, Mo Jacob wrote:
> Greg please confirm receiving
>
> Thank you and best wishes
>
> MO J

> On Oct 3, 2018, at 2:39 PM, P CLA <jilventure22@yahoo.com> wrote:
>
> Hi!
>
> $100K wire is done. Pls see attached, thanks.
> <image1.png>
>
> On Oct 3, 2018, at 2:10 PM, Greg Mancuso <greg@rainier.ch> wrote:
>
> CONSUL GROUP RE 2021 LTD
>
> WIRE INFO FOR 125,000
> Rainier AG
> ABA 026009593
>
> Account ████████2918
>
> Address:
> **RAINIER AG**
> **SWISS ASSET MANAGEMENT**
> `Neugasse 15`
> `CH-6301 Zug`
> `Switzerland`
>
> DWAC INFO:
> INTERACTIVE BROKERS LLC

1/28/2019                                        iCloud Mail

DTC# 0534
ACCOUBT: ████8219
ACCOUNT NAME: RAINIER AG


---
Greg Mancuso
*RAINIER AG*
*SWISS ASSET MANAGEMENT*
*Neugasse 15*
*CH-6301 Zug*
*Switzerland*
*Direct: +1.781.367.5428 (USA)*
*Tel: +41 43 508 26 70*
*Fax: +41 44 274 2749*
*Greg@rainier.ch*
 Greg@rainier.ch

1/28/2019                                          iCloud Mail

*SWISS ASSET MANAGEMENT*
*Neugasse 15*
*CH-6301 Zug*
*Switzerland*


DWAC INFO:

INTERACTIVE BROKERS LLC
DTC# 0534
ACCOUBT: U2058219
ACCOUNT NAME: RAINIER AG


---
Greg Mancuso
*RAINIER AG*
*SWISS ASSET MANAGEMENT*
*Neugasse 15*
*CH-6301 Zug*
*Switzerland*
*Direct: +1.781.367.5428 (USA)*
*Tel: +41 43 508 26 70*
*Fax: +41 44 274 2749*
*Greg@rainier.ch*
 Greg@rainier.ch

# EXHIBIT 4

 | October 1, 2018 to October 31, 2018

## Withdrawals and other debits - continued

| Date | Description | Amount |
|------|-------------|--------|
| 10/03/18 | WIRE TYPE:BOOK OUT DATE:181003 TIME:1633 ET TRN:2018100300363399 RELATED REF: 8544 BNF:LIDIA ZINCHENKO SOLE PROP ID: 2918 PMT DET DEPOSIT | -100,000.00 |
| 10/04/18 | WIRE TYPE:BOOK OUT DATE:181004 TIME:0928 ET TRN:2018100400206108 RELATED REF:2 444 BNF:LIDIA ZINCHENKO SOLE PROP ID 918 PMT DET DEPOSIT | -25,000.00 |

# EXHIBIT 5



American
Bankers
Association.®

Contact Us     Press Room     Consumers

About ABA     Training & Events     Issues & Advocacy     Compliance     Tools & Resources     Products     ABA Foundation

Share |                                                                 Print

## ABA Routing Number Lookup

This website allows for single lookups of routing numbers. It is intended for use by individuals who need to look up their financial institution's routing number. Users of this service are allowed no more than two lookups per day and are limited to ten lookups per month. Users who need additional lookups or need a more robust tool for accessing the ABA Routing Number database should contact Accuity, the Official Routing Number registrar.

If you have any questions concerning this site, please call 1-800-BANKERS (226-5377) or e-mail custserv@aba.com.

ACCUITY

Back to Search            Powered By |

Fircosoft        Bankers ALMANAC        NRS

| Bank Name | Address | City | State | Zip Code | Routing Number |
|---|---|---|---|---|---|
| **Bank of America, National Association** (Head Office) | 100 N Tryon St, Ste 170 | Charlotte | North Carolina | 28202 | 011400178 |
| **Bank of America, National Association** (Branch) | 100 W 33rd St, 4th Fl | New York City | New York | 10001 | 026009593 |

Total Records Found: 2

*Disclaimer: Some institutions restrict the use of specific routing numbers. Please check directly with the financial institution before using any routing number(s) displayed above.*

Questions?
E-mail the ABA Webmaster or Customer Service
Call 1-800-BANKERS (800-226-

Site Sponsor:
Corporation for American Banking LLC

 **American Bankers Association**
1120 Connecticut Ave NW
Washington, DC 20036

5377)

<u>Reprint Request</u> | <u>Privacy Policy</u>

© 2017 American Bankers Association

# EXHIBIT 6

DEWAC INSTRUCTION LETTER

FROM: **J.I.L. VENTURE LLC** EIN: ███████████

SOLE MANAGER CELL: ████████ – ████████

TO: **EMPIRE STOCK TRANSFER INC.** – ATTAN: BRIAN BARTHLOW

RE: DEWAC INSTRUCTION FROM J.I.L. -
Bke asset 476 244,839 shares and Bke asset 476        J.I.L. Ventures
2,000,000 shares –
**RAINEIR Client's: CONSUL GROUP RE 2021
LTD – A Costa Rica Entity**

---

Dear Brian;

Please find here DEWAC instructions for J.I.L. Venture, LLC shares – to Rianier Client CONSUL
GROUP RE 2021 LTD – A Costa Rica Entity

Amount of Shares to be DEWAC: 2,44,839 GOPH Shares
Clearing Broker Name:  Bank of New York Mellon
DTC Participant: 0901
Broker Name: Caceis bank S. A.
Broker ACCT # at Clearing Broker: 112000 – For further credit: BAADER BANK-RAINIER AG ACCT
Rainier Address and contact info:
Greg Mancuso - RAINIER AG-SWISS ASSET MANAGEMENT
Neugasse 15, CH-6301 ZUG, Switzerland – Tel direct: +1 781-367-5428 e mail: greg@rainier.ch
RAINIER CLIENT IS: **CONSUL GROUP RE 2021 LTD – A Costa Rica Entity**

After you receive the documents, please open DEWAC delivery in the system, RAINIER will
initiate on their account online.

Sincerely


**J.I.L. VENTURE LLC**

By: ██████████ Manager, 10/6/2018

## IRREVOCABLE STOCK POWER

**FOR VALUE RECEIVED, the undersigned does hereby sell, assign and transfer unto:**

DWAC BNY FBO Caceis bank S. A FBO RAINER
AG/ BAADER BANK-RAINIER AG ACCT
_____          _____
Name                                                                                              Social Security/Tax ID Number

_____
Address

_____2,244,839_____          **shares of the Common Stock of:**
Number of shares

Gopher Protocol
_____
Issuer name

**Represented by:**

Bke asset 476 244,839 shares and  Bke asset 476   J.I.L. Ventures
2,000,000 shares
_____
Certificate Number(s)

**and does hereby irrevocably constitute and appoint Empire Stock Transfer Inc. to transfer the said stock on the books of the within-named Corporation with full power of substitution in the premises.**

10/6/18
_____                                          Dated
Signed

**NOTICE: The signature(s) to this assignment must correspond with the name(s) as written upon the face of this certificate in every particular without alteration or enlargement or any change whatsoever.**

Please See *MG*
Attached  10/06/18

Medallion Signature Guaranteed (THE SIGNATURES SHOULD BE GUARANTEED BY AN ELIGBLE GUARANTOR INSTITUTION, (BANKS, STOCKBROKERS, SAVINGS AND LOAN ASSOCIATION AND CREDIT UNIONS) WITH MEMBERSHIP IN AN APPROVED SIGNATURE GUARANTEE MEDALLION PROGRAM PURSUANT TO SEC RULE 17AD-15.

EXHIBIT 7

# IRREVOCABLE STOCK POWER

**FOR VALUE RECEIVED, the undersigned does hereby sell, assign and transfer unto:**

DWAC BNY FBO Caceis bank S. A FBO RAINER
AG/ BAADER BANK-RAINIER AG ACCT
_____
Name                                                    Social Security/Tax ID Number

_____
Address

2,400,000
_____        **shares of the Common Stock of:**
Number of shares

Gopher Protocol
_____
Issuer name

**Represented by:**

Bke asset 479 - 2,400,000 shares (Yassine
Amalial)
_____
Certificate Number(s)

**and does hereby irrevocably constitute and appoint Empire Stock Transfer Inc. to transfer the said stock on the books of the within-named Corporation with full power of substitution in the premises.**

_____        10/19/2018
Signed                                                              Dated

**NOTICE: The signature(s) to this assignment must correspond with the name(s) as written upon the face of this certificate in every particular without alteration or enlargement or any change whatsoever.**

Medallion Signature Guaranteed (THE SIGNATURES SHOULD BE GUARANTEED BY AN ELIGIBLE GUARANTOR INSTITUTION, (BANKS, STOCKBROKERS, SAVINGS AND LOAN ASSOCIATION AND CREDIT UNIONS) WITH MEMBERSHIP IN AN APPROVED SIGNATURE GUARANTEE MEDALLION PROGRAM PURSUANT TO SEC RULE 17AD-15.

CALIFORNIA ALL-PURPOSE ACKNOWLEDGEMENT

> A Notary Public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

**State of California**
**County of Los Angeles**

On _October 19, 2018_, before me, _Janeth L. Dardon_, Notary Public,

personally appeared _Yassine Amlallal_

who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of State of California that the foregoing paragraph is true and correct.

JANETH L. DARDON
Notary Public - California
Los Angeles County
Commission # 2172047
My Comm. Expires Nov 17, 2020

WITNESS my hand and official seal.

SIGNATURE _____

PLACE NOTARY SEAL ABOVE

---

Though the information below is not required by law, it may prove valuable to persons relying on the document and could prevent fraudulent removal and reattachment of this form to another document.

**Description of attached document**
Title or type of document: _DEWAC Instruction Letter_
_Irrevocable Stock Power_

Document Date: _October 18, 2018_    Number of Pages: _3_

Signer(s) Other than Named Above: _____

JANETH I. [illegible]
Notary Public - California
Los Angeles County
Commission # [illegible]
My Comm. Expires Nov 17, 2020

# EXHIBIT 8

**CASH STATEMENT**

**Date:** 2018-09-30 to 2018-10-29

**Name:** Consul Group RE 2021 Ltd.

**count Number:** ████7188



**Rainier AG**

Neugasse 15, CH-6301 Zug Switzerland

**Telephone: +41 43 508 26 70**

| Date | Description | Debit | Credit | Balance |
|------|-------------|-------|--------|---------|
| **USD** | **US Dollar** | | | |
| 2018-10-04 | OPENING BALANCE | | | -500.00 |
| 2018-05-29 | : : New Account Due Diligence Fee | -500.00 | | -1000.00 |
| 2018-10-04 | : : Initial Cash Deposit | | 125000.00 | 124000.00 |
| 2018-10-04 | : : Margin Credit Deposit 2.68% p.q. | | 125000.00 | 249000.00 |
| 2018-10-04 | : : Reimbursement of Account Opening Due Diligence Fee | | 500.00 | 249500.00 |
| 2018-10-16 | : : Fee - DWAC | -300.00 | | 249200.00 |
| 2018-10-17 | : : Interest Charge on Loan | -1250.00 | | 247950.00 |
| 2018-10-17 | Gopher Protocol, Inc.: : GOPH Daily Sales Summary | | 44798.08 | 292748.08 |
| 2018-10-18 | Gopher Protocol, Inc.: | | 74219.13 | 366967.21 |
| 2018-10-19 | Gopher Protocol, Inc.: | | 70993.15 | 437960.36 |
| 2018-10-22 | Gopher Protocol, Inc.: | | 102321.93 | 540282.29 |
| 2018-10-23 | Gopher Protocol, Inc.: | | 67970.99 | 608253.28 |
| 18-10-24 | Gopher Protocol, Inc.: | | 31530.05 | 639783.33 |
| 2018-10-24 | CLOSING BALANCE | | | **639783.33** |

**Disclaimer:** Rainier AG, Neugasse 15, CH-6301 Zug Switzerland ("Rainier") or its affiliates cannot be held liable for any errors or omissions in this document. The information in this document should not be relied upon and action should not be taken on the basis of any information contained in this document without receiving the appropriate advice from your account representative, legal and accounting consultants. In the event that any information in this document is incorrect, Rainier will not be responsible for any losses, charges, expenses or costs which are incurred as a result. Rainier expressly disclaims any liability to any person in respect of anything done or omitted to be done in reliance upon the contents of this information.



# EXHIBIT 9

# Rainier AG Customer Outgoing Wire Request
SWISS ASSET MANAGEMENT

October 29th, 2018
Date

$ | | 2 | 6 | 5 | 0 | 0 | 0 | 0
Dollar Amount

☑ One Time:     Transfer Date (if different)

☐ Recurring:    Month _____   Day of Month

Wire Type:   ☐ US-bound   ☑ Non-US bound

Consul Group RE 2021, Ltda
Rainier AG Account Name

____7188 /
Rainier AG  Account Number and PIN

Citibank New York
Intermediary Bank Name

Banco Promerica
Account Name at Intermediary Bank

36228381
Account Number at Intermediary Bank

CITIUS33
Intermediary Bank SWIFT (for non-US bound wires only)

Intermediary Bank Bank ABA (for US-bound wires only)

Remark or Comment: _____

Additional Information: _____

Beneficiary Account Name

Beneficiary Account Number

Banco Promerica de Costa Rica
Beneficiary Bank Name

Beneficiary Bank ABA (for US-bound wires only)

PRMKCRSJ
Beneficiary  Bank SWIFT (for non-US bound wires only)

Beneficiary IBAN (for non-US bound wires only)

## Please Sign Below

X
Client Signature

Mauricio Lara R.
Client Name

October 30th, 2018
Date

X
Joint Client Signature

Joint Client Name

Date

## Rainier AG Agent Approval

X
Rainier AG Agent Signature

Rainier AG Agent Name

Date

## Internal Use Only

Prepared By: _____

X
Compliance Approval Signature

Compliance Approval Name

Date

NOTARY PUBLIC ACKNOWLEDGEMENT

Before me HERNAN VELASCO SASSO, a Notary Public, on this day personally appeared MAURICIO LARA RAMOS, known to me to be the persons whose names are subscribed to the foregoing instrument and acknowledged to me that he executed the same for the purposes and considerations there in expressed. My commission does not expires.

Notary Public Signature

Date | October 30th, 2018



Notary Public



EXHIBIT 10



**Bank of America**

**Your checking account**

▆▆▆▆▆ | Account # ▆▆▆▆▆▆ | November 1, 2018 to November 30, 2018

## Deposits and other credits

| Date | Description | Amount |
|------|-------------|--------|
| ███ | ███████████████████████████████████████ | ███ |
| 11/09/18 | WIRE TYPE:BOOK IN DATE:181109 TIME:1520 ET TRN:2018110900372444 SNDR REF:246836140 ORIG:EZBANC CORP. ID:██████ 0642 PMT DET:LOAN GRE GORY MANCUSO | 165,000.00 |
| ███ | ████████████████████████████████████████████████ | ███ |

Total deposits and other credits

# EXHIBIT 11

**CASH STATEMENT**

**Date:** 2018-05-29 to 2018-12-12

**Name:** Consul Group RE 2021 Ltd.

**Account Number:** ▆▆17188



**Rainier AG**

Neugasse 15, CH-6301 Zug Switzerland

**Telephone: +41 41 552 4030**

| Date | Description | Debit | Credit | Balance |
|---|---|---|---|---|
| USD | US Dollar | | | |
| 2018-05-29 | OPENING BALANCE | | | 0.00 |
| 2018-05-29 | : : New Account Due Diligence Fee | -500.00 | | -500.00 |
| 2018-10-04 | : : Initial Cash Deposit | | 125000.00 | 124500.00 |
| 2018-10-04 | : : Margin Credit Deposit 2.68% p.q. | | 125000.00 | 249500.00 |
| 2018-10-04 | : : Reimbursement of Account Opening Due Diligence Fee | | 500.00 | 250000.00 |
| 2018-10-16 | : : Fee - DWAC | -300.00 | | 249700.00 |
| 2018-10-17 | : : Interest Charge on Loan | -1250.00 | | 248450.00 |
| 2018-10-17 | Gopher Protocol, Inc.: : GOPH Daily Sales Summary | | 44798.08 | 293248.08 |
| 2018-10-18 | Gopher Protocol, Inc.: | | 74219.13 | 367467.21 |
| 2018-10-19 | Gopher Protocol, Inc.: | | 70993.15 | 438460.36 |
| 2018-10-22 | Gopher Protocol, Inc.: | | 102321.93 | 540782.29 |
| 2018-10-23 | Gopher Protocol, Inc.: | | 67970.99 | 608753.28 |
| 2018-10-24 | Gopher Protocol, Inc.: | | 31530.05 | 640283.33 |
| 2018-10-25 | Gopher Protocol, Inc.: | | 61718.86 | 702002.19 |
| 2018-10-26 | Gopher Protocol, Inc.: | | 57111.39 | 759113.58 |
| 2018-10-29 | : : Loan Repayment | -125000.00 | | 634113.58 |
| 2018-10-29 | : : Treasure Drive Ltd. | -250.00 | | 633863.58 |
| 2018-10-29 | : : Treasure Drive Ltd. | -265000.00 | | 368863.58 |
| 2018-10-29 | Gopher Protocol, Inc.: | | 57150.23 | 426013.81 |
| 2018-10-30 | Gopher Protocol, Inc.: | | 50034.23 | 476048.04 |
| 2018-10-31 | Gopher Protocol, Inc.: | | 49051.49 | 525099.53 |
| 2018-10-31 | : : Web Portal Setup Fee | -60.00 | | 525039.53 |
| 2018-10-31 | : : Safekeeping Fee Oct 2018 | -355.42 | | 524684.11 |
| 2018-11-01 | Gopher Protocol, Inc.: | | 47657.46 | 572341.57 |
| 2018-11-02 | Gopher Protocol, Inc.: | | 47155.12 | 619496.69 |
| 2018-11-05 | Gopher Protocol, Inc.: | | 52060.99 | 671557.68 |
| 2018-11-06 | Gopher Protocol, Inc.: | | 53555.80 | 725113.48 |
| 2018-11-07 | : : Fee - DWAC | -300.00 | | 724813.48 |
| 2018-11-07 | : : DWAC In | -50.00 | | 724763.48 |
| 2018-11-07 | Gopher Protocol, Inc.: | | 94913.66 | 819677.14 |
| 2018-11-08 | Gopher Protocol, Inc.: | | 60918.82 | 880595.96 |
| 2018-11-09 | : : Fee - DWAC | -300.00 | | 880295.96 |
| 2018-11-09 | : : DWAC-In Fee Int | -50.00 | | 880245.96 |
| 2018-11-09 | Gopher Protocol, Inc.: | | 79117.58 | 959363.54 |
| 2018-11-09 | Mobiquity Technologies, Inc.: | | 232.78 | 959596.32 |

| 2018-11-09 | Gopher Protocol, Inc.: | | 73463.03 | 1033059.35 |
|---|---|---|---|---|
| 2018-11-09 | : : Compliance Review Fee (Wire Out Requests) | -255.00 | | 1032804.35 |
| 2018-11-12 | Gopher Protocol, Inc.: | | 73463.03 | 1106267.38 |
| 2018-11-13 | Gopher Protocol, Inc.: | | 79844.23 | 1186111.61 |
| 2018-12-12 | : : Rasel Ltd. | -500000.00 | | 686111.61 |
| 2018-12-12 | : : Rasel Ltd. | -200.00 | | 685911.61 |
| 2018-12-12 | Mobiquity Technologies, Inc.: | | 10098.87 | 696010.48 |
| 2018-12-14 | Mobiquity Technologies, Inc.: | | 1943.18 | 697953.66 |
| 2018-12-17 | Mobiquity Technologies, Inc.: | | 1241.68 | 699195.34 |
| 2018-12-18 | Mobiquity Technologies, Inc.: | | 4049.94 | 703245.28 |
| 2018-12-18 | CLOSING BALANCE | | | **703245.28** |

**Disclaimer:** Rainier AG, Neugasse 15, CH-6301 Zug Switzerland ("Rainier") or its affiliates cannot be held liable for any errors or omissions in this document. The information in this document should not be relied upon and action should not be taken on the basis of any information contained in this document without receiving the appropriate advice from your account representative, legal and accounting consultants. In the event that any information in this document is incorrect, Rainier will not be responsible for any losses, charges, expenses or costs which are incurred as a result. Rainier expressly disclaims any liability to any person in respect of anything done or omitted to be done in reliance upon the contents of this information.

EXHIBIT 12

Advisory and STO Origination Agreement: Rainier AG.

## ADVISORY AND STO ORIGINATION AGREEMENT

This Agreement ("Agreement") is entered into as of the __9th__ day of _____November_____ 2018 (the "Effective Date") by and between <u>Wise Network, S.A.</u> located at: <u>EBC Bldg, 9th fl. Escazu, SJ 10203. Costa Rica</u> (the "Company"), and Rainier Advisory Group Ltd., the wholly-owned subsidiary of Rainier AG, a Swiss Asset Management and Financial Intermediary company, Member of SRO ARIF regulated by FINMA, with the offices at Neugasse 15, CH-6301 Zug, Switzerland ("Advisor").

WHEREAS, Advisor is the wholly-owned subsidiary of the professional, regulated Swiss financial company with significant experience among other things in corporate finance and merchant services internationally, including but not limited to advisory, underwriting and management of offerings of securities and other financial instruments;

WHEREAS, the Company desires to engage Advisor to provide certain services as set forth on Schedule "A" attached hereto and as specified from time to time by the Company and Advisor desires to provide such services and duties for a fee as set forth herein,

NOW, THEREFORE, in consideration of the foregoing and the mutual covenants and conditions contained herein, the parties hereto agree as follows:

**1. Engagement.** The Company hereby engages Advisor to perform advisory, underwriting and management services related to Security Token Offering for the benefit of the Company set forth in the Schedule A attached hereto and such other duties as may be requested from time to time by the Company. Advisor hereby accepts such engagement upon the terms and subject to conditions set forth in this Agreement.

**2. Compensation.** For the services rendered by Advisor under this Agreement, the Company shall pay to Advisor the compensation specified in the Schedule A, subject to the terms and conditions set forth in this Agreement.

**3. Terms and Survivability.** The term of this Agreement shall be for a period of one year from the Effective Date. The Agreement in part of the continued periodic services as set forth herein shall renew automatically at the end of each twelve (12) months unless terminated by either party in writing prior to the Termination Date. Upon termination of this Agreement the following sections of this Agreement shall survive such termination: Sections 3, 5, 6, 7, 8, 10, 12, 13, and Schedule A Sections 4.b, 4.c and 4.d. The rights in Schedule A Sections 4.b, 4.c and 4.d shall survive indefinitely unless otherwise agreed to by the Advisors.

**4. Costs and Expenses of Advisor's Performance.** Except as set forth on the Schedule A, all costs and expenses of Advisor's performance hereunder shall be borne by the Advisor.

**5. Taxes.** As an independent contractor, Advisor acknowledges and agrees that it is solely responsible for the payment of any taxes and/or assessments imposed on account of the payment of compensation to, or the performance of services by Advisor pursuant this Agreement, including, without limitation, any unemployment insurance tax, federal and

1

Advisory and STO Origination Agreement: Rainier AG.

state income taxes, Federal Social Security (FICA) payments if such are payable in the USA, AHV payments in Switzerland, and any state disability insurance and social security taxes in Switzerland. The Company shall not make any withholdings or payments of said taxes or assessments with respect to amounts paid to Advisor hereunder; provided, however, that if required by law or any governmental agency, the Company shall withhold such taxes or assessments from amounts due Advisor, and any such withholding shall be for Advisor's account and shall not be reimbursed by the Company to Advisor. Advisor expressly agrees to make all payments of such taxes, as and when the same may become due and payable with respect to the compensation earned under this Agreement.

**6. Confidentiality.** Advisor agrees that Advisor will not, except when required by applicable law or order of a court, during the term of this Agreement or thereafter, disclose directly or indirectly to any person or entity, or copy, reproduce or use, any Trade Secrets (as defined below) or Confidential Information (as defined below) or other information treated as confidential by the Company known, learned or acquired by the Advisor during the period of the Advisor's engagement by the Company. For purposes of this Agreement, "Confidential Information" shall mean any and all Trade Secrets, knowledge, data or know-how of the Company, any of its affiliates or of third parties in the possession of the Company or any of its affiliates, and any nonpublic technical, training, financial and/or business information treated as confidential by the Company or any of its affiliates, whether or not such information, knowledge, Trade Secret or data was conceived, originated, discovered or developed by Advisor hereunder. For purposes of this Agreement, "Trade Secrets" shall include, without limitation, any formula, concept, pattern, processes, designs, device, software, systems, list of customers, training manuals, marketing or sales or service plans, business plans, marketing plans, financial information, or compilation of information which is used in the Company's business or in the business of any of its affiliates. Any information of the Company or any of its affiliates, which is not readily available to the public, shall be considered to be a Trade Secret unless the Company advises Advisor in writing otherwise. Advisor acknowledges that all of the Confidential Information is proprietary to the Company and is a special, valuable and unique asset of the business of the Company, and that Advisor's past, present and future engagement by the Company has created, creates and will continue to create a relationship of confidence and trust between the Advisor and the Company with respect to the Confidential Information. Furthermore, Advisor shall immediately notify the Company of any information, which comes to its attention, which might indicate that there has been a loss of confidentiality with respect to the Confidential Information. In such event, Advisor shall take all reasonable steps within its power to limit the scope of such loss.

**7. Return of Company's Proprietary Materials.** Advisor agrees to deliver promptly to the Company on termination of this Agreement for whatever reason, or at any time the Company may so request, all documents, records, artwork, designs, data, drawings, flowcharts, listings, models, sketches, apparatus, notebooks, disks, notes, copies and similar repositories of Confidential Information and any other documents of a confidential nature belonging to the Company, including all copies, summaries, records, descriptions, modifications, drawings or adaptations of such materials which Advisor may then possess or have under its control. Concurrently with the return of such proprietary materials to the

2

Advisory and STO Origination Agreement: Rainier AG.

Company, Advisor agrees to deliver to the Company such further agreements and assurances to ensure the confidentiality of proprietary materials. Advisor further agrees that upon termination of this Agreement, Advisor's, employees, Advisors, agents or independent contractors shall not retain any document, data or other material of any description containing any Confidential Information or proprietary materials of the Company.

**8. Assignment of Proprietary Rights.** Advisor hereby assigns and transfers to the Company all right, title and interest that Advisor may have, if any, in and to all Proprietary Rights (whether or not patentable or copyrightable) made, conceived, developed, written or first reduced to practice by Advisor, whether solely or jointly with others, during the period of Advisor's engagement by the Company which relate in any manner to the actual or anticipated business or research and development of the Company, or result from or are suggested by any task assigned to Advisor or by any of the work Advisor has performed or may perform for the Company. Advisor acknowledges and agrees that the Company shall have all right, title and interest in, among other items, all research information and all documentation or manuals related thereto that Advisor develops or prepares for the Company during the period of Advisor's engagement by the Company and that such work by Advisor shall be work made for hire and that the Company shall be the sole author thereof for all purposes under applicable copyright and other intellectual property laws. Advisor represents and covenants to the Company that there are no Proprietary Rights relating to the Company's business, which were made by Advisor prior to Advisor's engagement by the Company. Advisor agrees promptly to disclose in writing to the Company all Proprietary Rights in order to permit the Company to claim rights to which it may be entitled under this Agreement. With respect to all Proprietary Rights, which are assigned to the Company pursuant to this Section 8, Advisor will assist the Company in any reasonable manner to obtain for the Company's benefit patents and copyrights thereon in any and all jurisdictions as may be designated by the Company, and Advisor will execute, when requested, patent and copyright applications and assignments thereof to the Company, or other persons designated by the Company, and any other lawful documents deemed necessary by the Company to carry out the purposes of this Agreement. Advisor will further assist the Company in every reasonable way to enforce any patents, copyrights and other Proprietary Rights of the Company.

**9. Trade Secrets of Others.** Advisor represents to the Company that its performance of all the terms of this Agreement does not and will not breach any agreement to keep in confidence proprietary information or trade secrets acquired by Advisor in confidence or in trust prior to its engagement by the Company, and Advisor will not disclose to the Company, or induce the Company to use, any confidential or proprietary information or material belonging to others. Advisor agrees not to enter into any agreement, either written or oral, in conflict with this Agreement.

**10. Other Obligations.** Advisor acknowledges that the Company, from time to time, may have agreements with other persons, which impose obligations or restrictions on the Company regarding proprietary rights made or developed during the course of work hereunder or regarding the confidential nature of such work. Advisor agrees to be bound

3

Advisory and STO Origination Agreement: Rainier AG.

by all such obligations and restrictions and to take all action necessary to discharge the obligations of the Company hereunder.

**11. Independent Contractor.** Advisor shall not be deemed to be an employee or agent of the Company for any purpose whatsoever. Advisor shall have the sole and exclusive control over its employees, Advisors or independent contractors who provide services to the Company, and over the labor and employee relations policies and policies relating to wages, hours, working conditions or other conditions of its employees, Advisors or independent contractors.

**12. Non-Solicitation.** Parties will not, during the term this Agreement and for one year thereafter, directly or indirectly (whether as an owner, partner, shareholder, agent, officer, director, employee, independent contractor, Advisor, or otherwise) with or through any individual or entity: (i) employ, engage or solicit for employment any individual who is, or was at any time during the twelve-month period immediately prior to the termination of this Agreement for any reason, an employee of the other party, or otherwise seek to adversely influence or alter such individual's relationship.

**13. Equitable Remedies.** In the event of a breach or threatened breach of the terms of this Agreement by Advisor, the parties hereto acknowledge and agree that it would be difficult to measure the damage to the Company from such breach, that injury to the Company from such breach would be impossible to calculate and that monetary damages would therefore be an inadequate remedy for any breach. Accordingly, the Company, in addition to any and all other rights which may be available, shall have the right of specific performance, injunctive relief and other appropriate equitable remedies to restrain any such breach or threatened breach without showing or proving any actual damage to the Company.

**14. Supersedes Prior Agreements.** This Agreement supersede any and all written and verbal agreements prior between the Advisor and the Company.

**15. Governing Law, Attorneys' Fees.** All questions concerning the construction, validity, enforcement and interpretation of this Agreement shall be governed by and construed and enforced in accordance with the internal laws of Switzerland, without regard to the principles of conflicts of law thereof. Each party agrees that all legal proceedings concerning the interpretations, enforcement and defense of the transactions contemplated by this Agreement (whether brought against a party hereto or its respective affiliates, directors, officers, shareholders, employees or agents) shall be commenced exclusively in the courts sitting in Switzerland. Each party hereby irrevocably submits to the exclusive jurisdiction of the courts sitting in Switzerland for the adjudication of any dispute hereunder or in connection herewith or with any transaction contemplated hereby or discussed herein, and hereby irrevocably waives, and agrees not to assert in any suit, action or proceeding, any claim that it is not personally subject to the jurisdiction of any such court, that such suit, action or proceeding is improper or inconvenient venue for such proceeding. In case of any litigation between the parties of this Agreement the prevailing party in such litigation will be entitled to recovery from the other party of all attorneys' fees and costs of the prevailing party in such litigation.

4

Advisory and STO Origination Agreement: Rainier AG.

**16. Entire Agreement: Modifications and Amendments**. The terms of this Agreement are intended by the parties as a final expression of their agreement with respect-to such terms as are included in this Agreement and may not be contradicted by evidence of any prior or contemporaneous agreement. The Schedules A referred to in this Agreement is incorporated into this Agreement by this reference. This Agreement may not be modified, changed or supplemented, nor may any obligations hereunder be waived or extensions of time for performance granted, except by written instrument signed by the parties or by their agents duly authorized in writing or as otherwise expressly permitted herein.

**17. Assignment.** This Agreement and the rights, duties and obligations hereunder may be assigned or delegated by Advisor in part to independent professionals such as attorneys, accountants and US FINRA-Member broker-dealers, US SEC-registered RIA, UK FCA-Licensed securities broker-dealers or Isle of Man Registered Digital Asset Exchange. All fees paid to such third parties are inclusive herein unless additional disbursements are expressly pre-approved by the Company.

**18. Binding Effect:** Successors and Assignment. This Agreement and the provisions hereof shall be binding upon each of the parties, their successors and permitted assigns.

**19. Validity.** This Agreement is intended to be valid and enforceable in accordance with its terms to the fullest extent permitted by law. If any provision of this Agreement is found to be invalid or unenforceable by any court of competent Jurisdiction, the invalidity or unenforceability of such provision shall not affect the validity or enforceability of all the remaining provisions hereof.

**20. Notices.** All notices and other communications hereunder shall be in writing and, unless otherwise provided herein, shall be deemed duly given if delivered personally or by telecopy or mailed by registered or certified mail (return receipt requested) or by Federal Express or other similar courier service to the parties at the following addresses or (at such other address for the party as shall be specified by like notice). Additionally, an email shall be sent with a copy of all written notices.

(i)      If to the Company:

Wise Network, S.A.

Attn: Mauricio E. Lara R., Esq

EBC Bldg 9th fl. Escazu, SJ 10203. Costa Rica

(ii)     If to the Advisor:

Rainier AG
Attn: Tatjana Gutschmidt El Chbeir
Neugasse 15
CH-6301 Zug, Switzerland
Phone: +41 41 552 4030
Facsimile: +41 44 274 2749

Advisory and STO Origination Agreement: Rainier AG.

Email: support@rainier.ch

Any such notice, demand or other communication shall be deemed to have been given on the date personally delivered or as of the date mailed, as the case may be.

IN WITNESS WHEREOF, the parties hereto have executed this STO Advisory and Underwriting Agreement as of the Effective Date written above.

Rainier AG

By:_____
Name: Tatjana Gutschmidt El Chbeir
Title: Managing Director

Wise Network, S.A.

By:_____
Name:
Title:

**Schedule "A"**

## 1. TITLE, DUTIES AND OPERATIONAL RESPONSIBILITIES:

a. Throughout the term of this Agreement Rainier Advisory Group, Ltd. will have the title of Advisor.

b. As allowed by applicable Swiss laws and regulations, US Federal and State laws and SEC Regulations and other relevant rules and regulations of the jurisdictions where activities by Advisor on behalf of the Company will be conducted, Advisor will undertake its best effort to assist the Company in its interactions with government financial and industry regulators, self-regulatory agencies governing financial markets, lawyers, accountants, investment banks, merchant banks, venture capital funds and private equity investors, digital asset exchanges as well as individual investors ("Financiers") and in particular will prepare, file, manage and procure registration of required forms and documents, assist the Company in the negotiating of the terms and conditions of the agreements between the Company and the Financiers with the purpose of securing the first round of up to US$_____M in funding and second round of up to US$_____M in funding for the Company in the form of Security Token Offering of assets, equity and/or debt instruments distributed using blockchain technology via reputable and regulated digital asset marketplaces on the terms and conditions negotiated with, acceptable to and approved by the Company.

c. Advisor will provide advisory services as well as preparation, filing, post-filing management and processing of the requisite forms and documents, and other forms of guidance in the following areas as relates to assistance in and underwriting of such Security Token Offering, if required, via filing of the Registration Statement with the SEC and acquiring the registered status of the Company's security tokens in either of the following

6

Advisory and STO Origination Agreement: Rainier AG.

or a combination thereof:

i. Incorporation of the Company's subsidiary in the US or EU, if required; preparation, filing and post-filing management of the SEC Forms 1-A, S-1, or Form 10, and FINRA Form15c-211, Private Placement Memoranda, preparation and submission of the DTCC-eligibility, CUSIP Authority and other relevant applications and related documents, coordination of the handling of the SEC and FINRA comments and other pertinent formalities, filings etc.; alternatively and/or concurrently, preparation and filing of requisite registration forms and other documents with EU, UK and/or IOM financial regulators and Euroclear, if required.

ii. Drafting of pertinent binding agreements, forms 8-K, 10-Q and 10-K or other regular reporting forms and submissions as required by the respective regulations, coordination of work of investment bankers, attorneys, transfer agents and accountants involved in the same on behalf of the Company.

iii. Preparation for edgarization of forms to be filed with the SEC.

iv. Response to SEC comment letters, assistance with the procedures required for continued compliance with the relevant regulations.

v. Liaison with the shareholders of the Company and investor relations services for the purposes of creating and maintaining investor awareness for the benefit of the Company, assistance with the road shows, presentations and coordination of financial public relations.

vi. Listing of the Company's Security Tokens on no less than 3 reputable, regulated digital asset marketplaces internationally.

vii. Assistance with and consulting on matters related to UK FCA, IOM FSA, US DTC, FINRA, and SEC regulations and compliance upon registration of the Company's securities by the SEC and attaining publicly traded status therefor.

## 2. SCHEDULE AND COMMITMENT OF TIME:
Advisor is expected to devote as much time as needed to assist in fulfilling responsibilities in Sec. 1 of Schedule A above.

## 3. REPORTING SCHEDULE:
Advisor shall report regularly, but no less than every week, to the Company.

## 4. COMPENSATION AND PAYMENT TERMS:
a. Upon execution of this Agreement the Company will pay Advisor a retainer in the amount of US$500,000, in two installments. The first installment of US$250,000 is due and payable upon signing of this Agreement. The second installment of US$250,000 is due and payable in no later than sixty days since the date hereof or upon completion and obtaining of the effective status of the regulatory registration required for commencement of the sales of the Company's Security Tokens in no less than one internationally recognized jurisdictions, whichever comes sooner. In addition to the retainer Advisor is entitled to Equity Compensation in exchange for their services to the Company contracted herein. Advisor will be entitled to Equity Compensation in the amount of 4.99% of the issued Security Tokens of the Company as "payment for advisory services" based on this Agreement, and the Security Tokens allotted for Advisor's compensation shall be afforded all the registration, non-dilution and other rights at par with other token-holders of the Company as set forth in the respective registration statements and other relevant documents

Advisory and STO Origination Agreement: Rainier A.G.

and contracts.

b. All fees are considered earned when paid.

c. Upon execution of this Agreement Company shall provide Advisor with all the reasonable required information needed in fulfillment responsibilities in item 1 above. The required information shall be provided within 30 days from date of the request by Advisor, otherwise Advisor has right to terminate this Agreement and retain all the fees earned to the date of termination, or continue executing this Agreement but in such case the Company will be responsible to pay for the additional costs of Advisor's subcontractors (attorneys, accountants etc.).

d. To the extent additional assistance is needed after the termination of this Agreement the Company shall get the Advisor services at our standard hourly rates which are as follows: Partner $500 per hour, Associate $300 per hour.

e. Fees shall be wired to the Advisor when due as follows:

Wire Particulars:

Account Name: Rainier Advisory Group Ltd.
Bank name: Barclays Bank UK PLC
Bank Address: 1 Churchill Place, London E14 5HP, England
Sort Code: 20-92-63
Account № ▓▓▓▓7497
IBAN: GB33BUKB20926333627497
Swift: BUKBGB22

**5. EXPENSES:**

Company agrees to reimburse Advisor for any pre-approved in writing expenses within 15 days of submitting receipts and expense report. All expenses shall be pre-approved in advance by Company in order to qualify to reimbursement. An email authorization by an officer of Company shall be deemed a valid approval.

8

# EXHIBIT 13



**CHASE**
JPMorgan Chase Bank, N.A.
P O Box 182051
Columbus, OH 43218- 2051

December 03, 2018 through December 31, 2018
Account Number: ██████████



### CUSTOMER SERVICE INFORMATION

| | |
|---|---|
| Web site: | **www.Chase.com** |
| Service Center: | **1-877-425-8100** |
| Deaf and Hard of Hearing: | **1-800-242-7383** |
| Para Espanol: | **1-888-622-4273** |
| International Calls: | **1-713-262-1679** |

00126236 DRE 703 219 00119 NNNNNNNNNNN  1 000000000 64 0000



### DEPOSITS AND ADDITIONS

| DATE | DESCRIPTION | AMOUNT |
|---|---|---|
| 12/07 | Fedwire Credit Via: Bank of America, N.A./███████593 B/O: Ezbanc Corp. Miami FL 33155-3112 Ref: Chase Nyc/Ctr/Bnf=Rasel Ltd Beverly Hills, CA 902123809/Ac-00000000359 8 Rfb=249270018 Obl=Loan Disburseme Nt Mr G Mancuso Imad: 1207B6B7Hu2R014140 Trn: 6544809341Ff | $300,000.00 |



# EXHIBIT 14

**TRADING STATEMENT**

Date: to

Name: Consul Group RE 2021 Ltd.

Account Number: 188



**Rainier AG**

Neugasse 15, CH-6301 Zug Switzerland

Telephone: +41 41 552 4030

| Trade Date | Trade Type | Securities Name | Symbol | Quantity | Price | Gross | Total Comm and fees | Proceeds |
|---|---|---|---|---|---|---|---|---|
| 2018-10-16 | Deposit | Gopher Protocol, Inc. | GOPH | 2,244,839 | 0.000000 | 0.00 | 0.00 | 0.00 |
| 2018-10-17 | Sell | Gopher Protocol, Inc. | GOPH | 60,000 | 0.794675 | 47680.50 | 2682.43 | 44798.08 |
| 2018-10-18 | Sell | Gopher Protocol, Inc. | GOPH | 100,000 | 0.788139 | 78813.90 | 4394.77 | 74219.13 |
| 2018-10-19 | Sell | Gopher Protocol, Inc. | GOPH | 100,000 | 0.754012 | 75401.20 | 4208.05 | 70993.15 |
| 2018-10-22 | Sell | Gopher Protocol, Inc. | GOPH | 150,000 | 0.723692 | 108553.80 | 6031.87 | 102321.93 |
| 2018-10-23 | Sell | Gopher Protocol, Inc. | GOPH | 100,000 | 0.722031 | 72203.10 | 4032.11 | 67970.99 |
| 2018-10-24 | Sell | Gopher Protocol, Inc. | GOPH | 47,821 | 0.703472 | 33640.73 | 1910.68 | 31530.05 |
| 2018-10-25 | Sell | Gopher Protocol, Inc. | GOPH | 100,000 | 0.655870 | 65587.00 | 3668.14 | 61718.86 |
| 2018-10-26 | Sell | Gopher Protocol, Inc. | GOPH | 100,000 | 0.607113 | 60711.30 | 3399.92 | 57111.39 |
| 2018-10-29 | Sell | Gopher Protocol, Inc. | GOPH | 100,000 | 0.607524 | 60752.40 | 3402.17 | 57150.23 |
| 2018-10-30 | Sell | Gopher Protocol, Inc. | GOPH | 100,000 | 0.533633 | 53363.30 | 3129.08 | 50034.23 |
| 2018-10-31 | Sell | Gopher Protocol, Inc. | GOPH | 100,000 | 0.523206 | 52320.60 | 3069.11 | 49051.49 |
| 2018-11-01 | Sell | Gopher Protocol, Inc. | GOPH | 100,000 | 0.508415 | 50841.50 | 2984.05 | 47657.46 |
| 2018-11-02 | Sell | Gopher Protocol, Inc. | GOPH | 100,000 | 0.503085 | 50308.50 | 2953.39 | 47155.12 |
| 2018-11-05 | Sell | Gopher Protocol, Inc. | GOPH | 100,000 | 0.555137 | 55513.70 | 3252.71 | 52060.99 |
| 2018-11-06 | Sell | Gopher Protocol, Inc. | GOPH | 107,018 | 0.533553 | 57099.77 | 3343.98 | 53555.80 |
| 2018-11-07 | Sell | Gopher Protocol, Inc. | GOPH | 200,000 | 0.504907 | 100981.40 | 5867.74 | 94913.66 |
| 2018-11-07 | Deposit | Gopher Protocol, Inc. | GOPH | 2,400,000 | 0.000000 | 0.00 | 0.00 | 0.00 |
| 2018-11-08 | Sell | Gopher Protocol, Inc. | GOPH | 129,502 | 0.501244 | 64912.10 | 3793.29 | 60918.82 |
| 2018-11-09 | Sell | Mobiquity Technologies, Inc. | MOBQ | 4,722 | 0.094000 | 443.87 | 211.09 | 232.78 |
| 2018-11-09 | Deposit | Mobiquity Technologies, Inc. | MOBQ | 8,500,000 | 0.000000 | 0.00 | 0.00 | 0.00 |
| 2018-11-09 | Sell | Gopher Protocol, Inc. | GOPH | 200,000 | 0.421107 | 84221.40 | 4903.82 | 79117.58 |
| 2018-11-09 | Sell | Gopher Protocol, Inc. | GOPH | 200,000 | 0.391109 | 78221.80 | 4558.77 | 73463.03 |
| 2018-11-12 | Sell | Gopher Protocol, Inc. | GOPH | 200,000 | 0.391109 | 78221.80 | 4558.77 | 73463.03 |
| 2018-11-13 | Sell | Gopher Protocol, Inc. | GOPH | 250,000 | 0.340661 | 85165.25 | 5171.02 | 79844.23 |
| 2018-12-12 | Sell | Mobiquity Technologies, Inc. | MOBQ | 75,000 | 0.152667 | 11450.03 | 1126.15 | 10098.87 |
| 2018-12-14 | Sell | Mobiquity Technologies, Inc. | MOBQ | 16,000 | 0.161563 | 2585.01 | 416.83 | 1943.18 |
| 2018-12-17 | Sell | Mobiquity Technologies, Inc. | MOBQ | 11,250 | 0.162000 | 1822.50 | 355.82 | 1241.68 |
| 2018-12-18 | Sell | Mobiquity Technologies, Inc. | MOBQ | 30,000 | 0.162500 | 4875.00 | 600.06 | 4049.94 |
| **TOTAL** | | | | | | **1435691.46** | **84025.82** | **1346615.70** |

**Disclaimer:** Rainier AG, Neugasse 15, CH-6301 Zug Switzerland ("Rainier") or its affiliates cannot be held liable for any errors or omissions in this document. The information in this document should not be relied upon and action should not be taken on the basis of any information contained in this document without receiving the appropriate advice from your account representative, legal and accounting consultants. In the event that any information in this document is incorrect, Rainier will not be responsible for any losses, charges, expenses or costs which are incurred as a result. Rainier expressly disclaims any liability to any person in respect of anything done or omitted to be done in reliance upon the contents of this information.

EXHIBIT 15

support@rainier.ch

# Rainier AG

Contact Group: HE 2021 Ltd
Account Number: PR0017188

DASHBOARD   HISTORY   REPORT   MY PROFILE   CONTACT   LOG OUT

## Dashboard

Securities Brokerage & Custody Position Balances as of Wednesday January 16, 2019

| Position | Symbol | Type | Available Qty | Pending Settlement | Current Price | Available Value | Unsettled Cash |
|---|---|---|---|---|---|---|---|
| | | Stock | | 0 | | | 0.00 |
| | | Stock | | 0 | | | 0.00 |
| **TOTAL:** | | | | | | | **0.00** |

Cash Balances as of Wednesday January 16, 2019

Rainier AG

Telephone: +41 41 111 1111

Copyright © 2019 Rainier AG. All rights reserved

Terms of Use · Privacy Policy

EXHIBIT 16

Security Position Reports: Weekly Subscription Report
The Depository Trust Company
Weekly Security Position Report
Daily Closing Balances
For Week Ending 01/18/2019
Security Description
GOPHER PROTOCOL INC +

| Participant Number | Participant Name | Opening 1/11/19 | Monday 1/14/19 | Tuesday 1/15/19 | Wednesday 1/16/19 | Thursday 1/17/19 | Friday 1/18/19 | Week's Change Shares | Percent |
|---|---|---|---|---|---|---|---|---|---|
| | | | Cusip 38268V108 | | | | | | |
| 901 | BANK OF NY | 2874998 | 2874998 | 754500 | 754500 | 656500 | 656500 | -2218498 | -77.1 |
| 443 | PERSHING | 363645 | 614745 | 2757601 | 2631216 | 2587928 | 2512058 | 2148413 | Over 100 |

© 2019 The Depository Trust & Clearing Corporation  |  Legal Information  |  Privacy Policy

# EXHIBIT 17

The Depository Trust Company

Weekly Subscription Security Position Report

Daily Closing Balances

For Week Ending 01/25/2019

Security De Cusip

MOBIQUIT 60743F102

| Participant Number | Participant Name | Opening | Monday 1/18/2019 | Tuesday 1/21/2019 | Wednesday 1/22/2019 | Thursday 1/23/2019 | Friday 1/24/2019 | Share 1/25/2019 Change | Percent Change |
|---|---|---|---|---|---|---|---|---|---|
| 901 | BANK OF N | 8,397,588 | Holiday - | 8,397,588 - | 8,397,588 - | 8,397,588 - | 8,397,588 - | 0 |





EXHIBIT 18

LAW OFFICES OF
## ROBERT M. YASPAN
21700 OXNARD STREET
SUITE 1750
WOODLAND HILLS, CALIFORNIA 91367
(818) 905-7711 OR (818) 774-9929
FAX (818) 501-7711 OR (818) 774-9989

ROBERT M. YASPAN
DEBRA R. BRAND
JOSEPH G. McCARTY

January 21, 2019

*Via Email to* support@rainier.ch; greg@rainier.ch;
 *and USPS International Mail*
RAINIER AG
Swiss Asset Management
c/o Greg Mancuso
Neugasse 15
CH-6301
Zug, Switzerland

Re: Consul Group RE 2021, S.R.L (The "Company")., Account No. PR0017188 (the "Account"); Notice of Termination of the Brokerage Account Agreement and the Account

Dear Mr. Mancuso:

This office represents Consul Group RE 2021 S.R.L., Mauricio Lara Ramos (Manager, and Primary Beneficial Holder), Gopher Protocol, Inc. and its affiliate consultants.

As the result of your firm's misconduct the Company noticed you regarding the closing of its account with you.  You ignored the notice of closing and instead illegally held onto the assets in the account.  You are not authorized to withhold any funds or Stock or delay the transfer in any way.  You will be held fully responsible for any delay and further damages incurred if you fail to transfer all funds and stock held in the Account immediately as requested.

The misconduct of your firm extends to its authorized representatives and if and when the Company institutes litigation in the States the representatives will also be named in any appropriate litigation.

This letter will serve as the second notice that pursuant to paragraph 24 of the Brokerage Account Agreement (the "Agreement") for the Account, the Account Holder and the Beneficiary of the Account hereby terminate the Account and Agreement with immediate effect.  Therefore, you are instructed to transfer all of the funds to the Company account as instructed by Mr. Ramos in writing; the GOPH shares in the account shall be sent via DWAC to Empire Stock Transfer, Inc., 1859 Whitney Mesa Dr, Henderson, NV 89014; GOPH's transfer agent; and the

LAW OFFICES OF
ROBERT M. YASPAN

RAINIER AG
Swiss Asset Management
Page 2 of 2
January 21, 2019

MOBQ shares shall be sent via DWAC to Continental Stock Transfer & Trust, Inc., 17 Battery Place, 8th Floor, New York, NY 10004, MOBQ's transfer agent.

Thank you for your anticipated prompt attention to this matter.  I am available for your call.  Please do not contact the Company directly; all comments and communications should be directed to this office.

Sincerely yours,

Robert M. Yaspan

Enclosures – Consul formal notice dated 1/16/2019

cc:    James Rogers, Regulatory Analyst
       FINRA - Office of Fraud Detection and Market Intelligence
       15200 Omega Drive, Suite 210
       Rockville, MD  20850

       Gopher Protocol, Inc.

       Mitchell Tavera (Chief of Police, Ret.)

EXHIBIT 19

# Robert Yaspan

| | |
|---|---|
| **From:** | Rainier AG Compliance Department <compliance@rainier.ch> |
| **Sent:** | Wednesday, January 23, 2019 10:14 AM |
| **To:** | Tanya Menachian |
| **Cc:** | greg@rainier.ch; Mauricio Lara; Robert Yaspan; whistleblower@finra.org |
| **Subject:** | Re: Consul Group RE 2021, S.R.L - Account No. PR0017188 |

Mr. Yaspan,

We are aware of your letter. Your position as the director of the issuer simultaneously representing the apparent insider that is engaged in what seems to be an illegal distribution of unregistered securities orchestrated by an undisclosed control person of the company, will without a doubt be carefully examined by FINRA Office of Fraud Detection and Market Intelligence, who are copied herewith and who are being supplied with respective ample evidence that came to our possession for their review. Further, please note that Mr. James Rogers is no longer with FINRA. Our representatives are in contact with his office though consulting on the relevant matters mentioned herein. Please additionally note that you apparently have not read the Account Agreement entered into by your client in detail. In particular, please analyze the venue of jurisdiction clauses as well as Sec. 17 of the same contract prior to making unfounded threats that fall on deaf ears respectively. For further information due to the aggravated nature of the suspected activities an attorney will be retained representing our firm in this matter. You will be contacted by the same accordingly within 72 business hours or less. Therefore no further direct contacts with our company will be necessary.

Philippe Herrmann, COO
Rainier AG Compliance Department
Rainier AG
Neugasse 15
CH-6301 Zug
Switzerland



Telephone: **+41 41 552 4030**
Facsimile: **+41 44 274 2749**
E-mail: compliance@rainier.ch

The contents of this email and any attachments are confidential and intended solely for the addressee and may also be privileged or exempt from disclosure under applicable law and, in any case, shall not constitute or be construed as an offer to buy or sell securities in the United States, Canada, Australia, Japan, Switzerland or any other territory or jurisdiction. If you are not the addressee, or have received this e-mail in error, please notify the sender immediately, delete it from your system and do not copy, disclose or otherwise act upon any part of this e-mail or its attachments.

Rainier AG is a registered SRO-Member of Association Romande des Intermédiaires Financiers (ARIF), an officially recognized self-regulatory organization (SRO) according to the Anti-Money-Laundering Act (AMLA) and Swiss Asset Management Act.

On Jan 22, 2019, at 7:02 PM, Tanya Menachian <tmenachian@yaspanlaw.com> wrote:

Please see the attached letter from Robert M. Yaspan.

Thank you.

**Tatyana (Tanya) Menachian**
JD Paralegal / Office Manager
Law Offices of Robert M. Yaspan
21700 Oxnard Street, Suite 1750
Woodland Hills, CA 91367
Telephone: (818) 905-7711

Fax: (818) 501-7711
Email: Tanya@YaspanLaw.com

\<Rainier AG letter 1-21-19.pdf\>

EXHIBIT 20

**Robert Yaspan**

| | |
|---|---|
| **From:** | Mauricio Lara <mauricio@laralegalcorp.com> |
| **Sent:** | Wednesday, January 23, 2019 10:28 AM |
| **To:** | Rainier AG Compliance Department |
| **Cc:** | Tanya Menachian; greg@rainier.ch; Robert Yaspan; whistleblower@finra.org |
| **Subject:** | Re: Consul Group RE 2021, S.R.L - Account No. PR0017188 |

Dear Mr. Herrmann,

We do not take your threats lightly and we have been able to do quite some extensive due diligence of our own on your operation (if it can even be called that). Your claim of being a 40 year company is completely and utterly false. The company that you represent was in fact incorporated in 1971, however it wasn't until 2015 that reforms were made to the company to establish its current purpose.

We have also found out that under Swiss law, the supervision that you hold only covers the supervision of your anti-money laundering program and a code of deutology. Under this license you are not legally authorized, under Swiss law, to hold client funds but much rather just manage (trade) on the assets.

I also think FINRA will be very surprised to learn how you received orders from a US citizen that holds no signatory authority over the account and that not a single wire transfer that you claim to have sent was even sent to the account of my company.

We have also retained the offices of Lenz & Staehelin and will be represented by Mr. Dominique Müller. He had a handful of comments about schemes like your.

We will pursue this with the full weight of the law.

Sleep tight.

Sent from my iPhone

On Jan 23, 2019, at 7:13 PM, Rainier AG Compliance Department <compliance@rainier.ch> wrote:

> Mr. Yaspan,
>
> We are aware of your letter. Your position as the director of the issuer simultaneously representing the apparent insider that is engaged in what seems to be an illegal distribution of unregistered securities orchestrated by an undisclosed control person of the company, will without a doubt be carefully examined by FINRA Office of Fraud Detection and Market Intelligence, who are copied herewith and who are being supplied with respective ample evidence that came to our possession for their review. Further, please note that Mr. James Rogers is no longer with FINRA. Our representatives are in contact with his office though consulting on the relevant matters mentioned herein. Please additionally note that you apparently have not read the Account Agreement entered into by your client in detail. In particular, please analyze the venue of jurisdiction clauses as well as Sec. 17 of the same contract prior to making unfounded threats that fall on deaf ears respectively. For further information due to the aggravated nature of the suspected activities an attorney will be retained representing our firm in this matter. You will be contacted by the same accordingly within 72 business hours or less. Therefore no further direct contacts with our company will be necessary.
>
> Philippe Herrmann, COO

1



EXHIBIT 21

LAW OFFICES OF
## ROBERT M. YASPAN
21700 OXNARD STREET
SUITE 1750
WOODLAND HILLS, CALIFORNIA 91367
(818) 905-7711 OR (818) 774-9929
FAX (818) 501-7711 OR (818) 774-9989

ROBERT M. YASPAN
DEBRA R. BRAND
JOSEPH G. McCARTY

February 14, 2019

*Via Federal Express Priority Overnight Mail*
The Bank of New York Mellon Corporation
Shareowner Services
400 So. Hope, Suite 400
Los Angeles, California 90071

*Via Federal Express Priority Overnight Mail*
Pershing, LLC dba BNY Mellon/Pershing
400 So. Hope, Suite 500
Los Angeles, California 90071

*Via Federal Express Priority Overnight Mail*
Caceis Bank, S.A./Caceis USA, Inc.
1301 Avenue of the Americas
New York, NY 10019

*Via Federal Express Priority Overnight Mail*
Baader Bank AG/Baader Helvea, Inc.
420 Lexington Avenue, Suite 804
New York, NY 10170

Re:  Notice of Stolen Property

Victim:  Consul Group RE Dos Mil Veintiuno Sociedad de Responsabilidad Limitada
(translated to English as Consul Group RE 2021 S.R.L) aka Consul Group RE 2021, Ltda
("CONSUL")

Gentlemen:

This firm represents CONSUL.  This letter is written on behalf of CONSUL which is a
victim of an international crime and fraud.  This letter is being sent as a part of a litigation which
is expected to be filed on February 15, 2019.  This letter will be an exhibit to that litigation.

CONSUL is a Costa Rican company which sent over 4,000,000 publicly traded shares of
Gopher Protocol, Inc. (OTCMKTS: GOPH) and 8,500,000 publicly traded shares of Mobiquity
Technologies, Inc. (OTCMKTS: MOBQ) by DWAC to an alleged brokerage house supposedly
located in Zug, Switzerland by the name of "Rainier AG" ("SWISS RAINIER").

LAW OFFICES OF
ROBERT M. YASPAN

The Bank of New York Mellon Corporation
Pershing, LLC dba BNY Mellon/Pershing
Caceis Bank, S.A./Caceis USA, Inc.
Baader Bank AG/Baader Helvea, Inc.
February 14, 2018
Page 2

　　　SWISS RAINIER is believed to have a clearinghouse account with The Bank of New
York Mellon Corporation ("BNY") and/or Pershing, LLC dba BNY Mellon/Pershing ("PC"). If
not, then SWISS RAINIER may be instead a client of Caceis Bank S.A., or Baader Bank
AG/Baader Helvea, Inc, (that are in turn clearinghouse customers of BNY or PC). In that case
SWISS RAINIER would be a sub-client of either Caceis or Baader. Alternatively, a Santa
Barbara resident, Lidia Zinchenko dba Rainier AG, may have clearinghouse accounts in her own
name.

　　　The shares were sent as the result of fraudulent misrepresentations of SWISS RAINIER
to CONSUL. Those fraudulent representations are the subject of an extensive federal complaint
to be filed on February 15, 2019. As the result of those misrepresentations you are holding the
subject MOBQ and GOPH shares (as described below) in constructive trust for the benefit of
CONSUL.

　　　The shares were sent in several tranches. SWISS RAINIER allegedly had arranged to
have the GOPH and MOBQ shares held at either the BNY or PC clearinghouse through one or
more. One such tranche of 2,244,839 shares was sent at the instruction of CONSUL by J.I.L.
Venture LLC to BNY as follows: "DWAC BNY FBO Caceis Bank S.A. FBO Rainer
AG/BAADER BANK-RAINIER AG ACCT" on or about October 6, 2018. See Exhibit 1. A
second such tranche of 2,400,000 shares of GOPH was sent as follows to BNY: "DWAC BNY
FBO Caceis Bank S.A. FBO Rainer AG/BAADER BANK-RAINIER AG ACCT" on or about
October 19, 2018. See Exhibit 2.

　　　SWISS RAINIER admits that it held 2,000,498 shares of GOPH as of January 16, 2018.
Exhibits 3 and 4.

　　　Based on the Weekly Security Position Report of the Depository Trust Company BNY
consistently held in excess of 2,000,498 shares from the date of deposit through January 14, 2019
and as of that date still held 2,874,998 shares of GOPH in its clearinghouse. The next day it
transferred 2,120,498 shares away presumably to PC because on that same day PC's holdings
were increased to 2,142,845 shares. Thus, either PC or BNY still holds the CONSUL-owned
GOPH shares as of January 14, 2019. That position was maintained by PC through at least
February 8, 2019. See Exhibit 5.1.

LAW OFFICES OF
ROBERT M. YASPAN

The Bank of New York Mellon Corporation
Pershing, LLC dba BNY Mellon/Pershing
Caceis Bank, S.A./Caceis USA, Inc.
Baader Bank AG/Baader Helvea, Inc.
February 14, 2018
Page 3

    A third tranche of shares (MOBQ shares) were sent to BNY on behalf of CONSUL as follows: On November 8, 2018 BNY received 8,500,000 MOBQ shares.  BNY never held less than 8,397,588 MOBQ shares from the date of receipt through January 24, 2019. Based on the Weekly Security Position Report of the Depository Trust Company BNY still held in excess of 8,363,028 shares of MOBQ in its clearinghouse through January 24, 2019, which position continued to exist through at least February 8, 2019.   Exhibits 6 and 6.1

    On January 21, 2019 CONSUL demanded the return of the unsold GOPH and MOBQ shares. See Exhibit 7.  SWISS RAINIER refused.  Presuming BNY/PC to be the custodian of the GOPH and MOBQ shares CONSUL hereby notifies you that BNY/PC is holding CONSUL's shares in constructive trust FBO CONSUL, and CONSUL only.

    CONSUL believes that it is the victim of an international crime and fraud perpetrated by individuals named Lidia Zinchenko and Michael Guss in California (together with others).  The proof of this is contained in two "dba" filings in the County of Santa Barbara; and a personal visit to Rainier's AG's supposed office in Zug, Switzerland.  The first such filing is that of Ms. Zinchenko in which she registered a fictitious business name of "Rainier AG" on May 16, 2017 in Santa Barbara County.  Exhibit 8.

    CONSUL sent the opening deposit of USD $125,000 at the instruction of SWISS RAINIER to SWISS RAINIER.  However, despite the written instructions received by CONSUL the funds were actually received by an account in the name of Lidia Zinchenko dba Rainier AG at the Bank of America in the USA, and not SWISS RAINIER in Switzerland.

    When SWISS RAINIER claimed to send monies back to CONSUL's representative the monies were not sent by SWISS RAINIER but rather by "Ezbanc Corp." which turns out to be a Florida company that was dissolved in 2012 and reinstated in 2018 just prior to the receipt of the opening deposit from CONSUL. Ezbanc Corp is a corporation whose President is Michael Guss and whose registered agent is Embles Financial Inc (Exhibit 11). Embles Financial is the fictitious business name of Mr. Guss.  See Exhibits 9, 10 and 11.

    Mr. Guss is a criminal convicted of money laundering in 1996.  Exhibit 12, Page 4.  Mr. Guss is barred from securities practice under a ruling of the NASD in 2007.  Mr. Guss helped himself in the federal crime by cooperating with "federal prosecutors and testified against members of a Russian organized crime group in exchange for avoiding jail time.  See Exhibit 12, Pages 4-5.

LAW OFFICES OF
ROBERT M. YASPAN

The Bank of New York Mellon Corporation
Pershing, LLC dba BNY Mellon/Pershing
Caceis Bank, S.A./Caceis USA, Inc.
Baader Bank AG/Baader Helvea, Inc.
February 14, 2018
Page 4

It appears that CONSUL has gotten itself involved with criminals that hoodwinked
CONSUL and stole its property. BNY/PC is now holding that stolen property for the benefit of
the titleholder which is CONSUL, and CONSUL only. Demand is made for its return and/or for
the freezing of such assets pending further court order.

A copy of this letter is being sent as well to the two company's stock transfer agents so
that they will be aware of any attempted change in share ownership.

I am available to you should you have any questions.

Sincerely yours,

Robert M. Yaspan

RMY/a

Enclosures

cc: Client with Enclosures

LAW OFFICES OF
## ROBERT M. YASPAN

ROBERT M. YASPAN
DEBRA R. BRAND
JOSEPH G. McCARTY

21700 OXNARD STREET
SUITE 1750
WOODLAND HILLS, CALIFORNIA 91367
(818) 905-7711 OR (818) 774-9929
FAX (818) 501-7711 OR (818) 774-9989

February 14, 2019

*Via Federal Express Priority Overnight Mail*
The Bank of New York Mellon Corporation
Shareowner Services
400 So. Hope, Suite 400
Los Angeles, California 90071

*Via Federal Express Priority Overnight Mail*
Pershing, LLC dba BNY Mellon/Pershing
400 So. Hope, Suite 500
Los Angeles, California 90071

*Via Federal Express Priority Overnight Mail*
Caceis Bank, S.A./Caceis USA, Inc.
1301 Avenue of the Americas
New York, NY 10019

*Via Federal Express Priority Overnight Mail*
Baader Bank AG/Baader Helvea, Inc.
420 Lexington Avenue, Suite 804
New York, NY 10170

Re:   Notice of Stolen Property

Victim:  Consul Group RE Dos Mil Veintiuno Sociedad de Responsabilidad Limitada (translated to English as Consul Group RE 2021 S.R.L) aka Consul Group RE 2021, Ltda ("CONSUL")

Gentlemen:

This firm represents CONSUL. This letter is written on behalf of CONSUL which is a victim of an international crime and fraud. This letter is being sent as a part of a litigation which is expected to be filed on February 15, 2019. This letter will be an exhibit to that litigation.

CONSUL is a Costa Rican company which sent over 4,000,000 publicly traded shares of Gopher Protocol, Inc. (OTCMKTS: GOPH) and 8,500,000 publicly traded shares of Mobiquity Technologies, Inc. (OTCMKTS: MOBQ) by DWAC to an alleged brokerage house supposedly located in Zug, Switzerland by the name of "Rainier AG" ("SWISS RAINIER").

LAW OFFICES OF
ROBERT M. YASPAN

The Bank of New York Mellon Corporation
Pershing, LLC dba BNY Mellon/Pershing
Caceis Bank, S.A./Caceis USA, Inc.
Baader Bank AG/Baader Helvea, Inc.
February 14, 2018
Page 2

SWISS RAINIER is believed to have a clearinghouse account with The Bank of New
York Mellon Corporation ("BNY") and/or Pershing, LLC dba BNY Mellon/Pershing ("PC"). If
not, then SWISS RAINIER may be instead a client of Caceis Bank S.A., or Baader Bank
AG/Baader Helvea, Inc, (that are in turn clearinghouse customers of BNY or PC). In that case
SWISS RAINIER would be a sub-client of either Caceis or Baader. Alternatively, a Santa
Barbara resident, Lidia Zinchenko dba Rainier AG, may have clearinghouse accounts in her own
name.

The shares were sent as the result of fraudulent misrepresentations of SWISS RAINIER
to CONSUL. Those fraudulent representations are the subject of an extensive federal complaint
to be filed on February 15, 2019. As the result of those misrepresentations you are holding the
subject MOBQ and GOPH shares (as described below) in constructive trust for the benefit of
CONSUL.

The shares were sent in several tranches. SWISS RAINIER allegedly had arranged to
have the GOPH and MOBQ shares held at either the BNY or PC clearinghouse through one or
more. One such tranche of 2,244,839 shares was sent at the instruction of CONSUL by J.I.L.
Venture LLC to BNY as follows: "DWAC BNY FBO Caceis Bank S.A. FBO Rainer
AG/BAADER BANK-RAINIER AG ACCT" on or about October 6, 2018. See Exhibit 1. A
second such tranche of 2,400,000 shares of GOPH was sent as follows to BNY: "DWAC BNY
FBO Caceis Bank S.A. FBO Rainer AG/BAADER BANK-RAINIER AG ACCT" on or about
October 19, 2018. See Exhibit 2.

SWISS RAINIER admits that it held 2,000,498 shares of GOPH as of January 16, 2018.
Exhibits 3 and 4.

Based on the Weekly Security Position Report of the Depository Trust Company BNY
consistently held in excess of 2,000,498 shares from the date of deposit through January 14, 2019
and as of that date still held 2,874,998 shares of GOPH in its clearinghouse. The next day it
transferred 2,120,498 shares away presumably to PC because on that same day PC's holdings
were increased to 2,142,845 shares. Thus, either PC or BNY still holds the CONSUL-owned
GOPH shares as of January 14, 2019. That position was maintained by PC through at least
February 8, 2019. See Exhibit 5.1.

LAW OFFICES OF
ROBERT M. YASPAN

The Bank of New York Mellon Corporation
Pershing, LLC dba BNY Mellon/Pershing
Caceis Bank, S.A./Caceis USA, Inc.
Baader Bank AG/Baader Helvea, Inc.
February 14, 2018
Page 3

    A third tranche of shares (MOBQ shares) were sent to BNY on behalf of CONSUL as follows: On November 8, 2018 BNY received 8,500,000 MOBQ shares.   BNY never held less than 8,397,588 MOBQ shares from the date of receipt through January 24, 2019.  Based on the Weekly Security Position Report of the Depository Trust Company BNY still held in excess of 8,363,028 shares of MOBQ in its clearinghouse through January 24, 2019, which position continued to exist through at least February 8, 2019.   Exhibits 6 and 6.1

    On January 21, 2019 CONSUL demanded the return of the unsold GOPH and MOBQ shares.  See Exhibit 7.  SWISS RAINIER refused.  Presuming BNY/PC to be the custodian of the GOPH and MOBQ shares CONSUL hereby notifies you that BNY/PC is holding CONSUL's shares in constructive trust FBO CONSUL, and CONSUL only.

    CONSUL believes that it is the victim of an international crime and fraud perpetrated by individuals named Lidia Zinchenko and Michael Guss in California (together with others).  The proof of this is contained in two "dba" filings in the County of Santa Barbara; and a personal visit to Rainier's AG's supposed office in Zug, Switzerland.  The first such filing is that of Ms. Zinchenko in which she registered a fictitious business name of "Rainier AG" on May 16, 2017 in Santa Barbara County.  Exhibit 8.

    CONSUL sent the opening deposit of USD $125,000 at the instruction of SWISS RAINIER to SWISS RAINIER.  However, despite the written instructions received by CONSUL the funds were actually received by an account in the name of Lidia Zinchenko dba Rainier AG at the Bank of America in the USA, and not SWISS RAINIER in Switzerland.

    When SWISS RAINIER claimed to send monies back to CONSUL's representative the monies were not sent by SWISS RAINIER but rather by "Ezbanc Corp." which turns out to be a Florida company that was dissolved in 2012 and reinstated in 2018 just prior to the receipt of the opening deposit from CONSUL.  Ezbanc Corp is a corporation whose President is Michael Guss and whose registered agent is Embles Financial Inc (Exhibit 11).  Embles Financial is the fictitious business name of Mr. Guss.  See Exhibits 9, 10 and 11.

    Mr. Guss is a criminal convicted of money laundering in 1996.  Exhibit 12, Page 4.  Mr. Guss is barred from securities practice under a ruling of the NASD in 2007.  Mr. Guss helped himself in the federal crime by cooperating with "federal prosecutors and testified against members of a Russian organized crime group in exchange for avoiding jail time.  See Exhibit 12, Pages 4-5.

LAW OFFICES OF
ROBERT M. YASPAN

The Bank of New York Mellon Corporation
Pershing, LLC dba BNY Mellon/Pershing
Caceis Bank, S.A./Caceis USA, Inc.
Baader Bank AG/Baader Helvea, Inc.
February 14, 2018
Page 4

It appears that CONSUL has gotten itself involved with criminals that hoodwinked CONSUL and stole its property. BNY/PC is now holding that stolen property for the benefit of the titleholder which is CONSUL, and CONSUL only.  Demand is made for its return and/or for the freezing of such assets pending further court order.

A copy of this letter is being sent as well to the two company's stock transfer agents so that they will be aware of any attempted change in share ownership.

I am available to you should you have any questions.

Sincerely yours,

Robert M. Yaspan

RMY/a

Enclosures

cc: Client with Enclosures

Exhibit 1

DEWAC INSTRUCTION LETTER

**FROM: J.I.L. VENTURE LLC EIN:** ▓▓▓▓▓
**SOLE MANAGER CELL:** ▓▓▓▓▓ Pinky Clamor

**TO: EMPIRE STOCK TRANSFER INC. – ATTAN: BRIAN BARTHLOW**

RE: DEWAC INSTRUCTION FROM J.I.L. –
Bke asset 476 244,839 shares and Bke asset 476     J.I.L. Ventures
2,000,000 shares –
**RAINEIR Client's: CONSUL GROUP RE 2021
LTD – A Costa Rica Entity**

---

Dear Brian;

Please find here DEWAC instructions for J.I.L. Venture, LLC shares – to Rianier Client CONSUL GROUP RE 2021 LTD – A Costa Rica Entity

Amount of Shares to be DEWAC: 2,44,839 GOPH Shares
Clearing Broker Name:  Bank of New York Mellon
DTC Participant: 0901
Broker Name: Caceis bank S. A.
Broker ACCT # at Clearing Broker: 112000 – For further credit: BAADER BANK-RAINIER AG ACCT
Rainier Address and contact info:
Greg Mancuso - RAINIER AG-SWISS ASSET MANAGEMENT
Neugasse 15, CH-6301 ZUG, Switzerland – Tel direct: +1 781-367-5428 e mail: greg@rainier.ch
RAINIER CLIENT IS: **CONSUL GROUP RE 2021 LTD – A Costa Rica Entity**

After you receive the documents, please open DEWAC delivery in the system, RAINIER will initiate on their account online.

Sincerely

**J.I.L. VENTURE LLC**

By: Pinky Clamor, Manager, 10/6/2018

**

## IRREVOCABLE STOCK POWER

**FOR VALUE RECEIVED, the undersigned does hereby sell, assign and transfer unto:**

DWAC BNY FBO Caceis bank S. A FBO RAINER
AG/ BAADER BANK-RAINIER AG ACCT
_____          _____
Name                                                                        Social Security/Tax ID Number

_____
Address

   2,244,839                                          shares of the Common Stock of:
       Number of shares


Gopher Protocol
_____
                Issuer name

**Represented by:**


Bke asset 476 244,839 shares and  Bke asset 476    J.I.L. Ventures
2,000,000 shares
_____
                    Certificate Number(s)

**and does hereby irrevocably constitute and appoint Empire Stock Transfer Inc. to transfer the said stock on the books of the within-named Corporation with full power of substitution in the premises.**

                                                         10/6/18
_____
                                                       Dated

Signed

**NOTICE: The signature(s) to this assignment must correspond with the name(s) as written upon the face of this certificate in every particular without alteration or enlargement or any change whatsoever.**

                                                   Please See  MG
                                                   Attached  10/06/18

**Medallion Signature Guaranteed** (THE SIGNATURES SHOULD BE GUARANTEED BY AN ELIGBLE GUARANTOR INSTITUTION, (BANKS, STOCKBROKERS, SAVINGS AND LOAN ASSOCIATION AND CREDIT UNIONS) WITH MEMBERSHIP IN AN APPROVED SIGNATURE GUARANTEE MEDALLION PROGRAM PURSUANT TO SEC RULE 17AD-15.

Exhibit 2

## IRREVOCABLE STOCK POWER

**FOR VALUE RECEIVED, the undersigned does hereby sell, assign and transfer unto:**

DWAC BNY FBO Caceis bank S. A FBO RAINER
AG/ BAADER BANK-RAINIER AG ACCT
_____
Name                                                    Social Security/Tax ID Number

_____
Address

___2,400,000_____    shares of the Common Stock of:
Number of shares


Gopher Protocol
_____
Issuer name

**Represented by:**


Bke  asset  479 - 2,400,000  shares  (Yassine
Amaliai)
_____
Certificate Number(s)

and does hereby irrevocably constitute and appoint Empire Stock Transfer Inc. to transfer the said
stock on the books of the within-named Corporation with full power of substitution in the
premises.

_____          10/19/2018
Signed                                                   Dated

**NOTICE:** The signature(s) to this assignment must correspond with the name(s) as written upon
the face of this certificate in every particular without alteration or enlargement or any change
whatsoever.


_____
**Medallion Signature Guaranteed** (THE SIGNATURES SHOULD BE GUARANTEED BY AN ELIGBLE GUARANTOR INSTITUTION, (BANKS,
STOCKBROKERS, SAVINGS AND LOAN ASSOCIATION AND CREDIT UNIONS) WITH MEMBERSHIP IN AN APPROVED SIGNATURE GUARANTEE MEDALLION
PROGRAM PURSUANT TO SEC RULE 17AD-15.

CALIFORNIA ALL-PURPOSE ACKNOWLEDGEMENT

A Notary Public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

State of California
County of Los Angeles }

On _October 19, 2018_____, before me, _Janeth L. Dardon_, Notary Public,
personally appeared _Wassine Anlallal_____

who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of State of California that the foregoing paragraph is true and correct.

JANETH L. DARDON
Notary Public - California
Los Angeles County
Commission # 2172047
My Comm. Expires Nov 17, 2020

WITNESS my hand and official seal.

SIGNATURE _____

PLACE NOTARY SEAL ABOVE

Though the information below is not required by law, it may prove valuable to persons relying on the document and could prevent fraudulent removal and reattachment of this form to another document.

Description of attached document
Title or type of document: _DEWAC Instruction Letter_
_Irrevocable Stock Power_

Document Date: _October 18, 2018_      Number of Pages: _3_

Signer(s) Other than Named Above:_____



NOTARY PUBLIC
KATHLEEN J. FREEMAN
Sacramento County · Shasta Victoria
For Analysis County
Commission # 2112042
My Comm. Expires Nov. 17, 2019

Exhibit 3

**TRADING STATEMENT**

Date: to

Name: Consul Group RE 2021 Ltd.

Account Number: ⬛⬛⬛⬛718B



**Rainier AG**

Neugasse 15, CH-6301 Zug Switzerland

Telephone: +41 41 552 4030

| Trade Date | Trade Type | Securities Name | Symbol | Quantity | Price | Gross | Total Comm and fees | Proceeds |
|---|---|---|---|---|---|---|---|---|
| 2018-10-16 | Deposit | Gopher Protocol, Inc. | GOPH | 2,244,839 | 0.000000 | 0.00 | 0.00 | 0.00 |
| 2018-10-17 | Sell | Gopher Protocol, Inc. | GOPH | 60,000 | 0.794675 | 47680.50 | 2882.43 | 44798.08 |
| 2018-10-18 | Sell | Gopher Protocol, Inc. | GOPH | 100,000 | 0.788139 | 78813.90 | 4394.77 | 74219.13 |
| 2018-10-19 | Sell | Gopher Protocol, Inc. | GOPH | 100,000 | 0.754012 | 75401.20 | 4208.05 | 70993.15 |
| 2018-10-22 | Sell | Gopher Protocol, Inc. | GOPH | 150,000 | 0.723692 | 108553.80 | 6031.87 | 102321.93 |
| 2018-10-23 | Sell | Gopher Protocol, Inc. | GOPH | 100,000 | 0.722031 | 72203.10 | 4032.11 | 67970.99 |
| 2018-10-24 | Sell | Gopher Protocol, Inc. | GOPH | 47,821 | 0.703472 | 33640.73 | 1910.68 | 31530.05 |
| 2018-10-25 | Sell | Gopher Protocol, Inc. | GOPH | 100,000 | 0.655870 | 65587.00 | 3668.14 | 61718.86 |
| 2018-10-26 | Sell | Gopher Protocol, Inc. | GOPH | 100,000 | 0.607113 | 60711.30 | 3399.92 | 57111.39 |
| 2018-10-29 | Sell | Gopher Protocol, Inc. | GOPH | 100,000 | 0.607524 | 60752.40 | 3402.17 | 57150.23 |
| 2018-10-30 | Sell | Gopher Protocol, Inc. | GOPH | 100,000 | 0.533693 | 53363.30 | 3129.08 | 50034.23 |
| 2018-10-31 | Sell | Gopher Protocol, Inc. | GOPH | 100,000 | 0.523206 | 52320.60 | 3069.11 | 49051.49 |
| 2018-11-01 | Sell | Gopher Protocol, Inc. | GOPH | 100,000 | 0.508415 | 50841.50 | 2984.05 | 47857.45 |
| 2018-11-02 | Sell | Gopher Protocol, Inc. | GOPH | 100,000 | 0.503085 | 50308.50 | 2953.39 | 47155.12 |
| 2018-11-05 | Sell | Gopher Protocol, Inc. | GOPH | 100,000 | 0.555137 | 55513.70 | 3252.71 | 52060.99 |
| 2018-11-06 | Sell | Gopher Protocol, Inc. | GOPH | 107,018 | 0.533553 | 57099.77 | 3343.98 | 53555.80 |
| 2018-11-07 | Sell | Gopher Protocol, Inc. | GOPH | 200,000 | 0.504907 | 100981.40 | 5867.74 | 94913.66 |
| 2018-11-07 | Deposit | Gopher Protocol, Inc. | GOPH | 2,400,000 | 0.000000 | 0.00 | 0.00 | 0.00 |
| 2018-11-08 | Sell | Gopher Protocol, Inc. | GOPH | 129,502 | 0.501244 | 64912.10 | 3793.29 | 60918.82 |
| 2018-11-09 | Sell | Mobiquity Technologies, Inc. | MOBQ | 4,722 | 0.094000 | 443.87 | 211.09 | 232.78 |
| 2018-11-09 | Deposit | Mobiquity Technologies, Inc. | MOBQ | 8,500,000 | 0.000000 | 0.00 | 0.00 | 0.00 |
| 2018-11-09 | Sell | Gopher Protocol, Inc. | GOPH | 200,000 | 0.421107 | 84221.40 | 4903.82 | 79117.58 |
| 2018-11-09 | Sell | Gopher Protocol, Inc. | GOPH | 200,000 | 0.391109 | 78221.80 | 4558.77 | 73463.03 |
| 2018-11-12 | Sell | Gopher Protocol, Inc. | GOPH | 200,000 | 0.391109 | 78221.80 | 4558.77 | 73463.03 |
| 2018-11-13 | Sell | Gopher Protocol, Inc. | GOPH | 250,000 | 0.340661 | 85165.25 | 5171.02 | 79844.23 |
| 2018-12-12 | Sell | Mobiquity Technologies, Inc. | MOBQ | 75,000 | 0.152667 | 11450.03 | 1126.15 | 10098.87 |
| 2018-12-14 | Sell | Mobiquity Technologies, Inc. | MOBQ | 16,000 | 0.161563 | 2585.01 | 416.83 | 1943.18 |
| 2018-12-17 | Sell | Mobiquity Technologies, Inc. | MOBQ | 11,250 | 0.162000 | 1822.50 | 355.62 | 1241.68 |
| 2018-12-18 | Sell | Mobiquity Technologies, Inc. | MOBQ | 30,000 | 0.162500 | 4875.00 | 600.06 | 4049.94 |
| **TOTAL** | | | | | | **1435691.46** | **84025.82** | **1346615.70** |

Disclaimer: Rainier AG, Neugasse 15, CH-6301 Zug Switzerland ("Rainier") or its affiliates cannot be held liable for any errors or omissions in this document. The information in this document should not be relied upon and action should not be taken on the basis of any information contained in this document without receiving the appropriate advice from your account representative, legal and accounting consultants. In the event that any information in this document is incorrect, Rainier will not be responsible for any losses, charges, expenses or costs which are incurred as a result. Rainier expressly disclaims any liability to any person in respect of anything done or omitted to be done in reliance upon the contents of this information.

Exhibit 4

Exhibit 5

Security Position Reports: Weekly Subscription Report
The Depository Trust Company
Weekly Security Position Report
Daily Closing Balances
For Week Ending 01/18/2019
Security Description
GOPHER PROTOCOL INC +

| Participant Number | Participant Name | Opening 1/11/19 | Monday 1/14/19 | Tuesday 1/15/19 | Wednesday 1/16/19 | Thursday 1/17/19 | Friday 1/18/19 | Week's Change Shares | Percent |
|---|---|---|---|---|---|---|---|---|---|
| | Cusip 38268V108 | | | | | | | | |
| 901 | BANK OF NY | 2874998 | 2874998 | 754500 | 754500 | 656500 | 656500 | -2218498 | -77.1 |
| 443 | PERSHING | 363645 | 614745 | 2757601 | 2631216 | 2587928 | 2512058 | 2148413 | Over 100 |

© 2019 The Depository Trust & Clearing Corporation  |  Legal Information  |  Privacy Policy

Exhibit 5.1

GOPHER PROTOCOL INC – CUSIP 38268V108

| Part No. | Participant Name | Opening | Monday | Tuesday | Wednesday | Thursday | Friday | Week's Change Shares | Percent |
|---|---|---|---|---|---|---|---|---|---|
| | | 8/31/2018 | 9/3/2018 | 9/4/2018 | 9/5/2018 | 9/6/2018 | 9/7/2018 | Shares | Percent |
| 901 | BANK OF NY | 18,000 | Holiday | 23,000 | 23,000 | 23,000 | 23,000 | 5,000 | 27.7 |
| 443 | PERSHING | 1,366,228 | Holiday | 1,346,743 | 1,219,743 | 1,200,267 | 1,157,351 | -208,877 | -15.2 |
| | | 9/7/2018 | 9/10/2018 | 9/11/2018 | 9/12/2018 | 9/13/2018 | 9/14/2018 | Shares | Percent |
| 901 | BANK OF NY | 23,000 | 23,000 | 23,000 | 23,000 | 23,000 | 23,000 | 0 | 0 |
| 443 | PERSHING | 1,157,351 | 1,140,835 | 1,135,688 | 890,084 | 890,984 | 880,378 | -276,973 | -23.9 |
| | | 9/14/2018 | 9/17/2018 | 9/18/2018 | 9/19/2018 | 9/20/2018 | 9/21/2018 | Shares | Percent |
| 901 | BANK OF NY | 23,000 | 23,000 | 23,000 | 23,000 | 23,000 | 23,000 | 0 | 0 |
| 443 | PERSHING | 880,378 | 806,468 | 777,921 | 724,999 | 736,191 | 761,975 | -118,403 | -13.4 |
| | | 9/21/2018 | 9/24/2018 | 9/25/2018 | 9/26/2018 | 9/27/2018 | 9/28/2018 | Shares | Percent |
| 901 | BANK OF NY | 23,000 | 23,000 | 23,000 | 23,000 | 23,000 | 23,000 | 0 | 0 |
| 443 | PERSHING | 761,975 | 742,775 | 739,605 | 688,787 | 689,961 | 669,861 | -92,114 | -12 |
| | | 9/28/2018 | 10/1/2018 | 10/2/2018 | 10/3/2018 | 10/4/2018 | 10/5/2018 | Shares | Percent |
| 901 | BANK OF NY | 23,000 | 23,000 | 23,000 | 23,000 | 23,000 | 23,000 | 0 | 0 |
| 443 | PERSHING | 669,861 | 663,511 | 645,492 | 646,052 | 648,087 | 648,087 | -21,774 | -3.2 |
| | | 10/5/2018 | 10/8/2018 | 10/9/2018 | 10/10/2018 | 10/11/2018 | 10/12/2018 | Shares | Percent |
| 901 | BANK OF NY | 23,000 | 23,000 | 23,000 | 23,000 | 23,000 | 23,000 | 0 | 0 |
| 443 | PERSHING | 648,087 | 648,087 | 650,826 | 643,964 | 678,355 | 676,191 | 28,104 | 4.3 |
| | | 10/12/2018 | 10/15/2018 | 10/16/2018 | 10/17/2018 | 10/18/2018 | 10/19/2018 | Shares | Percent |
| 901 | BANK OF NY | 23,000 | 2,267,839 | 2,267,839 | 2,267,839 | 2,267,839 | 2,207,839 | 2,184,839 | Over 100 |
| 443 | PERSHING | 676,191 | 649,113 | 650,505 | 650,480 | 650,665 | 650,585 | -25,606 | -3.7 |
| | | 10/19/2018 | 10/22/2018 | 10/23/2018 | 10/24/2018 | 10/25/2018 | 10/26/2018 | Shares | Percent |
| 901 | BANK OF NY | 2,207,839 | 2,107,839 | 2,007,839 | 1,857,839 | 1,757,839 | 1,710,018 | -497,821 | -22.5 |
| 443 | PERSHING | 650,585 | 650,805 | 650,180 | 652,948 | 655,169 | 658,069 | 7,484 | 1.1 |
| | | 10/26/2018 | 10/29/2018 | 10/30/2018 | 10/31/2018 | 11/1/2018 | 11/2/2018 | Shares | Percent |
| 901 | BANK OF NY | 1,710,018 | 1,610,018 | 1,510,018 | 1,410,018 | 1,310,018 | 1,210,018 | -500,000 | -29.2 |
| 443 | PERSHING | 658,069 | 659,109 | 655,314 | 656,146 | 1,335,802 | 1,336,719 | 678,650 | Over 100 |
| | | 11/2/2018 | 11/5/2018 | 11/6/2018 | 11/7/2018 | 11/8/2018 | 11/9/2018 | Shares | Percent |
| 901 | BANK OF NY | 1,210,018 | 1,110,018 | 3,410,018 | 3,310,018 | 3,423,000 | 3,223,000 | 2,012,982 | Over 100 |
| 443 | PERSHING | 1,336,719 | 1,106,947 | 1,046,947 | 996,947 | 956,947 | 906,947 | -429,772 | -32.1 |
| | | 11/9/2018 | 11/12/2018 | 11/13/2018 | 11/14/2018 | 11/15/2018 | 11/16/2018 | Shares | Percent |
| 901 | BANK OF NY | 3,223,000 | 3,223,000 | 3,093,498 | 2,646,498 | 2,351,498 | 2,541,498 | -681,502 | -21.1 |
| 443 | PERSHING | 906,947 | 906,947 | 876,947 | 787,711 | 647,235 | 617,235 | -289,712 | -31.9 |
| | | 11/16/2018 | 11/19/2018 | 11/20/2018 | 11/21/2018 | 11/22/2018 | 11/23/2018 | Shares | Percent |
| 901 | BANK OF NY | 2,541,498 | 2,466,498 | 2,393,498 | 2,393,498 | Holiday | 2,393,498 | -148,000 | -5.8 |
| 443 | PERSHING | 617,235 | 577,235 | 577,235 | 537,235 | Holiday | 536,235 | -81,000 | -13.1 |
| | | 11/23/2018 | 11/26/2018 | 11/27/2018 | 11/28/2018 | 11/29/2018 | 11/30/2018 | Shares | Percent |
| 901 | BANK OF NY | 2,393,498 | 2,393,498 | 2,393,498 | 2,393,498 | 2,393,498 | 2,693,498 | 300,000 | 12.5 |
| 443 | PERSHING | 536,235 | 505,735 | 497,735 | 497,735 | 477,735 | 447,735 | -88,500 | -16.5 |
| | | 11/30/2018 | 12/3/2018 | 12/4/2018 | 12/5/2018 | 12/6/2018 | 12/7/2018 | Shares | Percent |
| 901 | BANK OF NY | 2,693,498 | 2,693,498 | 2,693,498 | 2,608,498 | 2,523,498 | 2,523,498 | -170,000 | -6.3 |
| 443 | PERSHING | 447,735 | 429,735 | 423,230 | 423,230 | 423,230 | 423,230 | -24,505 | -5.4 |

GOPHER PROTOCOL INC - CUSIP 38268V108

| Part No. | Participant Name | Opening | Monday | Tuesday | Wednesday | Thursday | Friday | Week's Change | |
|---|---|---|---|---|---|---|---|---|---|
| | | 12/7/2018 | 12/10/2018 | 12/11/2018 | 12/12/2018 | 12/13/2018 | 12/14/2018 | Shares | Percent |
| 901 | BANK OF NY | 2,523,498 | 3,432,498 | 3,390,498 | 3,307,498 | 3,210,498 | 3,113,498 | 590,000 | 23.3 |
| 443 | PERSHING | 423,230 | 418,230 | 418,230 | 418,230 | 418,230 | 418,230 | -5,000 | -1.1 |
| | | | | | | | | | |
| | | 12/14/2018 | 12/17/2018 | 12/18/2018 | 12/19/2018 | 12/20/2018 | 12/21/2018 | Shares | Percent |
| 901 | BANK OF NY | 3,113,498 | 3,064,498 | 3,015,498 | 2,966,498 | 2,923,998 | 2,874,998 | -238,500 | -7.6 |
| 443 | PERSHING | 418,230 | 418,230 | 420,530 | 420,530 | 420,530 | 440,530 | 22,300 | 5.3 |
| | | | | | | | | | |
| | | 12/21/2018 | 12/24/2018 | 12/25/2018 | 12/26/2018 | 12/27/2018 | 12/28/2018 | Shares | Percent |
| 901 | BANK OF NY | 2,874,998 | 2,874,998 | Holiday | 2,874,998 | 2,874,998 | 2,874,998 | 0 | 0 |
| 443 | PERSHING | 440,530 | 440,530 | Holiday | 440,530 | 443,257 | 443,530 | 3,000 | 0.6 |
| | | | | | | | | | |
| | | 12/28/2018 | 12/31/2018 | 1/1/2019 | 1/2/2019 | 1/3/2019 | 1/4/2019 | Shares | Percent |
| 901 | BANK OF NY | 2,874,998 | 2,874,998 | Holiday | 2,874,998 | 2,874,998 | 2,874,998 | 0 | 0 |
| 443 | PERSHING | 443,518 | 443,518 | Holiday | 343,518 | 343,945 | 343,945 | -99,585 | -22.4 |
| | | | | | | | | | |
| | | 1/4/2019 | 1/7/2019 | 1/8/2019 | 1/9/2019 | 1/10/2019 | 1/11/2019 | Shares | Percent |
| 901 | BANK OF NY | 2,874,998 | 2,874,998 | 2,874,998 | 2,874,998 | 2,874,998 | 2,874,998 | 0 | 0 |
| 443 | PERSHING | 343,945 | 386,445 | 427,895 | 405,395 | 365,845 | 363,645 | 19,700 | 5.7 |
| | | | | | | | | | |
| | | 1/11/2019 | 1/14/2019 | 1/15/2019 | 1/16/2019 | 1/17/2019 | 1/18/2019 | Shares | Percent |
| 901 | BANK OF NY | 2,874,998 | 2,874,998 | 754,500 | 754,500 | 656,500 | 656,500 | -2,218,498 | -77.1 |
| 443 | PERSHING | 363,645 | 614,745 | 2,757,601 | 2,631,216 | 2,587,928 | 2,512,058 | 2,148,413 | Over 100 |
| | | | | | | | | | |
| | | 1/18/2019 | 1/21/2019 | 1/22/2019 | 1/23/2019 | 1/24/2019 | 1/25/2019 | Shares | Percent |
| 901 | BANK OF NY | 656,500 | Holiday | 656,500 | 631,603 | 531,603 | 431,603 | -224,897 | -34.2 |
| 443 | PERSHING | 2,512,058 | Holiday | 2,509,558 | 2,514,058 | 2,554,058 | 2,579,058 | 67,000 | 2.6 |
| | | | | | | | | | |
| | | 1/25/2019 | 1/28/2019 | 1/29/2019 | 1/30/2019 | 1/31/2019 | 2/1/2019 | Shares | Percent |
| 901 | BANK OF NY | 431,603 | 381,603 | 381,603 | 281,603 | 231,603 | 181,603 | -250,000 | -57.9 |
| 443 | PERSHING | 2,579,058 | 2,590,058 | 2,590,058 | 2,677,114 | 2,677,714 | 2,740,014 | 160,956 | 6.2 |
| | | | | | | | | | |
| | | 2/1/2019 | 2/4/2019 | 2/5/2019 | 2/6/2019 | 2/7/2019 | 2/8/2019 | Shares | Percent |
| 901 | BANK OF NY | 181,603 | 181,603 | 181,603 | 181,603 | 181,603 | 181,603 | 0 | 0 |
| 443 | PERSHING | 2,740,014 | 2,743,873 | 2,739,373 | 2,742,048 | 2,743,048 | 2,745,578 | 5,564 | 0.2 |

Exhibit 6

The Depository Trust Company

Weekly Subscription Security Position Report

Daily Closing Balances

For Week Ending 01/25/2019

Security De Cuslp

MOBIQUIT* 60743F102

| Participant Number | Participant Name | Opening | Monday 1/21/2019 | Tuesday 1/22/2019 | Wednesday 1/23/2019 | Thursday 1/24/2019 | Friday 1/25/2019 | Share Change | Percent Change |
|---|---|---|---|---|---|---|---|---|---|
| | | 1/18/2019 | | | | | | | |
| 901 | BANK OF N | 8,397,588 | Holiday | 8,397,588 - | 8,397,588 - | 8,397,588 - | 8,397,588 - | | 0 |





Exhibit 6.1

MOBIQUITY TECHNOLOGIES INC - CUSIP 60743F102

| Part No. | Participant Name | Opening | Monday | Tuesday | Wednesday | Thursday | Friday | Share | Percent |
|---|---|---|---|---|---|---|---|---|---|
| | | 8/31/2018 | 9/3/2018 | 9/4/2018 | 9/5/2018 | 9/6/2018 | 9/7/2018 | Change | Change |
| 901 | BANK OF NY | 34,560 | Holiday | 34,560 | 34,560 | 34,560 | 34,560 | 0 | 0 |
| 443 | PERSHING | 1,191,313 | Holiday | 1,191,313 | 1,191,313 | 1,191,313 | 1,191,313 | 0 | 0 |
| | | | | | | | | | |
| | | | | | | | | | |
| 901 | BANK OF NY | | | | | | | | |
| 443 | PERSHING | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| 901 | BANK OF NY | | | | | | | | |
| 443 | PERSHING | | | | | | | | |
| | | 9/21/2018 | 9/24/2018 | 9/25/2018 | 9/26/2018 | 9/27/2018 | 9/28/2018 | Change | Change |
| 901 | BANK OF NY | 34,560 | 34,560 | 34,560 | 34,560 | 34,560 | 34,560 | - | 0 |
| 443 | PERSHING | 1,188,970 | 1,188,970 | 1,159,413 | 1,159,413 | 1,159,313 | 1,159,313 | -29,657 | -2.4 |
| | | 10/5/2018 | 10/8/2018 | 10/9/2018 | 10/10/2018 | 10/11/2018 | 10/12/2018 | Change | Change |
| 901 | BANK OF NY | 34,560 | 34,560 | 34,560 | 34,560 | 34,560 | 34,560 | 0 | 0 |
| 443 | PERSHING | 1,073,544 | 1,073,544 | 1,069,794 | 1,070,794 | 1,070,794 | 1,070,794 | -2750 | -0.2 |
| | | 10/12/2018 | 10/15/2018 | 10/16/2018 | 10/17/2018 | 10/18/2018 | 10/19/2018 | Change | Change |
| 901 | BANK OF NY | 34,560 | 34,560 | 34,560 | 34,560 | 34,560 | 34,560 | - | 0 |
| 443 | PERSHING | 1,070,794 | 1,070,794 | 1,070,794 | 1,070,794 | 1,040,794 | 1,040,794 | -30,000 | -2.8 |
| | | 10/19/2018 | 10/22/2018 | 10/23/2018 | 10/24/2018 | 10/25/2018 | 10/26/2018 | Change | Change |
| 901 | BANK OF NY | 34,560 | 34,560 | 34,560 | 34,560 | 34,560 | 34,560 | 0 | 0 |
| 443 | PERSHING | 1,040,794 | 1,040,794 | 1,020,794 | 1,020,794 | 1,020,794 | 1,020,794 | -20,000 | -1.9 |
| | | 11/2/2018 | 11/5/2018 | 11/6/2018 | 11/7/2018 | 11/8/2018 | 11/9/2018 | Change | Change |
| 901 | BANK OF NY | 34,560 | 34,560 | 34,560 | 34,560 | 8,534,560 | 8,534,560 | 8,500,000 | Over 100 |
| 443 | PERSHING | 1,000,794 | 875,399 | 875,399 | 875,399 | 875,399 | 875,399 | -125,395 | -12.5 |
| | | 11/16/2018 | 11/19/2018 | 11/20/2018 | 11/21/2018 | 11/22/2018 | 11/23/2018 | Change | Change |
| 901 | BANK OF NY | 8,529,838 | 8,529,838 | 8,529,838 | 8,529,838 | Holiday | 8,529,838 | 0 | 0 |
| 443 | PERSHING | 855,399 | 855,399 | 855,399 | 835,399 | Holiday | 835,399 | -20000 | -2.3 |
| | | 11/23/2018 | 11/26/2018 | 11/27/2018 | 11/28/2018 | 11/29/2018 | 11/30/2018 | Change | Change |
| 901 | BANK OF NY | 8,529,838 | 8,529,838 | 8,529,838 | 8,529,838 | 8,529,838 | 8,529,838 | - | 0 |
| 443 | PERSHING | 835,399 | 835,399 | 835,399 | 835,399 | 835,399 | 815,399 | -20,000 | -2.3 |
| | | 11/30/2018 | 12/3/2018 | 12/4/2018 | 12/5/2018 | 12/6/2018 | 12/7/2018 | Change | Change |
| 901 | BANK OF NY | 8,529,838 | 8,529,838 | 8,529,838 | 8,529,838 | 8,529,838 | 8,529,838 | - | 0 |
| 443 | PERSHING | 815,399 | 815,399 | 815,399 | 804,949 | 804,949 | 804,949 | -10,450 | -1.2 |
| | | 12/7/2018 | 12/10/2018 | 12/11/2018 | 12/12/2018 | 12/13/2018 | 12/14/2018 | Change | Change |
| 901 | BANK OF NY | 8,529,838 | 8,529,838 | 8,529,838 | 8,529,838 | 8,529,838 | 8,454,838 | -75,000 | -0.8 |
| 443 | PERSHING | 804,949 | 804,949 | 804,949 | 785,299 | 852,299 | 777,063 | -27,886 | (3) |
| | | 12/14/2018 | 12/17/2018 | 12/18/2018 | 12/19/2018 | 12/20/2018 | 12/21/2018 | Change | Change |
| 901 | BANK OF NY | 8,454,838 | 8,454,838 | 8,438,838 | 8,427,588 | 8,397,588 | 8,397,588 | -57250 | -0.6 |
| 443 | PERSHING | 777,063 | 772,063 | 772,063 | 772,063 | 772,063 | 772,063 | -5,000 | -0.6 |
| | | 12/21/2018 | 12/24/2018 | 12/25/2018 | 12/26/2018 | 12/27/2018 | 12/28/2018 | Change | Change |
| 901 | BANK OF NY | 8,397,588 | 8,397,588 | Holiday | 8,397,588 | 8,397,588 | 8,397,588 | 0 | 0 |

MOBIQUITY TECHNOLOGIES INC - CUSIP 60743F102

| Part No. | Participant Name | Opening | Monday | Tuesday | Wednesday | Thursday | Friday | Share | Percent |
|---|---|---|---|---|---|---|---|---|---|
| 443 | PERSHING | 772,063 | 772,063 | Holiday | 772,063 | 772,063 | 772,063 | 0 | 0 |
| | | | | | | | | | |
| | | 12/28/2018 | 12/31/2018 | 1/1/2019 | 1/2/2019 | 1/3/2019 | 1/4/2019 | Change | Change |
| 901 | BANK OF NY | 8,397,588 | 8,397,588 | Holiday | 8,397,588 | 8,397,588 | 8,397,588 | 0 | 0 |
| 443 | PERSHING | 772,063 | 772,063 | Holiday | 772,063 | 797,063 | 797,063 | 25,000 | 3.2 |
| | | | | | | | | | |
| | | 1/4/2019 | 1/7/2019 | 1/8/2019 | 1/9/2019 | 1/10/2019 | 1/11/2019 | Change | Change |
| 901 | BANK OF NY | 8,397,588 | 8,397,588 | 8,397,588 | 8,397,588 | 8,397,588 | 8,397,588 | 0 | 0 |
| 443 | PERSHING | 797,063 | 797,063 | 797,063 | 781,988 | 777,063 | 777,063 | -20,000 | -2.5 |
| | | | | | | | | | |
| | | 1/11/2019 | 1/14/2019 | 1/15/2019 | 1/16/2019 | 1/17/2019 | 1/18/2019 | Change | Change |
| 901 | BANK OF NY | 8,397,588 | 8,397,588 | 8,397,588 | 8,397,588 | 8,397,588 | 8,397,588 | 0 | 0 |
| 443 | PERSHING | 777,063 | 757,063 | 737,063 | 721,563 | 724,563 | 724,563 | -52,500 | -6.7 |
| | | | | | | | | | |
| | | 1/18/2019 | 1/21/2019 | 1/22/2019 | 1/23/2019 | 1/24/2019 | 1/25/2019 | Change | Change |
| 901 | BANK OF NY | 8,397,588 | Holiday | 8,397,588 | 8,397,588 | 8,397,588 | 8,397,588 | 0 | 0 |
| 443 | PERSHING | 724,563 | Holiday | 774,563 | 774,563 | 774,563 | 774,563 | 50,000 | 6.9 |
| | | | | | | | | | |
| | | 1/25/2019 | 1/28/2019 | 1/29/2019 | 1/30/2019 | 1/31/2019 | 2/1/2019 | Change | Change |
| 901 | BANK OF NY | 8,397,588 | 8,397,588 | 8,397,588 | 8,397,588 | 8,397,588 | 8,397,588 | 0 | 0 |
| 443 | PERSHING | 774,563 | 2,065,863 | 2,046,863 | 2,026,863 | 2,010,863 | 2,010,863 | 1,236,300 | Over 100 |
| | | | | | | | | | |
| | | 2/1/2019 | 2/4/2019 | 2/5/2019 | 2/6/2019 | 2/7/2019 | 2/8/2019 | Change | Change |
| 901 | BANK OF NY | 8,397,588 | 8,397,588 | 8,397,588 | 8,397,588 | 8,397,588 | 8,397,588 | 0 | 0 |
| 443 | PERSHING | 2,010,863 | 1,970,863 | 1,957,033 | 1,947,033 | 1,947,033 | 1,947,033 | -63,830 | -3.1 |

Exhibit 7

LAW OFFICES OF
ROBERT M. YASPAN
21700 OXNARD STREET
SUITE 1750
WOODLAND HILLS, CALIFORNIA 91367
(818) 905-7711 OR (818) 774-9929
FAX (818) 501-7711 OR (818) 774-9989

ROBERT M. YASPAN
DEBRA R. BRAND
JOSEPH G. McCARTY

January 21, 2019

*Via Email to* support@rainier.ch; greg@rainier.ch;
*and USPS International Mail*
RAINIER AG
Swiss Asset Management
c/o Greg Mancuso
Neugasse 15
CH-6301
Zug, Switzerland

Re: Consul Group RE 2021, S.R.L (The "Company")., Account No. PR0017188 (the "Account"); Notice of Termination of the Brokerage Account Agreement and the Account

Dear Mr. Mancuso:

This office represents Consul Group RE 2021 S.R.L., Mauricio Lara Ramos (Manager, and Primary Beneficial Holder), Gopher Protocol, Inc. and its affiliate consultants.

As the result of your firm's misconduct the Company noticed you regarding the closing of its account with you. You ignored the notice of closing and instead illegally held onto the assets in the account. You are not authorized to withhold any funds or Stock or delay the transfer in any way. You will be held fully responsible for any delay and further damages incurred if you fail to transfer all funds and stock held in the Account immediately as requested.

The misconduct of your firm extends to its authorized representatives and if and when the Company institutes litigation in the States the representatives will also be named in any appropriate litigation.

This letter will serve as the second notice that pursuant to paragraph 24 of the Brokerage Account Agreement (the "Agreement") for the Account, the Account Holder and the Beneficiary of the Account hereby terminate the Account and Agreement with immediate effect. Therefore, you are instructed to transfer all of the funds to the Company account as instructed by Mr. Ramos in writing; the GOPH shares in the account shall be sent via DWAC to Empire Stock Transfer, Inc., 1859 Whitney Mesa Dr, Henderson, NV 89014; GOPH's transfer agent; and the

LAW OFFICES OF
ROBERT M. YASPAN

RAINIER AG
Swiss Asset Management
Page 2 of 2
January 21, 2019

MOBQ shares shall be sent via DWAC to Continental Stock Transfer & Trust, Inc., 17 Battery Place, 8th Floor, New York, NY 10004, MOBQ's transfer agent.

Thank you for your anticipated prompt attention to this matter. I am available for your call. Please do not contact the Company directly; all comments and communications should be directed to this office.

Sincerely yours,

Robert M. Yaspan

Enclosures – Consul formal notice dated 1/16/2019

cc:   James Rogers, Regulatory Analyst
      FINRA - Office of Fraud Detection and Market Intelligence
      15200 Omega Drive, Suite 210
      Rockville, MD  20850

      Gopher Protocol, Inc.

      Mitchell Tavera (Chief of Police, Ret.)

Exhibit 8



The Office of Joseph E. Holland
County Clerk, Recorder and Assessor
Registrar of Voters

Home | Clerk-Recorder | Assessor | Elections | Forms | Data | About | Contact Us

Certificates | Fee Schedule | Fictitious Business Names | Grantor-Grantee Index | Marriage Licenses/Ceremonies | Forms | News |
Contact Us | Email Us | About

Text size: A A A

Clerk-Recorder > Fictitious Business Name > Fictitious Business Name Enquiry > FBN's Detail

Latest News

## Fictitious Business Name Detail

If you wish to order a copy of a particular Fictitious Business Name (FBN) statement, or if you wish to pay for an
official search of a FBN, please click here.

| | |
|---|---|
| **FBN Number :** | 2017-0001472 |
| **Business Address :** | MONTECITO, CA 93108 |
| **Filed :** | 5/16/2017 |
| **Commencement Date :** | |
| **Expiration Date :** | 5/16/2022 |
| **Publication Date :** | |

| Business Name(s) | Registrant Name(s) |
|---|---|
| RAINIER AG | ZINCHENKO, LIDIA |

Department Home | Business Hours and Location | Employment | County Home | Questions or Feedback
The Official Site of the Santa Barbara County's Clerk-Recorder, Assessor and Elections Department. Copyright©2001 County of Santa Barbara. All rights reserved.
The data provided on this site is for information purposes only and should not be used as the authoritative record; please contact the Assessor's office if you have any questions or concerns.
Disclaimer

Exhibit 9

2/1/2019

FBN Search Detail



The Office of Joseph E. Holland
County Clerk, Recorder and Assessor
Registrar of Voters

Home | Clerk-Recorder | Assessor | Elections | Forms | Data | About | Contact Us

Certificates | Fee Schedule | Fictitious Business Names | Grantor-Grantee Index | Marriage Licenses/Ceremonies | Forms |
News | Contact Us | Email Us | About

Text size: A A A

Clerk-Recorder > Fictitious Business Name > Fictitious Business Name Enquiry > FBN's Detail

Latest News

## Fictitious Business Name Detail

If you wish to order a copy of a particular Fictitious Business Name (FBN) statement, or if you wish to pay for an
official search of a FBN, please click here.

|                        |                        |
|------------------------|------------------------|
| **FBN Number :**       | 2015-0002643           |
| **Business Address :** | SANTA BARBARA, CA 93101 |
| **Filed :**            | 9/4/2015               |
| **Commencement Date :** | 9/3/2015              |
| **Expiration Date :**  | 9/4/2020               |
| **Publication Date :** |                        |

| Business Name(s): | Registrant Name(s): |
|-------------------|---------------------|
| EMBLES FINANCIAL  | GUSS, MICHAEL       |

Department Home | Business Hours and Location | Employment | County Home | Questions or Feedback
The Official Site of the Santa Barbara County's Clerk-Recorder, Assessor and Elections Department. Copyright©2001 County of Santa Barbara. All rights reserved.
The data provided on this site is for information purposes only and should not be used as the authoritative record; please contact the Assessor's office if you have any questions or concerns.
Disclaimer

Exhibit 10

EZBENEFITSMAPPING ... EZBANC - Florida business directory.

# EZBANC CORP
Miami, FL · Beverly Hills, CA

Status:
Inactive

Inactive reason:
Admin Dissolution For Annual Report

Registration:
May 24, 2004

Inactive since:
Sep 28, 2012

Addresses:
1521 Alton Rd 202, Miami Beach, FL 33139 (Physical)

468 N Camden Dr Ste 200, Beverly Hills, CA 90210 (Physical)

1521 Alton Rd, Miami, FL 33139

State ID:
P04000081891

Business type:
Florida Profit Corporation

Members (6):
Kushkhov, Oleg Mr, 1521 Alton Rd. #202, Miami Beach, FL 33139 (Physical)
Michael Guss (President, President, Director, inactive)
Nury Santiago (President, Director, Vice President, inactive)
Oleg M. Kushkhov (President, Director, Vice President, inactive)
Ajene Odeluga (Director, Vice President, inactive)
...

EIN:
201157423

Business Background Report

# EZBAY INC
3757 Charleston Loop, Oviedo, FL 32765

Status:
Inactive

Industry:
Business Services at Non-Commercial Site

Inactive reason:
Admin Dissolution For Annual Report

Registration:
Jun 16, 2004

Inactive since:
Sep 16, 2005

State ID:
P04000092884

Business type:
Florida Profit Corporation

Member:
Ali R Hakimian (President, inactive), 3830 Hollow Crossing Dr., Orlando, FL 32817 (Physical)

Agent:
Ali Hakimian
3830 Hollow Crossing Dr., Orlando, FL 32817 (Physical)

EIN:
NONE

Business Background Report

# EZBAYAUCTIONS INC
9300 South Dixie Highway Suite 203, Miami, FL 33156

Exhibit 11

## 2018  FLORIDA PROFIT CORPORATION REINSTATEMENT

DOCUMENT# P04000081891

**Entity Name:** EZBANC CORP.

**Current Principal Place of Business:**

1187 COAST VILLAGE RD
PMB 1-465
MONTECITO, CA  93108

**Current Mailing Address:**

1187 COAST VILLAGE RD
PMB 1-465
MONTECITO, CA  93108  US

**FEI Number:** 20-1157423                **Certificate of Status Desired:** No

**Name and Address of Current Registered Agent:**

EMBLES FINANCIAL, INC.
1187 COAST VILLAGE RD
PMB 1-465
MONTECITO, FL  93108  US

*The above named entity submits this statement for the purpose of changing its registered office or registered agent, or both, in the State of Florida.*

SIGNATURE:  GREGORY MANCUSO _____    05/04/2018

           Electronic Signature of Registered Agent                Date

**Officer/Director Detail :**

| | |
|---|---|
| Title | PRESIDENT |
| Name | GUSS, MICHAEL MR. |
| Address | 1187 COAST VILLAGE RD |
| | PMB 1-465 |
| City-State-Zip: | MONTECITO  CA  93108 |

*I hereby certify that the information indicated on this report or supplemental report is true and accurate and that my electronic signature shall have the same legal effect as if made under oath; that I am an officer or director of the corporation or the receiver or trustee empowered to execute this report as required by Chapter 607, Florida Statutes; and that my name appears above, or on an attachment with all other like empowered.*

SIGNATURE: MICHAEL GUSS                PRESIDENT            05/04/2018

           Electronic Signature of Signing Officer/Director Detail            Date

**FILED**
**May 04, 2018**
**Secretary of State**
**CR7912480380**

Exhibit 12

<u>BEFORE THE NATIONAL ADJUDICATORY COUNCIL</u>

<u>NASD</u>

| | |
|---|---|
| In the Matter of | <u>DECISION</u> |
| Department of Enforcement, | Complaint No. C06040027 |
|          Complainant, | Dated: February 12, 2007 |
| vs. | |
| Sterling Scott Lee<br>Austin, Texas, | |
| Dennis Todd Lloyd Gordon<br>Rosenberg, Texas, | |
|         Respondents. | |

**Registered principals and senior officers of member firm permitted unregistered individual to function as a principal of the firm, failed to maintain the accuracy of the firm's membership application, charged retail customers fraudulently excessive markups, and failed to disclose the markups on customer confirmations. <u>Held</u>, findings affirmed and sanctions modified.**

### Appearances

For the Complainant:  Karen E. Whitaker, Esq., and Leo F. Orenstein, Esq., NASD Department of Enforcement.

For the Respondents: Joel A. Gordon, Esq.

### <u>DECISION</u>

Pursuant to NASD Procedural Rule 9311, Sterling Scott Lee ("Lee") and Dennis Todd Lloyd Gordon ("Gordon") appeal a Hearing Panel's December 29, 2005 decision finding that the respondents permitted an unregistered individual to function as a principal of member firm Lloyd Scott and Valenti, Ltd. ("LSVL"), failed to maintain the accuracy of LSVL's membership application, and charged retail customers fraudulently excessive markups that were not disclosed on the confirmations that the customers received. The Hearing Panel barred Lee and Gordon in all capacities for permitting an unregistered, statutorily disqualified individual to function as a principal of LSVL. In light of the bar, the Hearing Panel imposed no additional sanction for

- 2 -

respondents' fraudulently excessive markups, but ordered respondents to pay restitution to LSVL customers of $22,657 for their markup violations. The Hearing Panel also assessed costs of $2,779. After a thorough review of the record, we affirm the Hearing Panel's findings and modify sanctions.

## I.      Background

Gordon entered the securities industry in April 1988 and became associated with LSVL in February 2000. In 1999, Gordon became acquainted with an unregistered individual who was known by several names, including Michael Guss and Michael Syroejine (hereinafter referred to as "Guss"). At that time, Gordon was associated with several member firms as a financial and operations principal ("FINOP"). Guss was never registered in the securities industry. Lee entered the securities industry in January 1989. In May 2000, Lee joined LSVL.

## II.      Procedural History

NASD's Department of Enforcement ("Enforcement") filed the complaint in this matter in August 2004. A complaint from a former employee of LSVL triggered Enforcement's investigation of Guss's association with LSVL.

Cause one of the complaint alleged and the Hearing Panel found that, between February 2000 and May 2003, Lee and Gordon permitted Guss to function as a principal of LSVL when he was not properly registered and was statutorily disqualified from the industry. The Hearing Panel found that Lee and Gordon allowed Guss to: establish LSVL's policies and procedures, recruit registered representatives for LSVL, negotiate clearing agreements, resolve disputes with LSVL's clearing firms, negotiate Office of Supervisory Jurisdiction ("OSJ") agreements, determine branch office operations, and represent LSVL to issuers on the subject of underwritings. The complaint alleged and the Hearing Panel further found that, during the same period, Gordon and Lee filed 29 amendments to LSVL's Uniform Application for Broker-Dealer Registration ("Form BD"), but failed to disclose Guss's involvement with LSVL. The Hearing Panel concluded that Gordon and Lee's conduct violated Membership and Registration Rule 1021, Conduct Rule 2110, and Article IV, Section 1 and Article V, Section 1 of NASD's By-Laws.

Cause two alleged and the Hearing Panel found that, from June through August 2002, Lee and Gordon executed 31 riskless principal trades in Pacific CMA, Inc. ("PCCM") stock in which they charged LSVL's retail customers fraudulently excessive markups of 12.9% to 54.55%. The complaint alleged and the Hearing Panel also found that Lee and Gordon failed to ensure that the markups were disclosed on customer confirmations. The Hearing Panel found that Lee and Gordon violated Conduct Rules 2110, 2120, 2230, and 2440, IM-2440, Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act"), and Exchange Act Rules 10b-5 and 10b-10.[1]

---

[1]      Enforcement also named LSVL and Guss as respondents. LSVL and Guss settled the matter; NASD censured and fined LSVL and Guss and ordered that they pay restitution to injured customers. Guss also agreed to a bar in all capacities, and LSVL agreed to undertake an

[Footnote continued on next page]

- 3 -

### III.    Facts

A.    Guss's Association with LSVL

Guss immigrated to the United States in 1991 from the former Soviet Union. In 1999, Guss advised Gordon that Elena Sordia ("Sordia"), a lawyer and business associate of his in Russia, was interested in investing in a broker-dealer in the United States and that she had granted Guss legal authority to conduct her business affairs in the United States. Gordon alerted Guss that the owner of member firm Lauren Capital was interested in selling his ownership of the firm. Sordia formed a holding company, Devonshire Forte, Ltd. ("Devonshire"), purchased Lauren Capital, and after receiving NASD approval of the purchase, renamed the firm LSVL. During all times relevant to the complaint, LSVL operated as a $5,000 broker-dealer.[2]

Gordon assisted Guss and Sordia in securing NASD approval of Sordia's purchase of Lauren Capital. In February 2000, Gordon became a principal of LSVL and assumed the positions of Chairman and Chief Executive Officer. He also acquired a minority interest (20%) in Devonshire and a position on Devonshire's Board of Directors.

Gordon recruited Lee to join LSVL. In May 2000, Lee became a principal of LSVL and the firm's President and Chief Compliance Officer. Lee also acquired a minority ownership interest (20%) in Devonshire and served on Devonshire's Board.

In 1999, Guss, who held no formal position with Devonshire or LSVL, recruited registered person Jeffrey Chicola ("Chicola") to join LSVL and open a branch office in New York. Guss led Chicola to understand that he (Chicola) would become President of LSVL, Sordia would infuse cash into the New York branch that Chicola would operate, and Chicola would acquire an ownership interest in Devonshire. Chicola's departure from his prior employer, however, was delayed, and Chicola was unable to join LSVL until June 2000. By that time, Lee had already assumed the position of President. In February 2001, Chicola resigned from LSVL.

---

[cont'd]
ownership change, but instead withdrew its registration. Neither paid restitution to the firm's injured customers.

[2]      Exchange Act Rule 15c3-1 establishes the requirement that broker-dealers maintain a certain ratio of indebtedness to liquid capital. Pursuant to Rule 15c3-1(a)(2)(vi), a broker-dealer that does not receive or hold customer funds or securities and does not carry accounts of or for customers shall maintain a minimum net capital of $5,000. LSVL was in this category of broker-dealers.

- 4 -

In May 2002, Envision Ventures, Inc. ("Envision") acquired LSVL from Devonshire. Guss's spouse, Kathia Santiago ("Santiago"), was the majority owner (60%) of Envision.[3] Gordon and Lee were minority owners (20% each) of Envision. Santiago was a former fashion model and had no experience in the securities industry. According to the membership continuance applications that Gordon filed with NASD on behalf of LSVL, Santiago intended to have no direct involvement in the affairs of LSVL. Guss acted as Santiago's representative with respect to her ownership of Envision, although Guss was not listed on LSVL's Form BD.

LSVL executed a management agreement, first with Devonshire and then with Envision, pursuant to which the holding company (Devonshire or Envision) covered all of LSVL's operating expenses and assumed LSVL's liabilities in exchange for LSVL's payment of a monthly "management fee" (due on the 15th of each month). In the management agreement, Devonshire/Envision agreed that, if any parent company invoice were to place LSVL into net capital deficiency, the parent company would permanently waive the debt. Sordia (Devonshire) or Santiago (Envision) infused cash into LSVL as necessary to enable the firm to continue operations. Although the parent companies never forgave a monthly liability that LSVL owed to them, Lee and Gordon testified that LSVL never succeeded in generating significant profits above its costs.

All of the individuals associated with LSVL, including those who were registered to conduct LSVL's securities business, were employed and compensated by the holding company (Devonshire or Envision) and "assigned" by the holding company to work at LSVL. Lee ran the day-to-day operations of LSVL in the firm's main office in Texas. Gordon worked from his home in Texas. LSVL intended to grow by acquiring other broker-dealer firms throughout the country and transforming them into a series of LSVL OSJs. Guss was particularly interested in developing OSJs in New York and Florida, where he resided.

Between May 2000 and February 2003 (the period of the registration violation alleged in the complaint), Guss was disqualified from registration in the securities industry as a result of a 1996 felony conviction.[4] Gordon and Lee claim to have been unaware of Guss's statutory disqualification or his underlying felony conviction. They were aware, however, that Guss refused to register with NASD, he did not want to hold an ownership interest in LSVL or its holding company, and he was not identified on LSVL's Form BD as a person who controls LSVL's management or policies.[5]

---

[3]    Lee and Gordon resigned their positions on Devonshire's Board in February 2002 over concerns that Guss and Sordia had been conducting other undisclosed businesses through Devonshire.

[4]    In 1996, Guss pled guilty and was convicted in the United States of money laundering. Guss cooperated with federal prosecutors and testified against members of a Russian organized crime group in exchange for avoiding jail time. As a result of the 1996 conviction, Guss was disqualified from registration. *See* Article III, Section 4(g) of NASD's By-Laws.

[5]    Guss did not testify at the Hearing Panel hearing in this matter. On June 9, 2003, he testified on the record before NASD staff that, in 2000 or 2001, he advised Lee and Gordon of

[Footnote continued on next page]

- 5 -

B.    LSVL's Markups in Retail Sales of PCCM

In 2001, Gordon established an account at LSVL's clearing firm to conduct riskless principal trading.  LSVL was not a market maker, but Gordon wanted LSVL "to do as much principal cross-trading as possible (which allows [LSVL] to make a profit as if [it] were a market maker)."  LSVL's clearing firm was not immediately amenable to establishing the account, and Gordon represented to the clearing firm that he had "cleared" the type of account with NASD.

Gordon testified that he opened the account at the request of LSVL representative WT.  WT identified large shareholders of Bulletin Board securities who were interested in selling all or part of their positions.  Once WT identified a willing seller, he submitted the issuer name to Lee for approval.  If approved, Lee added the issuer to LSVL's approved product list.  WT then searched out purchasers of the securities.  The buyers and sellers next opened accounts at LSVL, and WT matched purchases and sales and executed riskless principal transactions through LSVL's riskless principal trading account.

For all trades that LSVL executed in the riskless principal trading account, LSVL bought at the bid and sold at the ask and retained the spread as compensation.  Respondents contend that locating purchasers for these riskless principal transactions required significant time and energy and that LSVL was entitled to keep the spread as compensation for the additional work required for these types of sales.[6]

Only Lee and Gordon possessed authority to execute trades in LSVL's riskless principal trading account.  In fact, Lee executed all of the trades at issue in this case.

---

[cont'd]
his criminal conviction.  Lee and Gordon denied that Guss had advised them of his conviction prior to NASD's commencement of its investigation in this matter.  The Hearing Panel concluded that Lee and Gordon either knew or should have known that Guss was a convicted felon and therefore statutorily disqualified from the securities industry.  The only evidence in the record that Guss informed Lee and Gordon of his conviction is Guss's on-the-record testimony.  Lee and Gordon's testimony contradict Guss on this point, and no other record evidence supports Guss's version of events.  Although we concur that the record supports the Hearing Panel's findings of violation and that Guss was in fact statutorily disqualified, we are not convinced that Lee and Gordon knew or should have known of Guss's criminal conviction.  Indeed, the record reflects that Guss agreed not to publicize his cooperation with federal authorities and that he changed his name several times to conceal his identity.  Based on the record, we do not conclude that Lee and Gordon knew or should have known of Guss's statutory disqualification.

[6]    On these trades, LSVL paid 75% of the commissions to the registered representative and kept 25% as compensation for the firm.

- 6 -

In April 2002, WT recommended PCCM as a candidate for trading in LSVL's riskless principal trading account.[7] From June 6 through August 30, 2002, in 31 transactions, LSVL purchased PCCM from customer CYC at the inside bid, charged a commission of approximately 5%, and sold the PCCM stock to another customer at the inside offer. LSVL retained the spread in each trade as compensation, resulting in markups ranging from 12.9% to 54.55%, which LSVL did not disclose on customer confirmations. LSVL was responsible for a substantial percentage of the trading volume in PCCM during the three-month period at issue (approximately 82% in June, 80% in July, and 90% in August).

## IV.   Discussion

After a thorough review of the record, we affirm the Hearing Panel's findings of violation and hold that Lee and Gordon violated Membership and Registration Rule 1021, Conduct Rules 2110, 2120, 2230, and 2440, IM-2440, Article IV, Section 1 and Article V, Section 1 of NASD's By-Laws, Section 10(b) of the Exchange Act, and Exchange Act Rules 10b-5 and 10b-10.

A.   Registration Violations

1.   Lee and Gordon Permitted Guss to Act as a Principal of LSVL Without Principal Registration.

Under cause one, we find that Gordon and Lee allowed Guss, a statutorily disqualified individual, to function as an unregistered principal of LSVL over a period of approximately three years.

Article V, Section 1 of NASD's By-Laws states that no member shall permit a person to associate with the member to engage in the investment banking or securities business of the

---

[7]      The record suggests that WT learned of PCCM from Guss and that Guss and PCCM had agreed that Devonshire/Envision would conduct a "corporate sponsorship campaign" for PCCM. Through Devonshire/Envison, Guss operated a "corporate sponsorship" program whereby Devonshire/Envision contracted with issuers to increase investor awareness of the issuers. Guss attached to a November 2001 email to Gordon and Lee a "generic template" for the contract between Devonshire and issuers. According to the template, Guss agreed to publish the issuer's corporate profile on LSVL's Website and promised to deliver the holding company's "best effort to drive no less than five million investors from its own opt-in database and redirect traffic from major financial Websites to the LSVL's website ..." Additionally, Guss promised that Devonshire would provide copies of the issuer's corporate profile or research report and sales leads to a network of brokers, including LSVL representatives, and "encourage" them to solicit customers to buy the issuer's stock. Guss also offered to provide representatives who contacted LSVL via BrokerHunter.com the email addresses of potential investors who registered with LSVL on its Web site. Guss referred to these email addresses as "free pre-qualified leads." Although PCCM deposited shares of its stock into Guss's account at LSVL as payment for the program, Lee testified that Guss never actually conducted a corporate sponsorship program for PCCM.

- 7 -

member unless the person has satisfied NASD's qualification requirements and is not subject to disqualification.[8]  Membership and Registration Rule 1021 states that all persons engaged or to be engaged in the investment banking or securities business of a member who are to function as principals shall be registered as such with NASD.  Rule 1021 defines principal as a person associated with a member who is actively engaged in the management of the member's investment banking or securities business, including supervision, solicitation, conduct of business or the training of persons associated with a member for any of these functions.[9]  NASD IM-1000-3 states that the failure of any member to register an employee who should be so registered may be conduct inconsistent with just and equitable principles of trade and therefore a violation of Rule 2110.  Thus, to sustain the Hearing Panel's findings of violation, we must find that Guss: (1) was an associated person of LSVL; and (2) actively engaged in the management of LSVL's investment banking or securities business (including supervision, solicitation, conduct of business or training).

Lee and Gordon contend that Guss managed Devonshire and Envision only insofar as he was protecting Sordia's investment in Devonshire[10] and Santiago's investment in Envision, but that he did not participate in the management and operation of LSVL.  They state that, when he would inadvertently exceed his authority at LSVL, Lee and Gordon would remind him to curtail his activities.  They contend that Guss had administrative responsibilities only at LSVL and that he was LSVL's "Webmaster."  "A registration determination[, however,] does not depend on the individual's title, but rather on the functions that he or she performs."  *NASD Notice to Members* 99-49 (June 1999), 1999 NASD LEXIS 24, at *4.[11]  The record paints a different picture of Guss's activities at LSVL.

The record contains myriad emails among Guss, Lee and Gordon.  In several, Lee or Gordon chastises Guss for overstepping his bounds and inserting himself into the management and operations of LSVL.  Other emails, however, suggest that Lee and Gordon actively sought

---

[8]    NASD Rule 115 states that persons associated with a member shall have the same duties and obligations as members under NASD's rules.

[9]    Article I, Section (dd) of NASD's By-Laws defines "person associated with a member" to include a sole proprietor, partner, officer, director, or branch manager of a member, or other natural person occupying a similar status or performing a similar function, or a natural person engaged in the investment banking or securities business who is directly or indirectly controlling or controlled by a member.

[10]    Guss testified on the record that, although Sordia did not compensate him for representing her business interests in the United States, he nonetheless was willing to devote significant amounts of time and energy to developing the profitability of Sordia's investment in Devonshire because he owed Sordia money for unpaid legal fees.

[11]    *See also Dist. Bus. Conduct Comm. v. American Nat'l Equities, Inc.*, Complaint No. LA-4323, 1991 NASD Discip. LEXIS 86, at *20 (NBCC Nov. 25, 1991) (holding that the definition of "principal" is not limited to those who are involved in day-to-day management of broker-dealer).

- 8 -

Guss's permission and advice on matters related to LSVL's securities and investment business. In fact, Lee and Gordon clearly considered Guss to be their boss. *See Gordon Kerr*, 54 S.E.C. 930, 935 (2000) (holding that, to determine necessity for principal registration, SEC looks at "responsibilities assigned to the associated person by the firm and at the activities the individual actually performed"). In a December 2001 email from Gordon to Lee, Gordon writes:

> You are an employee of LSVL which is owned by [Devonshire] . . . I too am an employee, even if I am not paid. We both have bosses . . . As [Sordia's] proxy, we both report to [Guss]. He is our boss and yes, I am yours . . .[12]

Gordon and Lee considered Guss to be an owner of LSVL and treated him accordingly.[13] In October 2002, Gordon issued an email to the staff of LSVL's Austin, Texas office in which he stated unequivocally that Guss should be treated as their "superior."[14] In a June 2001 series of emails in which Guss encouraged Gordon to devote more time to his LSVL duties and delineated the amount of time that he (Guss) devoted to LSVL, Gordon responded: "If I owned half the firm I am sure my priorities would be different." Lee testified before the Hearing Panel that Guss "represented the shareholders. He was a conduit for [Sordia] and a conduit for his wife [Santiago], and so we respected that."

Lee and Gordon endowed Guss with the authority of a principal and owner of LSVL. Additionally, Guss's individual actions support our finding that he was a principal of LSVL. As indicated below, Guss engaged in managerial activities relating to nearly every aspect of LSVL's business.

        a.    <u>Guss Participated in Personnel Decisions, Including the Hiring and Firing of LSVL Staff.</u>

Lee and Gordon claim that Guss's participation in LSVL's personnel matters was limited to identifying potential hires from BrokerHunter.com, an Internet resume-posting service for brokers. But emails to and from Guss demonstrate a deeper involvement in personnel issues. They show that he exerted management prerogatives beyond an administrative role by deciding compensation issues and making hiring and firing decisions, conduct that suggests that Guss was acting as a principal of LSVL. *Cf. Douglas Conrad Black*, 51 S.E.C. 791, 794 (1993) (finding that an individual engaged in the supervision of another member of the firm should be registered

---

[12]    Although Lee took issue in his response with Gordon's claim that he (Gordon) was Lee's superior, Lee did not dispute that Guss was his boss.

[13]    In an email exchange in March 2002, Guss described himself as being at respondents' "complete mercy" because they could destroy *his broker-dealer investment* by placing "one phone call to [their] buddies at NASD."

[14]    In the same email, Gordon also directed staff to follow Guss's instructions "without fail." Gordon also stated in the email that "[Guss] will not provide . . . instructions related to specific securities, securities related issues, or brokerage related instructions."

- 9 -

as a principal); *Kirk A. Knapp*, 50 S.E.C. 858, 861 (1992) (holding that conduct that included hiring a salesperson for the firm resulted in Knapp's violation of a principal bar).

In a January 2002 email exchange on which Gordon was copied, Lee tells Guss that he received a call from CM, a broker who, after talking with *Guss*, decided to join LSVL. Lee continues: "Anything I should/need to know?" On January 18, Guss replies:

> Please get him registered (with pre-hire dated (sic) of 1/15/2002). He will come on board in a couple of weeks and will start an OSJ here in FL. He is a high-growth prospect and we will support him in several ways for a test period of time in a hope that he could add a lot of production.

Later, in another January 2002 email, Guss directs Lee to "proceed full speed ahead with registration for [CM]." Similarly, in a December 2002 email to Gordon on which Lee was copied, Guss writes:

> What would it take to set LSVL up to be a commodities dealer? I am interviewing a broker tomorrow who comes from [MS] and would like to deal in commodities. Please advise ASAP.

Two weeks later, Gordon inquired of *Guss* as to the status of the MS hire.[15]

The record also is replete with examples of Guss's control of LSVL salaries. Both Gordon and Lee sought salary increases from Guss. In a November 2001 email to Guss that was copied to Gordon, Lee complains: "I am currently way undervalued in my position [as LSVL President]. An additional 30k would help bring me a bit closer to being fairly valued, but I would still be grossly under-compensated for the work I perform." In a June 2001 series of emails, Guss supports awarding VV, an administrative assistant at LSVL, with a salary increase. In a September 2002 email, Guss advises Gordon and Lee that the holding company would withhold a certain dollar amount from the pay of a member of LSVL staff who had made an error that caused a trading loss.

Everyone at LSVL, from Lee, the President, down to VV, an administrative assistant, perceived that Guss was his or her boss. In a January 2002 email to VV, Lee refers to Guss as the "powers that be" and states that Guss had the "power to tell [Lee] to fire people." In a

---

[15]     Guss also established LSVL policy regarding the timing of the firm's hiring of registered representatives. In a January 2002 email, he directed Lee to backdate hire dates. He states:

> If you can, all the new hires as long as reasonably possible should go in for the pre-hire as well as NASD?U4 (sic) purposes as of 1/16 or before. It will take some time to figure out with BH. [CM] will be let to work out of the office lent to me in Ft. Lauderdale and we will pick up some of his expenses (still in negotiation). Test period is 3 months and he has to show at least $15k worth of production.

- 10 -

January 2003 email from Guss to Lee and Gordon, Guss requests that CH, a member of LSVL staff, be requested to resign. Guss writes:

> Please ask her to resign effective immediately (if the payments for the brokers for the month of November have all been settled). I would like to hear your suggestions as regards an interim bookkeeping solution for LSVL. I can get us an outsourced bookkeeper (with a FINOP license) at once. Please place an ad for a ser[ies] 7/24 licensed employee. New employee has to take up all the licensed functions that were spread between [CH] and [G]. I will take up as much (sic) unlicensed duties that can be carried out in a long-distance mode as necessary in the meantime.

One day later, Guss sent Lee and Gordon an email containing a draft letter terminating CH's employment at LSVL and bearing Santiago's name.[16]

    b.   <u>Guss Negotiated OSJ Agreements and Established OSJs for LSVL.</u>

Guss impliedly represented to potential new hires that he was a principal of LSVL and negotiated OSJ agreements on behalf of LSVL. *See Dist. Bus. Conduct Comm. v. Bruce L. Pecaro*, Complaint No. C8A960029, 1998 NASD Discip. LEXIS 13, at *20 (NBCC Jan. 7, 1998) (holding that an individual who held himself out in "a manner that would lead an objective observer to infer that he was intimately involved" as a principal in the firm's securities business must register as a principal). Guss endeavored to acquire existing firms to establish LSVL OSJs in New York, California, and Florida. In September 2002, Guss states in an email to Lee and Gordon:

> The negotiations here in FL are in the final stage. Attached is the draft of the OSJ agreement. Ironically, at this stage, one of the managers of [RB] who has (sic) originally recruited the crew in question for his firm, is talking to me as follows. If we manage to steal this crew from [RB] (talk about loyalty to the bank-owned firm), he would resign from there himself and switch with his 12 brokers and $22M under management to LSVL.

In February 2003, Guss copied Lee and Gordon on an email that he sent to the owner of an existing firm regarding a proposed OSJ agreement with the firm. Guss states:

---

[16]    Guss's involvement in personnel issues permeated every level of activity at LSVL. In January 2003, Guss wrote to Lee: "[AW] in Ft. Lauderdale is fired as of today. Please make sure to call ADP and tell them NOT to bill us $25 for that anymore." Lee's response that same day was "Wow . . . she was short-lived. I took care of ADP last week." Similarly, in February 2003, Guss directed Lee to "terminate [JB]." Guss continued "He called and told me he can't do much for LSVL because he really doesn't have a clue how to start and how to approach things." Lee responded "done."

- 11 -

> Attached is the raw draft of the OSJ Agreement . . . My firm, [LSVL] will
> upgrade its registration with NASD and will become a market maker etc.,
> basically copying all the necessary lines of your current restriction letter so that
> there is not discontinuation of any of your business . . .

Repeatedly, Guss held himself out to individuals outside of LSVL as a person in a
managerial position at the firm.

<div align="center">

c.    <u>Guss Established Policies and Procedures at LSVL.</u>

</div>

Guss participated significantly in establishing policies and procedures at LSVL and
interacted extensively with LSVL staff, including on issues related to retail clients.  In November
2001, Guss emailed to Lee and Gordon LSVL's "new corporate procedures."  These procedures
covered numerous topics, including order-flow compensation, collecting LSVL's outstanding
debts, and the firm's payout to representatives on house accounts.  Guss's November 2001 email
states:

> [I]n order to facilitate brokers' interest in our corporate sponsorship programs one
> of the incentives you could give them is participation in the order flow
> compensation.  In order to receive that order flow compensation we would need
> two things: a flow of orders and a friendly market maker.

Similarly, emails from Guss to Lee and Gordon in February 2002 question why certain
securities were on LSVL's approved product list and ask which of LSVL's representatives were
selling those securities.  In an October 2002 email, Guss directs Lee to release house accounts to
representatives in LSVL's OSJs.  In a January 2003 email, Guss chastises Lee and Gordon for
failing to collect a debt owed to LSVL from a former representative of the firm.  He states:

> I need to get to the bottom of this and therefore, this way or another, I would have
> to take over the day-to-day supervision of what's going on in [LSVL's main
> office's] accounting . . . We need to create a system that works, and that needs to
> be created NOW, before we completely destroy this firm.  Starting tomorrow I
> would have to get access to all the pertinent information and systems and all the
> daily accounting and bookkeeping will be done with my direct participation, if
> not by me personally.  I expect that changeover to be completed by the end of the
> next week.

Guss also emailed the following message to members of LSVL's administrative staff in
January 2003:

> It has come to our attention that in multiple conversations with the brokers you
> are making reference to [clearing firm] as the excuse for multiple problems and
> delays of processing documents . . . For all intents and purposes – [clearing firm]
> is OUR back office support subcontractor.  Unless completely necessary – the
> reps have no business of knowing what is going on between LSVL and [clearing
> firm] . . . please note that from now on you are asked to not refer to [clearing
> firm] in any conversations with the reps, unless completely necessary.  In addition

- 12 -

> to that, mentioning of [clearing firm] as any type of an excuse for any rep-related
> problem is expressly prohibited.

In the same month, Guss emailed the following to an LSVL representative in the firm's Florida
office:

> First of all, now that you have an assistant . . . that we are paying for, I fully
> expect you to train her and use her for all your miscellaneous business needs. It
> has come to my attention that you are in what seems to be somewhat excessive
> communications with the home office . . . Second of all, as I mentioned to you,
> the printer in the office is for business use only . . . Third of all, now that you
> have agreed to service the house accounts, attendance in the office during market
> hours . . . is mandatory . . . and Finally, I would like to see reporting set up so that
> we are reasonably assured that you and [T] are spending time in the office
> productively . . . please submit a brief written summary and breakdown of your
> house accounts service . . .

Guss was involved in every aspect of LSVL's operations from miniscule matters, such as
ordering stationery and business cards,[17] to major issues, such as agreements as to order flow and
directing office policy. Such conduct supports our finding that Guss acted as a principal. *See
Knapp*, 50 S.E.C. at 861 (holding that individual who conducted sales meeting, disseminated
memoranda to sales staff, and hired sales personnel must register as a principal); *Samuel A.
Sardinia*, 46 S.E.C. 337, 343 (1976) (holding that individual who relinquished titles of director
and officer required principal registration nonetheless because he devoted significant time to the
affairs of the firm and participated in management decisions).

> d.   Guss Negotiated Clearing Agreements and Communicated on Behalf of
> LSVL with Clearing Firms.

Guss regularly communicated on LSVL's behalf with LSVL's clearing firms, implying
that he held a managerial position at LSVL. *See L.H. Alton & Co.,* 53 S.E.C. 1118, 1126 n.21
(1999) (finding that fact that respondent held himself out to be a partner is additional evidence of
need for principal registration), *aff'd, Alton v. SEC,* Fed. Sec. L. Rep. (CCH) ¶91,021 (9th Cir.
2000). In December 2002, Guss complained to one of LSVL's clearing firms about
difficulty that LSVL had had attempting to open LSVL accounts for Canadian customers. Again
in February 2003, Guss corresponded via email directly with LSVL's clearing firm about
establishing a new clearing arrangement for LSVL. Guss wrote:

> As you may remember a while ago we submitted a proposal of a new clearing
> agreement to you. Some time ago you wrote to me promising to get back by the
> end of the next week. That was on 2/12/03, i.e. your response was eagerly

---

[17]   In a July 2002 email to Lee and Gordon, Guss established a "policy for reps' stationary
(sic) orders." He directed that "NO stationary (sic) orders should be sent to printers unless and
until the proper amounts are credited to [Envision's] bank account."

- 13 -

awaited by 2/21/03.  Almost a week later there is still no word from you on that
clearing agreement . . .

Indeed, in a March 2003 email, Guss forwarded a clearing agreement that *he* had negotiated on
behalf of LSVL to Lee and Gordon for their signatures.  We find that Guss routinely held
himself out to clearing firms as an officer or principal of LSVL.[18]

e.       Guss Communicated with LSVL Customers on Securities-Related Issues.

Guss interacted with some of LSVL's clients on account-related issues.  Guss helped a
German client of LSVL open a new account, and he interceded on behalf of a Russian bank that
was an LSVL client to ensure that a trade had been cancelled.  In a July 2002 email, Guss states
to an administrative person at LSVL:

The customer on [an LSVL on-line trading account] believes that on 07/08 he had
$54,353.38 of equity on his account whereas on 07/09 he had $54,121.38 – less
$232 – on his account.  According to him he had no activity on his account in
between those two dates . . . Please look into it and reply to the customer directly .
. . [and] copy me . . . as soon as possible.

Similarly, in June 2001, Guss emailed the following to Gordon and Lee:

It seems that we should expect our first [on-line trading] account to come from
Germany.  Please read below and let me know when this guy's paperwork arrives.

Guss attached the following email from the proposed customer:

Dear [Guss],

As I don't have a fax at home, I have send (sic) all necessary documents . . . via
mail (airmail) to you.  I think, the forms will arrive at you (sic) within the next
days.

Guss reviewed LSVL customer account information at will.  In one instance, Guss
interceded to enable a foreign client to trade on margin.  In a January 2002 email, Guss wrote to
a member of LSVL's administrative staff (and copied Lee) as follows:

I really want this client to fund their account first, and then I would casually have
them sign and deliver the updated forms.  It is OUR fault that the forms were not

---

[18]      Guss similarly represented himself to be an official of LSVL to issuers.  In a series of
emails in January 2003 between Guss and the representative of an issuer, Guss discussed the
possibility of LSVL being included on the cover of the issuer's upcoming registration statement.
After communicating directly with the issuer, Guss advised Gordon of the fact and demanded
action "ASAP."

- 14 -

up to date on our website and therefore making it too complicated for the
customer that has not funded the account is not cool . . . PLEASE, make sure that
by 02/01 (when most likely their $50K will show in the account) they have
margin privileges . . . it is EXTREMELY IMPORTANT that by the time the
account has been funded and I am ready to send them the updated Margin
Agreement . . . we also had a THIRD form to send them, i.e. Day Trading
Disclosures.

Lee cautioned Guss that LSVL's allowing a customer to trade on margin before obtaining the
necessary paperwork could place the firm at a compliance risk. Guss, however, was undeterred
by Lee's warning. Guss's activities on behalf of LSVL clearly crossed over from administrative
duties to developing and maintaining the firm's client base. *See Pecaro*, 1998 NASD Discip.
LEXIS 13, at *20 ("[Pecaro's] admitted entertaining of clients seems to at least cross into
maintaining, if not expanding, business clientele. Such interaction gives an appearance of being
involved in developing and maintaining the [f]irm's client base.").

<p style="text-align:center">*   *   *   *   *</p>

Guss did little to disguise his de facto management and control of LSVL.[19] Numerous
emails contained in the record provide consistent support for our findings and are corroborated
by the testimony of Chicola and two former members of LSVL staff, CH and VV.[20] Taken
together, the evidence demonstrates that Guss was an associated person of LSVL and was
engaged actively in the management of LSVL's investment banking and securities business and

---

[19]    In a March 2002 email, Guss states to Gordon and Lee:

I am really frustrated that my *very first and largest ever investment in a BD*
project has not brought me a penny back yet and I risk to be under very soon.
Until recently except for a few grouchy remarks related to spending in Austin you
have never heard me complain about it. Do you want to know why? Because I
was confident that I have very reliable and motivated partners in the deal and I
was confident that together we will pull it off this way or another. (Emphasis
added).

In other emails, Guss indicated that, as of June 2000, he had ceased all of his "revenue-
generating activities" and had dedicated all of his time to LSVL.

[20]     We have considered that LSVL terminated CH and VV and that both initiated and settled
actions against the firm to recover unpaid overtime pay. While CH and VV's relationships with
LSVL may have potentially provided incentive for them to misconstrue the truth, we note that
their testimonies were consistent with each other and with the emails contained in evidence. VV
denied that she discussed her testimony with CH, and their testimonies regarding business
operations at LSVL were consistent with Chicola's version of events. Furthermore, neither CH
nor VV appear to have been in a position to benefit monetarily from testifying falsely against
respondents.

- 15 -

that Lee and Gordon knowingly permitted Guss to act in a principal capacity without principal registration.

### 2. Lee and Gordon Failed to Update LSVL's Form BD.

Under cause one, we also find that, by failing to disclose Guss's association with LSVL on the firm's membership application (Form BD), respondents caused the firm's application to be incomplete and inaccurate. Article IV, Section 1 of NASD's By-Laws requires member firms to ensure that membership applications are kept current by the filing of supplemental amendments via electronic process. Lee and Gordon admit that, although they possessed the authority to and, at times, did amend LSVL's Form BD, they never amended it to reflect that Guss held an ownership interest in or otherwise participated in the management of LSVL. Question 9 on the Form BD asks whether any person not identified as a direct or indirect owner controls the management of policies of the applicant. LSVL, through Lee and Gordon, answered "no" and never amended the answer, notwithstanding Guss's active involvement in the management of the firm.

\*   \*   \*   \*   \*

We thus conclude under cause one that Lee and Gordon violated Membership and Registration Rule 1021, Conduct Rule 2110, and Article IV, Section 1 and Article V, Section 1 of NASD's By-Laws.

### B. Excessive Markups

Cause two of the complaint alleged and we find that Gordon and Lee caused LSVL to charge fraudulently excessive markups of 12.9% to 54.55% in 31 retail sales of PCCM stock between June 6 and August 30, 2002, and that LSVL failed to disclose the markups in customer confirmations.

### 1. Lee and Gordon Charged LSVL Customers Excessive Markups.

NASD's rules obligate NASD member firms to deal fairly with customers. Rule 2440 states that member firms shall buy securities from and sell securities to members of the public at prices that are fair, taking into consideration all relevant circumstances. Generally, markups in excess of 5% above the prevailing market price for a security are considered excessive and unfair. IM-2440 (Mark-Up Policy); *NASD Notice to Members 92-16* (Apr. 1992), 1992 NASD LEXIS 47, at \*6-7.[21]

We begin our analysis with a determination of the prevailing market price for PCCM stock at the time of the transactions. In cases such as this in which the member firm is not a

---

[21]     IM-2440 states that it is a violation of Rules 2110 and 2440 for a member firm "to enter into any transaction with a customer in any security at any price not reasonably related to the current market price . . ."

- 16 -

market maker in the securities at issue, the price that the firm pays (i.e., its cost) contemporaneously with retail sales is the best indicator of the prevailing market price. 1992 NASD LEXIS 47, at *25; *see also Daniel R. Lehl*, 51 S.E.C. 1156, 1159 (1994) (holding that a firm that is not a market maker must base its prices on its own contemporaneous cost), *aff'd*, *Lehl v. SEC*, 90 F.3d 1483 (10th Cir. 1996); *LSCO Sec., Inc.*, 50 S.E.C. 518, 519 (1991) ("[W]here a dealer is not a market maker, the best evidence of the current market, absent countervailing evidence, is the dealer's contemporaneous cost.").

Furthermore, it is undisputed that LSVL's sales of PCCM stock to its customers were riskless principal transactions and that LSVL executed the trades through its riskless principal account. "A riskless principal transaction occurs when a dealer, after receiving an order to buy or sell a security from a customer, purchases the security from another person to offset a contemporaneous sale to such customer or sells the security to another person to offset a contemporaneous purchase from such customer." *Strategic Res. Mgmt., Inc*, 52 S.E.C. 542, 544 n.8 (1995). "[C]ontemporaneous cost, regardless of countervailing evidence, is the correct basis for calculating markups in a riskless principal transaction." *R.B. Webster Invs., Inc.*, Exchange Act Rel. No. 35754, 1995 SEC LEXIS 1309, at *8 n.18 (May 23, 1995). Thus, the appropriate method for calculating LSVL's markups is contemporaneous cost which, in this case, is LSVL's purchases from customers.

NASD examiner Gene Davis ("Davis") testified that, for each of the 31 transactions, he matched the riskless principal trades for the sell customers and buy customers.[22] In every instance, LSVL paid the selling customer the inside bid price (generally between $.50 and $.65 per share) and charged a commission (which generally ranged from approximately $50 to in excess of $200 per purchase) and simultaneously sold the same stock to another customer at the inside ask. Davis utilized LSVL's purchase price as the basis for the prevailing market price and calculated LSVL's markups as ranging generally from 13% to 55%, which we find to be excessive.[23]

---

[22]     The 31 transactions in which Gordon and Lee charged LSVL customers excessive markups are detailed in Exhibit A appended to this decision.

[23]     Enforcement did not account for the commissions that LSVL charged selling customers in its calculation of markups. Had Enforcement accounted for the commissions, the basis for the computation of prevailing market price would have been less, and LSVL's markups would have been greater. When NASD relies on retail purchases as a basis for calculating markups not involving riskless principal transactions, NASD may impute a 5% markdown to make the retail purchase price comparable to the inter-dealer purchase price and calculate the markup based on the retail purchase price plus 5% (the imputed markdown). Here, respondents' sales were riskless principal trades, and Enforcement did not impute a 5% markdown. Enforcement also did not deduct from the purchase price the commission (which generally equaled or exceeded 5%) that LSVL charged each selling customer. Had Enforcement deducted the commissions from LSVL's cost, LSVL's markups would have been greater.

- 17 -

Lee and Gordon contend that these trades were not standard riskless principal trades and that, because LSVL had to expend significant time and resources on executing these trades, the firm was entitled to charge markups in excess of 5%. Lee and Gordon failed, however, to introduce evidence to justify the higher markups that LSVL charged. "[I]f a member seeks to charge its customers more than a 5[%] markup or markdown, it must be fully prepared to justify its reasons for the higher markup or markdown with adequate documentation." *NASD Notice to Members* 92-16, 1992 SEC LEXIS 47, at *7.[24]

### 2.   LSVL's Markups Were Fraudulent, and Gordon and Lee Acted with Scienter.

"Markups of more than ten percent over the prevailing market price are evidence of scienter and . . . fraudulent." *A.S. Goldmen & Co., Inc.*, 55 S.E.C. 147, 153-54 (2001); *Adams Sec., Inc.*, 51 S.E.C. 311, 315 (1993). Indeed, using unsubstantiated quotations, as respondents did here, to calculate markups "displays at a minimum reckless indifference to the duty owed to customers." *Frank L. Palumbo*, 52 S.E.C. 467, 478 (1995) (*citing Orkin v. SEC*, 31 F.3d 1056, 1065 n.12 (11th Cir. 1994)).

Lee and Gordon acted recklessly. Both testified that LSVL relied exclusively on bid and ask quotations in determining the prices charged to customers on the sales of PCCM stock, regardless of LSVL's actual cost. "NASD and [the] Commission have often cautioned against basing prices on quotations. Particularly in the case of riskless principal transactions, where the trades occur virtually simultaneously with the sale to customers ..." *First Independence Group, Inc.*, 51 S.E.C. 662, 665 (1993), *aff'd, First Independence v. S.E.C.*, 37 F.3d 30 (2d Cir. 1994). Furthermore, Lee and Gordon knew that LSVL was not a market maker and not entitled to the spread. With the riskless principal account, they sought to circumvent acceptable pricing methods and, as Gordon put it, make a profit "as if [LSVL was] a market maker." We find that Lee and Gordon acted recklessly when they ignored significant Commission and NASD precedent and based LSVL's prices on unsubstantiated quotations rather than the firm's contemporaneous cost. *See Id.* at 666 ("Applicants were, at a minimum, reckless in charging their customers markups based on unsubstantiated quotations."); *Sacks Inv. Co., Inc.*, 51 S.E.C. 492, 496 (1993) (finding that respondents were reckless when they charged their customers markups based on unsubstantiated ask quotations); *Adams Sec., Inc.*, 51 S.E.C. at 315

---

[24]     Lee and Gordon argue that the Hearing Panel erred in shifting the burden for producing countervailing evidence to them rather than requiring Enforcement to investigate potential countervailing evidence. We do not agree. The best evidence of the current market, where, as here, a broker-dealer is not a market maker, is contemporaneous cost. *LSCO Sec., Inc., 49 S.E.C.* 1126, 1127-1128 (1989). "The burden is on the *dealer* to establish the contrary." *Id.* (emphasis added). Once Enforcement produced evidence that LSVL's cost represented the prevailing market price, the burden shifted to respondents to prove that cost was not a reliable indicator of the prevailing market. *See U.S. Sec. Clearing Corp.*, 52 S.E.C. 92, 99 (1994) (rejecting respondents' argument that, in order to show that the firm's markups were excessive, NASD had to present evidence in addition to contemporaneous cost); *Charles Michael West*, 47 S.E.C. 39, 41-42 (1979) (holding that burden shifted to firm to produce countervailing evidence once NASD established contemporaneous cost).

- 18 -

(finding that respondents were reckless in rejecting contemporaneous cost as the basis for the firm's markups).

3.   Gordon and Lee Failed to Ensure that LSVL Disclosed its Markups on Customer Confirmations.

NASD Conduct Rule 2230 requires member firms, at the completion of a transaction with a customer, to send the customer a written notification disclosing information about the transaction, including the amount of any commission or other remuneration that the member received from the trade. Exchange Act Rule 10b-10 similarly requires the disclosure to the customer of the firm's compensation.

Gordon and Lee do not deny that LSVL's customer confirmations failed to disclose the firm's compensation on the trades at issue. They contend that the fault lies with LSVL's clearing firm and that they are not responsible. Gordon and Lee, however, were the only two principals responsible for regulatory compliance at LSVL. They received copies of the firm's confirmations and, as responsible principals, should have reviewed them to ensure that they were complete and accurate. Lee and Gordon failed to do so, and they are responsible for the firm's omissive confirmations. *See Dep't of Enforcement v. U.S. Rica Fin., Inc.,* Complaint No. C01000003, 2003 NASD Discip. LEXIS 24, at *15 (NAC Sept. 9, 2003) (holding principal of firm responsible for firm's inaccurate and incomplete customer confirmations).

4.   Gordon and Lee Share Responsibility for LSVL's Pricing Violations.

Lee and Gordon share responsibility for LSVL's excessive markups. Lee and Gordon were the only two individuals at LSVL with authority to execute trades in the riskless principal account, and LSVL's supervisory procedures manual listed them as the firm's only compliance principals. Lee does not deny responsibility for LSVL's markups. Indeed, he executed each of the 31 trades at issue on behalf of LSVL, and he readily admitted the firm's policy of buying at the bid price and selling at the ask price for trades in the riskless principal account.

Gordon established LSVL's riskless principal account and was familiar with LSVL's policy of buying at the bid price and simultaneously selling at the ask price. Indeed, in May 2001, Gordon indicated to Lee and Guss in an email that he wanted LSVL to execute as many trades "as possible" in the riskless principal account so that the firm could profit as if it were a market maker. Furthermore, in order to overcome concerns expressed by LSVL's clearing firm that LSVL was not a market maker when Gordon opened the riskless principal account, Gordon assured a representative of the clearing firm that he had already cleared the account with NASD.

"The securities industry contains many participants – all of whom must perform their duties properly if the ultimate goal of fairness to the customer is to be achieved." *Lehl,* 51 S.E.C. at 1160; *see also Robert Bruce Orkin,* 51 S.E.C. 336, 342 (1993) (finding that members of the securities industry cannot "simply rely on organizational structures or formalistic arrangements as a means of abdicating their responsibilities" to monitor pricing), *aff'd,* 31 F.3d 1056 (11th Cir. 1994). We find that Gordon and Lee share responsibility for LSVL's undisclosed, excessive markups.

- 19 -

\* \* \* \* \*

We therefore affirm the Hearing Panel's findings under cause two that Lee and Gordon charged LSVL customers undisclosed, excessive markups, as indicated on Exhibit A, in contravention of Conduct Rules 2110, 2120, 2230, and 2440, IM-2440, Section 10(b) of the Exchange Act, and Exchange Act Rules 10b-5 and 10b-10.

C.   Procedural Arguments

On appeal, respondents raise three procedural arguments.  Respondents contend that:  (1) NASD erred in accepting into the record emails from Guss and Guss's on-the-record testimony; (2) Enforcement took from respondents during its investigation documents that respondents needed to defend themselves; and (3) respondents were prejudiced by the Hearing Officer's delay in issuing its decision in this matter.  We address each argument in turn.

We find no error in the Hearing Panel's admitting into the record emails authored by Guss and Guss's on-the-record testimony, both of which are hearsay evidence.  Hearsay evidence is admissible in NASD proceedings, but must be evaluated for its probative value and reliability.  *See Kevin Lee Otto*, 54 S.E.C. 847, 854 (2000), *aff'd*, 253 F.3d 960 (7th Cir. 2001). The factors used to assess the reliability of hearsay evidence include:  possible bias of the declarant; whether direct testimony is contradictory; the type of hearsay at issue; whether the declarant was available to testify; and whether the hearsay is corroborated.  *Id.*

Here, Guss's statements in his on-the-record interview are consistent not only with emails that he authored, but also with emails that Lee, Gordon and other members of LSVL staff wrote.  They also are corroborated by VV and CH's testimony and by respondents' own statements that Guss was their "boss."  Furthermore, Guss had little reason to implicate Lee and Gordon falsely.  Any suggestion in Guss's testimony that Lee and Gordon violated NASD rules by allowing him to act as a principal without registration implicates Guss in the same violation. Thus, if Guss were inclined to accuse Gordon and Lee unjustly of registration violations, he also would be admitting to violations himself.  Additionally, Lee and Gordon's direct testimony does not contradict Guss's testimony or the statements that Guss made in his emails.  Indeed, our findings in this case are not based on rejecting Lee and Gordon's factual claims as to Guss's actions and finding Guss's testimony more credible.  Rather, our findings are based on our interpretation, in accordance with NASD precedent, of rules requiring Guss to register.  The parties here differ on the interpretation of what constitutes conduct that requires registration, not on what Guss actually did at LSVL.  We therefore reject respondents' argument.  *See Dep't of Enforcement v. Belden*, Complaint No. C05010012, 2002 NASD Discip. LEXIS 12, at *20 (NAC Aug. 13, 2002) (upholding admissibility of hearsay evidence for which credibility has been assessed), *aff'd, Wendell D. Belden*, Exchange Act Rel. No. 47859, 2003 SEC LEXIS 1154 (May 14, 2003); *Charles D. Tom*, 50 S.E.C. 1142, 1145 (1992) (upholding admissibility of hearsay evidence that is determined to be reliable).

We also reject respondents' second procedural argument.  Respondents contend, for the first time in their reply brief on appeal, that Enforcement confiscated during its investigation of the markup allegations all of the documents that respondents needed to defend themselves against the markup allegations.  NASD Rule 9251, however, requires Enforcement, during the

- 20 -

pre-hearing period, to make available for inspection and copying by any respondent documents prepared or obtained by NASD staff in connection with the investigation that led to the institution of the proceedings. Nothing in the record of this matter, including the transcripts of the pre-hearing conferences, suggests that respondents were denied the opportunity to inspect and copy documents contained in NASD's files. During the final pre-hearing conference conducted on March 18, 2005, counsel for respondents in fact indicated that there were no additional procedural issues that he intended to raise. We therefore reject this argument.[25]

We also find no error in the timing of the Hearing Panel's issuance of the decision in this matter. Procedural Rule 9268 provides that, within 60 days after the final date allowed for the filing of proposed findings of fact, conclusions of law, and post-hearing briefs, the Hearing Officer shall *prepare* a written decision. "[T]he rule addresses the timing of the Hearing Officer's *preparation* of a decision (which must then be distributed to other members of the Hearing Panel), and not the *issuance* of the decision." *Daniel Richard Howard,* 55 S.E.C. 1096, 1104 (2002), *aff'd,* 77 Fed. Appx. 2 (1st Cir. 2003). There is no evidence that the Hearing Officer failed to comply with the requirement that she *prepare* the decision timely. The Hearing Panel hearing occurred on March 29, 30 and 31, 2005. Post-hearing briefing ended on May 23, 2005, and the Hearing Panel issued its decision on December 29, 2005.

We reject respondents' arguments of procedural irregularities and unfairness.

## V.      Sanctions

The Hearing Panel aggregated respondents' registration violations for purposes of sanctions and barred respondents in all capacities for their misconduct under cause one. In light of the bar, the Hearing Panel did not suspend or fine respondents for their markup violations, but ordered that respondents pay restitution to the firm's injured customers in the amount of $22,657.40, plus interest. The Hearing Panel also assessed costs. We affirm these costs and sanctions, add a bar for respondents' fraudulently excessive markups, and modify the restitution order to reflect more accurately respondents' excessive markups.

For registration violations, NASD's Sanction Guidelines ("Guidelines") recommend a fine of $2,500 to $50,000 plus the amount of the respondent's financial gain and a suspension of up to six months. For egregious cases, the Guidelines recommend a suspension of up to two

---

[25]     Respondents also contend, in a related footnote in their reply brief, that NASD erred in failing to make available to testify at the Hearing Panel hearing the registered representatives at LSVL who sold PCCM stock. Rule 9252 states that a respondent may request that NASD invoke Rule 8210 to compel the testimony of persons within NASD's jurisdiction at an NASD hearing. The rule requires that respondents file such requests no later than 21 days before the scheduled hearing, describe with specificity the testimony sought, state why the testimony is material, and describe the respondents' efforts to obtain the testimony through other means. Respondents did not comply with Rule 9252 and, in fact, did not complain about the absence of other witnesses until this matter was on appeal to us. We therefore find no error.

- 21 -

years or a bar.[26]  We concur with the Hearing Panel's finding that respondents' misconduct was egregious.  The sanctions we impose therefore are within the range recommended in the applicable Guideline.

"The requirement that a person . . . register as a principal when actively engaged in a firm's securities business is an important one . . . [that] assists in the policing of the securities markets . . . [and] ensures that a person in a position to exercise some degree of control over a firm has a comprehensive knowledge of the securities industry and its related rules and regulations." *Pecaro*, 1998 NASD Discip. LEXIS 13, at *22.  The Guidelines for registration violations recommend that we consider whether the unregistered person had a registration application pending and the nature and extent of the unregistered person's responsibilities.  Here, Guss did not have a registration application pending.  Guss did, however, exercise significant influence and control over all of the activities of LSVL.  Lee and Gordon knew or should have known from email correspondence alone that Guss was intimately involved in nearly every aspect of LSVL's business, from the mundane ordering of supplies to the firm's negotiations with clearing firms and potential OSJs.  Lee and Gordon themselves went to Guss for advice and direction on securities-related issues, personnel decisions, and financial matters.  They considered Guss to be their boss and warned other LSVL staff that he could terminate them at will.

Respondents' conduct demonstrates a willingness to evade NASD rules that we find disturbing.  Respondents knew that Guss did not want to register with NASD, so they attempted in their emails to couch their language in disclaimers about Guss's true function at LSVL.  By doing so, they concealed Guss's management of a member firm, circumvented registration requirements, and hampered NASD's regulation of the firm and its principals.[27]

We also have considered that Lee and Gordon enabled Guss to act in a principal capacity without registration for a period of approximately three years.  Finally, although we do not find that respondents knew or reasonably should have known about Guss's statutory disqualification, we note that one consequence of their failure to register Guss is that a statutorily disqualified individual in fact acted as a principal at a member firm.  This aggravates the severity of respondents' misconduct.  Respondents knew that Guss was assisting in the management of LSVL and that he was not registered, yet they knowingly allowed him to continue in that capacity.[28]

---

[26]   *NASD Sanction Guidelines*, 48 (2006),
http://www.nasd.com/web/groups/enforcement/documents/enforcement/nasdw_011038.pdf.

[27]   Respondents furthered their concealment of Guss's activities by failing to update LSVL's Form BD accurately to reflect Guss's involvement in the management of LSVL.

[28]   Respondents argue that we should find mitigating their lack of disciplinary history.  We disagree.  While the existence of a disciplinary history is an aggravating factor when determining appropriate sanctions, its absence is not mitigating.  *See, e.g., Dep't of Enforcement v. Fergus*, Complaint No. C8A990025, 2001 NASD Discip. LEXIS 3, at * 58-59 (NAC May 17, 2001) (holding that the absence of disciplinary history is not considered part of "relevant disciplinary history" under the Guidelines for purposes of reducing sanctions); *Dep't of Enforcement v.*

[Footnote continued on next page]

- 22 -

Respondents continue to contend that their enabling Guss to act in the capacity in which he acted at LSVL was acceptable conduct. In order to disabuse respondents of the notion that their actions represent an acceptable business practice in the securities industry and to protect the investing public from the recurrence of their misconduct, we impose a bar in all capacities. In our view, a lesser sanction will not suffice to provide adequate protection to the investing public.

For pricing violations, the applicable Guideline recommends a fine of $5,000 to $100,000, plus restitution. In egregious cases, the Guideline recommends suspending the responsible individual or barring the individual.[29] We find that respondents' markup violations were egregious. We bar respondents in all capacities and affirm the Hearing Panel's restitution order, but reduce the restitution amount as indicated below.[30] The sanctions that we impose are within the range recommended in the applicable Guideline.

Respondents charged markups in excess of 10% in 31 retail sales over a period of three months. They stood to benefit from their misconduct because LSVL, which they indirectly owned, would profit from the trades. They recklessly disregarded long-standing precedent and allowed the firm to keep the spread as compensation, notwithstanding that the firm was not a market maker and the trades were riskless principal transactions. Respondents further failed to ensure that the firm's confirmations adequately disclosed the firm's remuneration to customers. Confirmation disclosures "[work] to protect investors and combat broker-dealer fraud by ensuring full and fair disclosure to investors . . ." *Hattier, Sanford & Reynoir*, 53 S.E.C. 426, 433 n.16 (1998), *aff'd, Hattier v. SEC*, 163 F.3d 1356 (5th Cir. 1998). Lee and Gordon demonstrated a "marked insensitivity to their obligation to deal fairly with customers" and caused LSVL's customers significant financial harm. *Frank L. Palumbo*, 52 S.E.C. 467, 480 (1995). They "recklessly overcharged their customers, even though they had no justification for basing their prices on . . . quotations." *Id.*

---

[cont'd]
*Balbirer*, Complaint No. C07980011, 1999 NASD Discip. LEXIS 29, at *10-11 (NAC Oct. 18, 1999) ("We are not compelled to reward a respondent because he has acted in the manner in which he agreed (and was required) to act when entering this industry . . ."). A respondent should not be rewarded because he may have previously acted appropriately as a registered person. Indeed, the Commission has consistently rejected arguments that a lack of a disciplinary record is a factor mitigating the sanction of a bar. *See Daniel D. Manoff*, 55 S.E.C. 1155, 1165-66 n.15 (2002); *Ronald H. V. Justiss*, 52 S.E.C. 746, 750 (1996).

[29]   *See Guidelines*, at 95.

[30]   The Hearing Panel found that respondents engaged in serious misconduct by charging undisclosed, fraudulently excessive markups, but did not impose, in light of the bar for respondents' registration violations, sanctions other than a restitution order.

- 23 -

In the face of overwhelming legal authority that directs non-market makers to calculate markups based on actual cost, not quotations, and additional case law that indicates that markups in riskless principal trades must always be calculated based on cost, respondents continue to contend that they acted appropriately. Respondents do not appreciate that LSVL was not entitled to collect markups of 12.9% to 54.55% from the firm's customers. In our view, a bar is necessary to protect the investing public and to deter future violations, and a lesser sanction will not suffice.

We affirm the Hearing Panel's order of restitution, which also is consistent with NASD's Guidelines,[31] but reduce the restitution amount to $20,832.40.[32] The Hearing Panel ordered that respondents pay to the firm's customers restitution of the firm's markups in excess of 10%, as indicated on Exhibit A attached hereto. Although we do not agree that markups as high as 10% generally are justified for riskless principal transactions, we have determined to affirm the Hearing Panel and order restitution of the firm's markups in excess of 10%.[33]

## VI.    Conclusion

We affirm the Hearing Panel's findings that Lee and Gordon violated Membership and Registration Rule 1021, Conduct Rule 2110, and Article IV, Section 1 and Article V, Section 1 of NASD's By-Laws by permitting an unregistered individual to function as a principal of member firm LSVL for a period of three years and failing to update the firm's Form BD. We also affirm the Hearing Panel's findings that Lee and Gordon charged fraudulently excessive, undisclosed markups in 31 retail sales of PCCM stock, in contravention of Conduct Rules 2110, 2120, 2230, and 2440, IM-2440, Section 10(b) of the Exchange Act, and Exchange Act Rules 10b-5 and 10b-10.

We find that respondents' registration violations were egregious, and we bar respondents in all capacities. We also find that respondents' markup violations were egregious, and we bar respondents in all capacities and order that they pay injured customers restitution of $20,832.40 (joint and several), plus interest from the date of the violative sales, calculated at the rate established for the underpayment of federal income tax in Section 6621 of the Internal Revenue Code, 26 U.S.C. 6621(a)(2). Respondents shall pay restitution (joint and several) of markups in

---

[31]    *See Guidelines*, at 4.

[32]    Exhibit A to the complaint and Exhibits A and B to the Hearing Panel decision identify eight violative sales in August 2002, but identify purchasing customers for only seven of the sales. We therefore reduce the Hearing Panel's restitution order by $1,825, the amount of the sale for which a purchasing customer is not identified.

[33]    The record indicates that NASD ordered LSVL and Guss to pay restitution in connection with their settlement of the allegations against them in this matter. Respondents may be given credit for and reduce their restitution amount by restitution amounts that respondents prove that LSVL or Guss actually paid to injured customers identified on Exhibit A to this decision.

- 24 -

excess of 10% in the amounts and to the customers identified on Exhibit A attached to this decision.  We also affirm the Hearing Panel's assessment of costs of $2,779.[34]

       Thus, Lee and Gordon are barred in all capacities, ordered to pay restitution of $20,832.40 plus interest, and assessed Hearing Panel costs of $2,779.  The bars imposed in this decision are effective immediately upon issuance of the decision.

       On Behalf of the National Adjudicatory Council,

       Marcia E. Asquith, Vice President and Deputy
Corporate Secretary

---

[34]      We also have considered and reject without discussion all other arguments advanced by the parties.

# Exhibit A (Page 1 of 4)
# Disciplinary Proceeding No. C06040027

| Customer Initials<br><br>(This List Corresponds to Contra Customers on Trading Analysis Chart) | Customer Name | Restitution Amount |
|---|---|---|
| RAA | Ralph A. Armendariz | $155.00<br>$224.00 |
| FAB | Francis A. Brady | $455.00 |
| JPB | James P. Brandenburg | $1,725.00 |
| DB | Dinald Brenkus | $934.60 |
| FWB | Fred W. Bryant | $1,210.00 |
| NC | Nick Como | $330.00 |
| MLC | Martin L. Corcoran | $850.00 |
| PD | Paul Delic | $255.00<br>$1,192.00 |
| RLF | Robert L. Fenner | $260.00 |
| DF | Duwayne Fenolio | $2,725.00 |
| JYF | Jeremy Fikac | $47.00 |
| JDF | Jerod Fikac | $103.00 |
| DHG | David H. Geary | $1,360.00<br>$850.00<br>$592.00 |
| MG | Marcel Goldfarb | $145.00 |
| RRG | Ronald R. Grieb | $55.00<br>$255.00 |
| FMH | Frederick M. Hackett IRA | $420.00 |
| REL | Robert E. Longo | $115.00 |
| KSM | Kenneth S. Millerd | $145.00 |
| SR | Stanley Randall | $534.80 |
| RAS | Robert A. Sanderson | $2,160.00 |
| CS | Christopher Soriano | $305.00 |
| KS | Ken Subala | $443.00 |
| IUV | Ishaq U. Vakil | $2,487.00 |
| RW | Rick Woodwyk | $80.00 |
| EW | Emmett Wright | $420.00 |
| Total Restitution Due : | | $20,832.40 |

Carlonic/Lee Gordon/Exhibit A1 to decision.doc

# Exhibit A
# Disciplinary Proceeding (Page 2 of 4) No. C06040027

ENFORCEMENT'S ANALYSIS OF EQUITY PRINCIPAL TRANSACTIONS IN PACIFIC CMA, INC.

## June 2002

| # | Account # | Customer | Trade Date | Entry Time | Exec. Time | Buy (B) Sell (S) | Qty | Description | Unit Price (Reported) | Commission | Net to Cust | Gross to Customer | Account # | Contra Customer (Riskless Firm) | Qty | Unit Price (Reported) | Commission | Net to Cust | Gross to Customer | Markup | Markup Percent (net incl comm) | Sell Commission Percent | Buy Commission Percent | Total Mk/Mk incl Cost |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | 954-10193-12 | CYC | 6/6/2002 | 15:54:00 | | S | 1,500 | PCCM | $0.600 | $55.00 | 845.00 | 900.00 | 954-10220-19 | RW | 1,500 | $0.750 | $0.000 | 1,125.00 | 1,125.00 | 0.15 | 25.00% | 6.11% | 0.00% | 31.111 |
| 2 | 954-10193-12 | CYC | 6/7/2002 | 14:29:00 | | S | 1,600 | PCCM | $0.550 | $50.00 | 830.00 | 880.00 | 954-10221-18 | NC | 1,600 | $0.850 | $0.000 | 1,360.00 | 1,360.00 | 0.30 | 54.55% | 5.68% | 0.00% | 60.231 |
| 3 | 954-10193-12 | CYC | 6/7/2002 | 14:34:00 | | S | 5,000 | PCCM | $0.550 | $135.00 | 2,615.00 | 2,750.00 | 954-10204-19 | DHG | 5,000 | $0.850 | $0.000 | 4,250.00 | 4,250.00 | 0.30 | 54.55% | 4.91% | 0.00% | 59.457 |
| 4 | 954-10193-12 | CYC | 6/10/2002 | 16:03:00 | | S | 2,000 | PCCM | $0.550 | $55.00 | 1,045.00 | 1,100.00 | 954-09898-14 | FAB | 2,000 | $0.850 | $0.000 | 1,700.00 | 1,700.00 | 0.30 | 54.55% | 5.00% | 0.00% | 59.559 |
| 5 | 954-10193-12 | CYC | 6/12/2002 | 14:41:00 | | S | 5,500 | PCCM | $0.600 | $165.00 | 3,135.00 | 3,300.00 | 954-09743-11 | PWB | 5,500 | $0.850 | $0.000 | 4,675.00 | 4,675.00 | 0.25 | 41.67% | 5.00% | 0.00% | 46.671 |
| 6 | 954-10193-12 | CYC | 6/12/2002 | 12:28:00 | | S | 2,200 | PCCM | $0.600 | $65.00 | 1,255.00 | 1,320.00 | 954-09067-17 | CS | 2,200 | $0.800 | $0.000 | 1,760.00 | 1,760.00 | 0.20 | 33.33% | 4.92% | 0.00% | 38.281 |
| 7 | 954-10193-12 | CYC | 6/17/2002 | 10:27:00 | | S | 1,500 | PCCM | $0.600 | $45.00 | 855.00 | 900.00 | 954-08742-12 | MG | 1,500 | $0.800 | $0.000 | 1,200.00 | 1,200.00 | 0.20 | 33.33% | 5.00% | 0.00% | 38.331 |
| 8 | 954-10193-12 | CYC | 6/19/2002 | 10:30:00 | | S | 5,000 | PCCM | $0.600 | $150.00 | 2,850.00 | 3,000.00 | 954-10226-13 | MLC | 5,000 | $0.800 | $0.000 | 4,000.00 | 4,000.00 | 0.20 | 33.33% | 5.00% | 0.00% | 38.331 |
| 9 | 954-10193-12 | CYC | 6/19/2002 | 15:46:00 | | S | 5,000 | PCCM | $0.600 | $150.00 | 2,850.00 | 3,000.00 | 954-10204-19 | DHG | 5,000 | $0.800 | $0.000 | 4,000.00 | 4,000.00 | 0.20 | 33.33% | 5.00% | 0.00% | 38.331 |
| 10 | 954-10193-12 | CYC | 6/20/2002 | 12:33:00 | | S | 2,700 | PCCM | $0.600 | $90.00 | 1,540.00 | 1,620.00 | 954-37243-15 | FMH | 2,700 | $0.800 | $0.000 | 2,160.00 | 2,160.00 | 0.20 | 33.33% | 4.94% | 0.00% | 38.271 |
| 11 | 954-10193-12 | CYC | 6/20/2002 | 12:33:00 | | S | 1,075 | PCCM | $0.600 | $32.00 | 613.00 | 645.00 | 954-09152-13 | JYF | 1,075 | $0.800 | $0.000 | 860.00 | 860.00 | 0.20 | 33.33% | 4.96% | 0.00% | 38.239 |
| 12 | 954-10193-12 | CYC | 6/20/2002 | 12:33:00 | | S | 1,325 | PCCM | $0.600 | $38.00 | 757.00 | 795.00 | 954-09151-14 | JDF | 1,325 | $0.800 | $0.000 | 1,060.00 | 1,060.00 | 0.20 | 33.33% | 4.78% | 0.00% | 38.111 |
| 13 | 954-10193-12 | CYC | 6/25/2002 | 10:55:00 | | S | 1,000 | PCCM | $0.550 | $55.00 | 495.00 | 550.00 | 954-10229-10 | RRG | 1,000 | $0.750 | $0.000 | 750.00 | 750.00 | 0.20 | 36.36% | 10.00% | 0.00% | 46.363 |
| 14 | 954-10193-12 | CYC | 6/25/2002 | 11:26:00 | | S | 10,000 | PCCM | $0.550 | $275.00 | 5,225.00 | 5,500.00 | 954-10218-13 | JPB | 10,000 | $0.750 | $0.000 | 7,500.00 | 7,500.00 | 0.20 | 36.36% | 5.00% | 0.00% | 41.363 |
| 15 | 954-10193-12 | CYC | 6/25/2002 | 11:28:00 | | S | 2,000 | PCCM | $0.550 | $55.00 | 1,045.00 | 1,100.00 | 954-10229-10 | RRG | 2,000 | $0.750 | $0.000 | 1,500.00 | 1,500.00 | 0.20 | 36.36% | 5.00% | 0.00% | 41.363 |
| 16 | 954-10193-12 | CYC | 6/25/2002 | 11:42:00 | | S | 2,000 | PCCM | $0.550 | $60.00 | 1,040.00 | 1,100.00 | 954-10213-18 | RLF | 2,000 | $0.750 | $0.000 | 1,500.00 | 1,500.00 | 0.20 | 36.36% | 5.45% | 0.00% | 41.823 |
| 17 | 954-10193-12 | CYC | 6/25/2002 | 15:01:00 | | S | 2,000 | PCCM | $0.550 | $55.00 | 1,045.00 | 1,100.00 | 954-10166-19 | PD | 2,000 | $0.750 | $0.000 | 1,500.00 | 1,500.00 | 0.20 | 36.36% | 5.00% | 0.00% | 41.363 |
| 18 | 954-10193-12 | CYC | 6/25/2002 | 16:01:00 | | S | 1,500 | PCCM | $0.550 | $45.00 | 780.00 | 825.00 | 954-09378-11 | KSN | 1,500 | $0.750 | $0.000 | 1,125.00 | 1,125.00 | 0.20 | 36.36% | 5.45% | 0.00% | 41.823 |

MONTHLY TOTAL

# Exhibit A
## Disciplinary Proceeding (Page 3 of 4) No. C06040027

### ENFORCEMENT'S ANALYSIS OF EQUITY PRINCIPAL TRANSACTIONS IN PACIFIC CMA, INC.

**July 2002**

| Trans | Account # | Customer | Trade Date | Entry Time | Exec Time | Buy (B) Sell (S) | Qty | Description | Unit Price (Reported) | Commission | Net to Cust. | Gross to Customer | Account # | Contra Customer (Riskless Prin) | Qty | Unit Price (Reported) | Commission | Net to Cust | Gross to Customer | Net-Dealt Bid Ask (not incl comm) | Markup (not incl comm) | Markup Percent (not incl comm) | Sell Commission Percent | Buy Commission Percent | T MU incl |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | 954-10193-12 | CYC | 7/10/2002 | 13:26:00 | | S | 10,000 | PCCM | $0.550 | $275.00 | 5,225.00 | 5,500.00 | 954-10225-14 | DF | 10,000 | $0.850 | $0.000 | 8,500.00 | 8,500.00 | | 0.30 | 54.55% | 5.00% | 0.00% | 59. |
| 2 | 954-10193-12 | CYC | 7/12/2002 | 14:39:00 | | S | 2,500 | PCCM | $0.620 | $69.00 | 1,462.00 | 1,550.00 | 954-10235-12 | KS | 2,500 | $0.850 | $0.000 | 2,125.00 | 2,125.00 | | 0.23 | 37.10% | 4.39% | 0.00% | 41. |
| 3 | 954-10193-12 | CYC | 7/15/2002 | 15:36:00 | | S | 12,500 | PCCM | $0.620 | $387.00 | 7,363.00 | 7,750.00 | 954-10227-12 | IUV | 12,500 | $0.850 | $0.000 | 10,625.00 | 10,625.00 | | 0.23 | 37.10% | 4.99% | 0.00% | 42. |
| 4 | 954-10193-12 | CYC | 7/18/2002 | 15:30:00 | | S | 4,700 | PCCM | $0.620 | $145.00 | 2,769.00 | 2,914.00 | 954-10242-13 | DB | 4,700 | $0.850 | $0.000 | 3,995.00 | 3,995.00 | | 0.23 | 37.10% | 4.98% | 0.00% | 42. |
| 5 | 954-10193-12 | CYC | 7/31/2002 | 15:32:00 | | S | 3,200 | PCCM | $0.620 | $99.00 | 1,885.00 | 1,984.00 | 954-37331-18 | RAA | 3,200 | $0.700 | $0.000 | 2,240.00 | 2,240.00 | | 0.08 | 12.90% | 4.99% | 0.00% | 17. |
| MONTHLY TOTAL | | | | | | | | | | | | | | | | | | | | | | | | | |

# Exhibit A

## Disciplinary Proceeding (Page 4 of 4) No. C06040027

### ENFORCEMENT'S ANALYSIS OF EQUITY PRINCIPAL TRANSACTIONS IN PACIFIC CMIA, INC.

**August 2002**

| Trans | Account # | Customer | Trade Date | Entry Time | Exec Time | Buy(B) Sell (S) | Qty. | Description | Unit Price (Reported) | Commission | Net to Cust. | Gross to Customer | Account # | Contra Customer (Riskless Prin'l) | Qty. | Unit Price (Reported) | Commission | Net to Cust. | Gross to Customer | Dlr-Dealr Bid Ask (not incl comm) | Markup (not incl comm) | Markup Percent (not incl comm) | Sell Commission Percent | Buy Commission Percent | Total MU/MDn (incl Com) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | 954-10193-12 | CYC | 8/15/2002 | 16:02:00 | | S | 2,000 | PCCM | $0.620 | $60.00 | 1,180.00 | 1,240.00 | 954-10031-15 | EW | 2,000 | $0.900 | $0.000 | 1,800.00 | 1,800.00 | | 0.28 | 45.16% | 4.84% | 0.00% | 50.00% |
| 2 | 954-10193-12 | CYC | 8/16/2002 | 16:49:00 | | S | 1,300 | PCCM | $0.620 | $60.00 | 746.00 | 806.00 | 954-37531-18 | RAA | 1,300 | $0.900 | $0.000 | 1,170.00 | 1,170.00 | | 0.28 | 45.16% | 7.44% | 0.00% | 52.61% |
| 3 | 954-10193-12 | CYC | 8/26/2002 | 15:47:00 | | S | 8,000 | PCCM | $0.620 | $248.00 | 4,712.00 | 4,960.00 | 954-10195-19 | PD | 8,000 | $0.800 | $0.000 | 6,400.00 | 6,400.00 | | 0.18 | 29.03% | 5.00% | 0.00% | 34.03% |
| 4 | 954-10193-12 | CYC | 8/27/2002 | 11:51:00 | | S | 1,500 | PCCM | $0.620 | $45.00 | 885.00 | 930.00 | 954-10235-12 | REL | 1,500 | $0.800 | $0.000 | 1,200.00 | 1,200.00 | | 0.18 | 29.03% | 4.84% | 0.00% | 33.87% |
| 5 | 954-10193-12 | CYC | 8/27/2002 | 13:19:00 | | S | 4,000 | PCCM | $0.620 | $120.00 | 2,360.00 | 2,480.00 | 954-10204-19 | DHG | 4,000 | $0.800 | $0.000 | 3,200.00 | 3,200.00 | | 0.18 | 29.03% | 4.84% | 0.00% | 33.87% |
| 6 | 954-10193-12 | CYC | 8/27/2002 | 16:39:00 | | S | 15,000 | PCCM | $0.620 | $390.00 | 8,910.00 | 9,300.00 | 954-10347-17 | RAS | 15,000 | $0.800 | $0.000 | 12,000.00 | 12,000.00 | | 0.18 | 29.03% | 4.19% | 0.00% | 33.23% |
| 7 | 954-10193-12 | CYC | 8/27/2002 | 16:05:00 | | S | 3,600 | PCCM | $0.620 | $110.00 | 2,122.00 | 2,232.00 | 954-10214-17 | SR | 3,600 | $0.800 | $0.000 | 2,880.00 | 2,880.00 | | 0.18 | 29.03% | 4.93% | 0.00% | 33.96% |
| 8 | 954-10193-12 | CYC | 8/30/2002 | 9:52:00 | | S | 12,500 | PCCM | $0.620 | $350.00 | 7,400.00 | 7,750.00 | 954-10350-11 | SR | 12,500 | $0.800 | $0.000 | 10,000.00 | 10,000.00 | | 0.18 | 29.03% | 4.52% | 0.00% | 33.55% |
| MONTHLY TOTAL | | | | | | | | | | | | | | | | | | | | | | | | | |
| GRAND TOTAL | | | | | | | 133,700 | | | | | | | | | | | | | | | | | | |