1    ROBERT M. YASPAN, SBN 051867
2 JOSEPH G. McCARTY, SBN 151020
   DEBRA R. BRAND, SBN 162285
3 LAW OFFICES OF ROBERT M. YASPAN
   21700 Oxnard Street, Suite 1750
4 Woodland Hills, California 91367
   Telephone: (818) 905-7711 Facsimile: (818) 501-7711
5 *Attorney for Plaintiffs Consul Group RE Dos Mil Veintiuno Sociedad de*
6 *Responsabilidad Limitada, etc.*

7

8

9 **UNITED STATES DISTRICT COURT**

10 **CENTRAL DISTRICT OF CALIFORNIA – WESTERN DIVISION**

11 CONSUL GROUP RE DOS MIL ) CASE NO.: **LA CV19-01254 JAK**
12 VEINTIUNO SOCIEDAD DE ) **(Ex)**
   RESPONSABILIDAD LIMITADA AKA )
13 CONSUL GROUP RE 2021 S.R.L. AKA ) FIRST AMENDED COMPLAINT
   CONSUL GROUP RE 2021, LTDA, a ) FOR:
14 Costa Rican limited liability company )
15    )
16    Plaintiff, ) 1. CONSPIRACY TO
   )    DEFRAUD;
17    v. ) 2. FRAUD;
   ) 3. CONVERSION;
18 LIDIA ZINCHENKO aka LIDIYA ) 4. CONSTRUCTIVE TRUST;
   ZINCHENKO, an individual and dba ) 5. RESULTING TRUST;
19 RAINIER AG; MICHAEL GUSS AKA ) 6. BREACH OF FIDUCIARY
   MICHAEL GAUSS AKA MIKHAIL )    DUTY;
20 GASS AKA MICHAEL I GUSS AKA ) 7. NEGLIGENCE;
   MICHAEL I. SYROEJINE AKA ) 8. ACCOUNTING;
21 MIKHAIL IVAN SYROJINE AKA ) 9. INJUNCTIVE RELIEF;
   MICHAEL SYROJESCHIN, AKA ) 10. DECLARATORY RELIEF;
22 MIKHAIL SYROETINE, an individual, ) 11. INJUNCTIVE RELIEF
   and dba EMBLES FINANCIAL; )    PURSUANT TO
23 EZBANC CORP., a Florida Corporation; )    VIOLATIONS OF THE
24 GREGORY MANCUSO aka GREG )    SECURITIES EXCHANGE
   MANCUSO, an individual; THE BANK )    ACT OF 1934 (15 U.S.C.
25 OF NEW YORK MELLON )    Section 78a et. Seq.)
26 CORPORATION aka BNY MELLON, a )
27 Delaware corporation; PERSHING, LLC, )
28

| a Delaware corporation; and DOES 1-50, inclusive, | ) 12. NEGLIGENCE RELATED |
|---|---|

a Delaware corporation; and DOES 1-50, inclusive,

Defendants.

) 12. NEGLIGENCE RELATED
)     TO BREACH OF THE
)     SECURITIES EXCHANGE
)     ACT AND 17 CFR SECTION
)     240.17f-1
)
) **DEMAND FOR JURY TRIAL**
)
)

Plaintiff Consul Group RE Dos Mil Veintiuno Sociedad de Responsabilidad Limitada  (translated to English as Consul Group RE 2021 S.R.L).aka Consul Group RE 2021, Ltda ("CONSUL") ( "Plaintiff") states as follows:

## JURISDICTION AND VENUE AND PARTIES

1.      This Court has jurisdiction of this action pursuant to 28 U.S.C. Sections 1331 and 1332(a)(2) & (b). There is complete diversity between  the Plaintiff on the one hand, and all defendants on the other.  Plaintiff CONSUL is located in and is a citizen of the Country of Costa Rica and: (1) Defendant LIDIA[1] (as defined below) is a citizen of the State of California; (2)  Defendant GUSS (as defined below) is a citizen of the State of California; (3)  Defendant MANCUSO (as defined below) is an individual who acted as the account manager for a

---

[1] "Rainier AG" is an alter ego of LIDIA, GUSS and MANCUSO based upon the comingling of assets in LIDIA's bank account, the use of the moniker "Rainier AG" name as a dba of an individual, and the use of the name "Rainier AG" to perpetrate a fraud, and the use of Rainier AG's alleged corporate form for LIDIA, GUSS and MANCUSO's personal business and gain. The alleged corporation known as "Rainier AG" does not have, for, at least, the purposes of the transactions alleged herein, any separate identity and there will be an inequitable result if the acts in question are treated as those of an alleged corporation alone.

2

COMPLAINT

company purportedly named "Rainier AG", who is a citizen of the State of Texas; (4) Defendant, Bank of New York Mellon Corporation dba BNY Mellon ("BNY" as defined below) is a citizen of the State of Delaware and has a principal place of business in the States of New York and California; and (5) Defendant, Pershing LLC variously also known as Pershing Corp., BNY's Pershing and BNY/Pershing (PC as defined below) is a subsidiary of BNY and is a citizen of State of Delaware and has a principal place of business in the State of New York and California; and Defendant EZBANC (defined below) is a Florida Corporation with a principal place of business in the State of California.  There is more than $75,000 in controversy, exclusive of interest and costs. As such, there is complete diversity between Plaintiff and the Defendants and this Court has diversity jurisdiction in this matter.

2.     This Court also has jurisdiction of this action pursuant to 28 U.S.C. Section 1331 because there are also Federal Questions presented as discussed and pled below in the Twelfth Cause of Action for Injunctive Relief.  More specifically, Plaintiff is seeking injunctive relief against Defendants, BNY and PC regarding their breaches of their duties under Securities Exchange Act of 1934, 15 U.S.C. Section 78a et. Seq. by, among other breaches, their failure to investigate and report the stolen shares as required pursuant to 17 CFR Section 240.17f-1 and their failure to stop sales or transfers from Plaintiff's ACCOUNT.

COMPLAINT

3.      Venue lies in this district pursuant to 28 U.S.C. Section 1391(a).

4.      Plaintiff CONSUL is a limited liability company organized and existing under the laws of Costa Rica, where it has its principal place of business.

5.      For all times herein relevant, the Manager of CONSUL is, and has been, Mauricio Lara ("LARA"), an attorney in Costa Rica and citizen of Costa Rica, who is also its only member/shareholder.

6.      Defendant Lidia Zinchenko aka Lidiya Zinchenko, dba Rainier AG ("LIDIA") is, and has been, a citizen of the State of California  residing in Santa Barbara County, State of California.  Rainier AG  is a DBA and/or an alter ego of LIDIA.  On or about May 16, 2017 LIDIA recorded a "fictitious business name" statement numbered as 2017-0001472 in the County of Santa Barbara under the name of "Rainier AG" (the "RAINIER DBA").  The business type is listed on the RAINIER DBA as an "individual".  A true and accurate copy of the RAINIER DBA filed with the County of Santa Barbara is attached hereto as Exhibit 1.

7.      Defendant LIDIA registered the fictitious business name statement so that she could impersonate and act as a corporate entity for her own purposes and to deceive and defraud unwitting third-party customers and investors such as CONSUL.

8.      Defendant Michael Guss dba Embles Financial ("GUSS") is a citizen of the State of California residing in either Santa Barbara County and/or Los

4

COMPLAINT

Angeles County.  GUSS is an individual who does business under several aliases. He is also known as ("aka") Michael Gauss aka Mikhail Gass aka Michael I Guss aka Michael I. Syroejine aka Mikhail Ivan Syrojine aka Michael Syrojeschin, aka Mikhail Syroetine.  GUSS does business in and around Los Angeles and its environs including the buying and selling of companies and their shares.   GUSS has been convicted of money laundering in 1996 and in 2007 was adjudicated as of managing a broker dealer while an unregistered control person.

9.     On or about September 4, 2015, GUSS recorded a fictitious business name statement numbered as 2015-0002643 in the County of Santa Barbara under the name of "Embles Financial" with its "business address" listed as being in "Santa Barbara, California".  A true and accurate copy of the Fictitious Business Name Statement filed with the County of Santa Barbara is attached hereto as Exhibit 2.   GUSS also executed a securities purchase agreement for "Rainier AG" in or about February 2017.

10.    Plaintiff is informed and believe and thereupon allege that LIDIA and GUSS are related and/or married and/or were previously married.

11.    Defendant Ezbanc Corp. ("EZBANC") is a Florida corporation and has its principal place of business in the State of California and maintains offices in the County of Santa Barbara, State of California.   GUSS is also an officer of EZBANC, which is an alleged owner of at least one of the bank accounts used by

"Rainer AG. EZBANC lists as its agent of service of process in California "Embles Financial, Inc.", although no such corporation exists in California and "Embles Financial" is a fictitious business name, or "dba", of GUSS.

12. Defendant Gregory Mancuso aka Greg Mancuso ("MANCUSO") is a citizen of the State of Texas acted as the alleged account manager for CONSUL on behalf of "Rainier AG", who also does business in the County of Santa Barbara, State of California.[2]

13. Since in or about July 2017, MANCUSO is a control person and primary owner of Heritage Equity Management, LLC that is located at 330 Spaulding Drive, Penthouse 1, Beverly Hills, California 90212 with a mailing address of 1187 Coast Village Road, #1-465, Montecito, California 93108.

14. Plaintiff is informed and believes, and thereupon alleges, that LIDIA held herself out falsely as a Swiss Trust Company in order to induce CONSUL to invest funds with "Rainier AG". In this endeavor LIDIA was aided and abetted by GUSS, acting under the names of Embles Financial and Ezbanc, and MANCUSO who falsely represented himself to be the "President" of Embles Financial when Embles Financial in reality is nothing more than GUSS under another name.[3]

---

[2] MANCUSO also signed a corporate reinstatement for EZBANC.

[3] In fact, Embles Financial, Inc. was formed in the British Virgin Islands ("BVI") on or about November 7, 2014 by LIDIA as its sole director and was subsequently stricken from the Register of Companies as of December 1, 2015 and is no longer in good standing.

COMPLAINT

15.     To facilitate the fraudulent activity, since LIDIA, GUSS and MANCUSO cannot hold the equity securities in their own name, they had to hold customers' assets in depositary accounts with recognized clearing agencies.  Two of such clearing agencies are maintained by Defendant The Bank of New York Mellon Corporation dba BNY Mellon ("BNY") and its subsidiary Defendant Pershing LLC variously also known as Pershing Corp., BNY's Pershing and BNY/Pershing ("PC").

16.     Defendant BNY is a Delaware corporation and has its principal place of business in the State of New York and also maintains offices in the County of Los Angeles, State of California.

17.     PC is a Delaware corporation and has its principal place of business in the State of New York and also maintains offices in the County of Los Angeles, State of California.

18.     LIDIA has a direct or indirect (i.e., in some other entity's name) depositary account at either BNY and PC (the "ACCOUNT").   Said ACCOUNT is either in the name of the supposed Swiss entity known as "Rainier AG" or LIDIA.  BNY or PC, to the extent that they have possession of  CONSUL's shares, as described below,  do so as a trustee or constructive trustee for the true owner of the shares, i.e. CONSUL.

19.     Either EZBANC, GUSS, MANCUSO or LIDIA, or some

COMPLAINT

combination thereof, has a direct (i.e., in their own name) or indirect (i.e., in some other entity's name) bank account in which funds sent by Plaintiff has been received.   EZBANC, GUSS, MANCUSO or LIDIA, to the extent that they hold CONSUL's monies, do so as a trustee or constructive trustee for the true owner of the funds, i.e., Plaintiff.

20.     BNY and PC are jointly referred to as the "BANK DEFENDANTS". Plaintiff is informed and believe and thereupon allege that the BANK DEFENDANTS as of January 31, 2019 held in excess of 2,000,000 shares of Gopher Protocol, Inc., CUSIP 38268V108 ("GOPH") belonging to CONSUL; and in excess of 8,300,000 shares of Mobiquity Networks, CUSIIP 60743F102, ("MOBQ") belonging to CONSUL.  As of March 8, 2019, the accounts held by the BANK DEFENDANTS had dissipated down to about 1,276,000 shares of GOPH stock.

21.     The true names, identities and capacities of the defendants named as Does 1 through 35, inclusive (each a **"Doe Defendant"** and, collectively, the **"Doe Defendants"**), are unknown to the Plaintiff at the present time.  However, Plaintiff is informed and believes and thereon allege that each of these fictitious defendants is/are in some manner responsible for the events and damages to Plaintiff as alleged in this Complaint.  Plaintiff will seek leave from this Court to amend this Complaint to include the true names, identities and/or capacities of

these fictitious defendants when they are ascertained.

22.     Plaintiff is informed and believes. and thereon allege, that at the times mentioned herein the Doe Defendants, and each of them, were the agents, shareholders, officers, directors,  employees, servants, independent contractors, partners, joint venturers, alter egos, successors in interest, and/or representatives of each of the other defendants, and each of them, and  conspired with each other, or some of them, in some manner which caused the damages suffered by Plaintiff as alleged herein and/or are the alter ego of the corporate defendants such that they should be determined to be liable with said defendants.

## ALTER EGO ALLEGATIONS

23.     Plaintiff is informed and believes, and on that basis alleges, that there exists, and at all times herein mentioned there existed, a unity of interest in ownership between the purported corporation calling itself "Rainier AG" (sometimes also referred to as "RAINIER") and defendants GUSS, MANCUSO and LIDIA and DOES 1-15 such that individuality and separateness of the purported corporation calling itself "Rainier AG"  DOES 1-15 has ceased, and that the purported corporation calling itself "Rainier AG" is an alter ego of Defendants, GUSS, MANCUSO and LIDIA and DOES 1-15.

24.     Plaintiff is informed and believes and thereupon allege that GUSS, MANCUSO and/or LIDIA direct and control all activities relating to  the

purported corporation calling itself "Rainier AG", including the actions at issue in this matter.  On information and belief,  GUSS, MANCUSO and/or LIDIA exercise control over the purported corporation calling itself "Rainier AG" daily activities, including all business-related matters.

25.    Plaintiff is informed and believes that GUSS, MANCUSO and/or LIDIA have transferred money between the purported corporation calling itself "Rainier AG" , GUSS, MANCUSO and/or LIDIA without the consent of the customers and to further their fraudulent acts.  Even today, at least, four weeks after they were instructed by CONSUL to stop selling shares belonging to it, they have continued to sell the shares in the market and have retained the proceeds thereof.

26.    Plaintiff is further informed and believes that the purported corporation calling itself "Rainier AG" was undercapitalized in light of the work it was supposed to perform.

27.    Plaintiff is further informed and believe that at all times herein mentioned the purported corporation calling itself "Rainier AG"  was a mere shell and sham without capital, assets or stock.  "Rainier AG" was conceived, intended and used by LIDIA, MANCUSO, GUSS and DOES 1-15 as a device to avoid individual liability and for the purpose of substituting an apparently financially insolvent corporation in the place of LIDIA, MANCUSO, GUSS and DOES 1-15.

The purported corporation calling itself "Rainier AG" is, and at all times herein mentioned was, so inadequately capitalized that, compared with the business to be done by it, and the risks of loss attendant thereto, its capitalization was illusory.

28.     Adherence to the fiction of the separate existence of the purported corporation calling itself "Rainier AG" would permit the abuse of the corporate privilege and would sanction fraud and would result in an injustice to Plaintiff.

## GENERAL ALLEGATIONS

29.     In late April 2018, LARA on behalf of Plaintiff, contacted Hernan Castro ("Castro") of AGM Technology, Inc., a financial broker in Costa Rica to find a company that could trade GOPH stock on behalf of a third-party company not otherwise involved herein ("COMPANY ONE").  LARA submitted an application to Castro on or about April 26, 2018.

30.     Castro was aware that GOPH was considered at the time as a "penny stock" (which meant that its shares typically traded at less than USD $5.00 per share).

31.     On or about May 8, 2018, Castro told LARA that he was talking with different clearing agents and that three of them were able to receive the GOPH shares for trading   On May 24, 2018, COMPANY ONE was told that an account with a company allegedly known as Rainer AG was approved with an account number ending in xxxx7188 ("ACCOUNT").  Based on Castro's representations

COMPLAINT

to LARA,  Castro has known GUSS for approximately 20 years and was referred to the purported corporation "Rainier AG" from GUSS.

32.     On May 28, 2018, LARA received an email from Castro providing the wire information for the purported corporation calling itself "Rainier AG" . Plaintiff and LARA were unaware that the wire transfer information was actually for the bank account of LIDIA in her deceptive role of "doing business" as "Rainier AG".  The information provided by Castro was:

    ABA 026009593
    Bank Account XXXXX2918

GUSS, LIDIA and/or MANCUSO provided the deceptive wire transfer information to Castro.

33.     On June 1, 2018, non-defendant Philippe Herrmann aka Philippe Hermann ("HERRMANN"), the purported Manager of the so-called "Compliance Department" of the purported corporation calling itself "Rainier AG"  sent an email to Castro which was forwarded to LARA on behalf of CONSUL, that explained the procedures regarding the fees, deposits and withdrawals. HERRMANN concealed the fact that the wire transfer information that RAINIER had forwarded to LARA was not that of the purported corporation calling itself "Rainier AG"  residing allegedly in Zug, Switzerland, but rather that of LIDIA, an individual in Santa Barbara, California.

34.     On June 4, 2018, Castro forwarded to LARA an email from

COMPLAINT

HERRMANN, and copied it to MANCUSO, which stated that HERRMANN had not heard any updates regarding the ACCOUNT (i.e., an opening transfer of funds to account). HERRMANN threatened to close the ACCOUNT, but when Plaintiff CONSUL agreed to work with Plaintiff, the account was "reopened" with no further required documentation.

35. Between June 5, 2018 and early October 2018, by telephone, MANCUSO purportedly on behalf of the purported corporation calling itself "Rainier AG" contacted LARA as a representative of Plaintiff. In said telephone conversations, MANCUSO represented to LARA that the purported corporation calling itself "Rainier AG" had been in existence since 1971 in Switzerland, was a member of FINMA and compliant with FINMA's rules and all Swiss banking regulations. None of these representations were true except that apparently a company with the name Rainier AG had been operating in an entirely different field since 1971 albeit under different ownership.

36. In addition, between June 5, 2018 and early October 2018, in telephone conversations with LARA, MANCUSO purportedly on behalf of the purported corporation calling itself "Rainier AG" and the Defendants, represented to Plaintiff CONSUL:

A. That the purported corporation calling itself "Rainier AG" was a licensed broker and would follow Plaintiff CONSUL's instructions;

B.      With respect to the money and stock entrusted to the purported corporation calling itself "Rainier AG" , such stock would be sold only with the purported corporation calling itself "Rainer AG's"  knowledge and consent, and money would only be transferred upon CONSUL's instructions.

C.      A purported corporation calling itself "Rainier AG" and its alleged employees would act as fiduciaries and trustees for the stock and monies being held on behalf of CONSUL and would safeguard CONSUL's assets.

37.      MANCUSO, purportedly on behalf of a purported corporation calling itself "Rainier AG" , also authorized Plaintiff CONSUL to use the ACCOUNT that had previously been set up for COMPANY ONE without getting first the approval of COMPANY ONE.

38.      On October 3, 2018, MANCUSO, purportedly on behalf of a purported Swiss corporation calling itself "Rainier AG" , sent wire transfer instructions to representatives of the entities that were transferring their stockholdings, and funds, to CONSUL.  The email stated:

> "Wire Info for $125,000
>   Rainier AG
>   ABA 026009593
>   Account XXXXX2918
>
>   Address
>   Rainier AG
>   Swiss Asset Management
>   Neugasse 15
>   CH-6301 Zug

COMPLAINT

Switzerland

DWAC INFO: [for securities]
Interactive Brokers LLC
DTC # 0534
Accoubt [sic]: XXXX8219
Account Name: Rainier AG

[signed]
Greg Mancuso
Rainier AG
Swiss Asset Management
Neugasse 15
CH-6301 Zug
Switzerland"

See Exhibit 3 (the "MANCUSO EMAIL").

39.    Unbeknownst to Plaintiff, the bank account for funds transfer listed in the MANCUSO EMAIL for "Rainier AG" in Exhibit 3 was LIDIA's bank account.  The DWAC information for shares transfer specified Interactive Brokers LLC ("IBL") a brokerage house located in the United States.

40.    Following MANCUSO's instructions allegedly on behalf of a purported corporation calling itself "Rainier AG", CONSUL, through a consultant of CONSUL, wire-transferred USD $100,000 on or about October 3, 2018 and USD $25,000 on October 4, 2018 to what it thought was a purported corporation calling itself "Rainer AG's"  bank account.  A copy of the transactions from the bank statement is attached hereto as Exhibit 4.  MANCUSO's instructions, as set forth above, state that the purported corporation calling itself "Rainer AG's"  bank

15

COMPLAINT

is in Switzerland but, Plaintiff later discovered that the code for the bank transfer, as published by the American Bankers Association, shows that the code is attributable to a Bank of America branch in the United States.  See Exhibit 5.

41.     Following MANCUSO's instructions CONSUL caused to be transferred 2,244,839 shares in Gopher Protocol Inc. ("GOPH") on or about October 6, 2018, to what it thought was a purported corporation calling itself "Rainer AG's" clearing agent's account.   See Exhibit 6.

42.     On October 9, 2018, MANCUSO sent to a consultant of CONSUL a "New Account Forms Corporate" as a "formality" on the already-opened ACCOUNT.

43.     Following MANCUSO's instructions, CONSUL caused to be transferred a further 2,400,000 shares in GOPH on October 19, 2018, to what it thought was the purported corporation calling itself "Rainer AG's"  clearing agent's account.   Said shares were transferred by DWAC pursuant to an irrevocable stock power to "BNY FBO Caceis S.A. FBO Rainier AG Baader Bank-Rainier AG Acct."  See Exhibit 7.

44.     On or about October 26, 2018, LARA, for CONSUL, filled out and sent in to what it thought was the purported corporation calling itself "Rainier AG" a series of forms entitled as "Account Opening Documentation." ("RAINIER DOCS"). The address of the purported corporation calling itself "Rainier AG"

was given as Neugasse 15, CH-6301 Zug, Switzerland on the forms.

45.    On October 29, 2018 a purported corporation calling itself "Rainier AG" sent a statement of account to CONSUL and admitted that it was holding USD $639,783.33 for the benefit of CONSUL.  See Exhibit 8.

46.    On October 29, 2018 CONSUL requested a withdrawal of USD $300,000 from the ACCOUNT supposedly at the purported corporation calling itself "Rainier AG".  MANCUSO, for no good reason, rejected the request, but he then stated that he would approve a withdrawal of USD $265,000 from the ACCOUNT which was to be sent to a third party for the benefit of CONSUL. CONSUL resubmitted a withdrawal request of USD $265,000.  See Exhibit 9.

47.    Instead on November 9, 2018, there was a transfer of USD $165,000 that was not sent by a purported corporation calling itself "Rainier AG", but rather Defendant EZBANC, the recently reinstated corporation of GUSS, with a notation that it was a loan from MANCUSO to CONSUL's consultant, a copy of which wire transfer is attached hereto as Exhibit 10.  Although sent by Defendant EZBANC, the statement of CONSUL's ACCOUNT with LIDIA or the purported corporation calling itself "Rainier AG" is shown as a debit on October 29, 2018 of USD $265,000, even though no such amount was ever paid out to CONSUL.  A copy of the "Cash Statement for 5-29-2018 to 12-12-2018 is attached hereto as Exhibit 11.

COMPLAINT

48.     Plaintiff does not have any account with Defendants EZBANC or MANCUSO; nor to the best of its knowledge, Plaintiff does not have any credit or debit balance with Defendants EZBANC  or MANCUSO.  In short, Plaintiff does not know why said funds were received from either EZBANC or MANCUSO.

49.     On November 9, 2018, Castro sent to CONSUL additional forms that needed to be filled out by CONSUL for the alleged sale of MOBQ shares.

50.     On or before November 28, 2018, CONSUL sent a request for funds to the purported corporation calling itself "Rainier AG", i.e., to be sent funds from the ACCOUNT that had already cleared.  On November 29, 2018, a purported corporation calling itself "Rainier AG" "declined" the request by claiming that the email was sent from an email account not on file with it.

51.     Thereafter on December 6, 2018, LARA sent another request for a wire transfer for the total amount of USD $500,000.  CONSUL instructed in an email that of the USD $500,000, USD $200,000 was to be sent for the balance of an alleged third party  agreement and USD $300,000 was to be sent to the consultant of CONSUL.

52.     On December 7, 2018, Defendant EZBANC sent USD $300,000 to a consultant of CONSUL with a notation that it was a "loan disbursement" to Defendant MANCUSO.  A copy of the transfer from EZBANC with the notation is attached hereto as Exhibit 12.  Although sent by Defendant EZBANC, the debit

from CONSUL's ACCOUNT with LIDIA and/or RAINIER is shown on the "Trading Statement" attached as Exhibit 13.  The statement reflects a debit of USD $500,000, but does not itemize the transaction showing that USD $200,000 was sent to a third party.

53.     During this period of time where Defendants, and each of them, were refusing to allow Plaintiff access to its money, that Plaintiff first discovered that the CONSUL funds were sent not to the purported Swiss corporation "Rainier AG's" bank account in Switzerland, but rather to a bank account owned by LIDIA.  The wire transfer out went to "Rainer AG" but the bank acknowledgment that was issued in mid-November 2018 shows that the beneficiary on the account was LIDIA.  See Exhibit 4.

54.     Plaintiff is informed and believes, and thereon alleges, that the only way for the bank to be able to accept a wire transfer directed to a purported corporation calling itself "Rainier AG" into an individual account in the name of LIDIA is because the bank was given the false fictitious business statement filed by LIDIA which alleges she was doing business as "Rainier AG".  See Exhibit 1. This was a willful intentional act of deception and fraud committed by the Defendants.

55.     Plaintiff further discovered that even though CONSUL did not do business with Defendant EZBANC, it transferred money to CONSUL.  Plaintiff is

COMPLAINT

informed and believes, and thereon alleges, that based on the continuous set of deceptions practiced by GUSS, MANCUSO and LIDIA, CONSUL's funds were not held by a purported corporation calling itself "Rainier AG" but rather by GUSS, MANCUSO and LIDIA through their maze of entities some of which are sued herein.

56.     As of December 12, 2018, the purported corporation "Rainier AG" or LIDIA sent a statement to CONSUL admitting that it owed USD $703,245.28 in cash to CONSUL.  See Exhibit "11" being labelled as a "Cash Statement".  Said statement is incorrect in, among other things, the reference to a USD $265,000 withdrawal on October 29, 2018 is incorrect in that only USD $165,000 was sent to CONSUL.  Thus, the amount held for the benefit of CONSUL as of December 12, 2018 was actually in excess of USD $868,245.28.

57.     As of December 18, 2018, the purported corporation "Rainier AG" or LIDIA sent a statement to CONSUL admitting that it held 2,000,498 shares of GOPH stock and 8,363,028 shares of MOBQ stock for the benefit of CONSUL. See Exhibit 13 labelled as a "Trading Statement".  On January 16, 2019 a snapshot of CONSUL's ACCOUNT as found on the Internet reiterated the same numbers of shares on hand supposedly with the purported corporation "Rainier AG", which is attached hereto as Exhibit 14.

58.     The shares of both GOPH and MOBQ were originally sent by

CONSUL through the DWAC process to Defendant BNY.  Either the purported

corporation "Rainier AG" or LIDIA directly or indirectly maintain an account

with BNY or BNY's clearing agent's subsidiary (PC).

59.     BNY has continuously reported to the Depository Trust Company

("DTC"), as required  by law, that it (or its wholly owned corporate subsidiary,

PC) holds for the benefit of its customers, at least 2,000,498 shares of GOPH  (i.e.,

the lowest intermediate balance) in its name since November 2018, the first date

that CONSUL sent GOPH shares to BNY.  As of the reporting date of January 18,

2019 PC reported that it held 2,148,413 shares of GOPH and BNY reported that it

held 2,218,498 shares of GOPH.  The DTC report (redacted) for the relevant

periods of time is attached as Exhibit 15.

60.     BNY had continuously reported to the DTC, as required by law, that

it holds for the benefit of its customers, at least 8,363,028 shares of MOBQ (i.e.,

the lowest intermediate balance) per the Rainier statement as of Wednesday

January 16, 2019 (Exhibit 14).  As of the reporting date of January 25, 2019 BNY

reported that it held 8,397,588 shares of MOBQ.   The redacted DTC reports for

the relevant periods of time are attached as Exhibit 16.  Defendants have not

accounted for the missing USD $34,550 MOBQ shares.

61.     On January 10, 2019, LARA sent an email to HERRMANN stating

that he was going to be in Switzerland and wanted to meet with HERRMANN

while he was there.   HERRMANN responded that all questions should be directed

to MANCUSO regarding the ACCOUNT and that RAINIER did not hold client

meetings in its "compliance and back office divisions."  HERRMANN also

claimed to have suspended the ACCOUNT, which was wrongful.  Plaintiff could

no longer even access its ACCOUNT on the internet.

62.    On January 16, 2019, LARA sent an email to HERRMANN and

MANCUSO terminating Plaintiffs' alleged contracts with a purported corporation

calling itself "Rainier AG".

63.    On January 21, 2019, the attorney for CONSUL demanded the

release of its cash and shares.   See Exhibit 17.  On January 23, 2019, the

purported corporation calling itself "Rainier AG" replied by email refusing to

comply.  See Exhibit 18.  On January 23, 2019 CONSUL, made a further demand;

yet, there has been no reply by the purported corporation calling itself "Rainier

AG" or LIDIA.  See Exhibit 19.

64.    On or about January 25, 2019, LARA and two other persons,  went to

the alleged purported corporate offices of "Rainier AG" at the address on its

website in Zug, Switzerland, and found the doors locked, and no one there.

LARA called the telephone number listed for the purported corporation "Rainier

AG" and reached an answering service which stated that it would provide a

message to HERRMANN.  HERRMANN then called LARA.  On that date,

HERRMANN and MANCUSO, on behalf of RAINIER, admitted that the funds and shares were due but that CONSUL "…had to give them [RAINIER] time to give us [CONSUL] the funds…"  As of the date of the filing of this complaint, Plaintiffs' monies and shares have not been returned to CONSUL.

65.     After Plaintiff terminated Defendants, and each of them, Defendants refused to turn over Plaintiff CONSUL's stock and money that was contained in its ACCOUNT and the monies that were improperly paid to third parties. Defendants also cut off Plaintiff's access to its ACCOUNT.  Furthermore, Defendants, and each of them, commingled Plaintiff's assets with their own.

66.     On or about February 14, 2019, Plaintiff, by its counsel, made a demand on the BANK DEFENDANTS to return and/or freeze the assets pending further court order.  A copy of the letter with redacted exhibits that was sent is attached hereto as Exhibit 20.

## **FIRST CLAIM OF RELIEF**
### **(CONSPIRACY TO DEFRAUD)**
**BY PLAINTIFF CONSUL AGAINST ALL DEFENDANTS EXCEPT THE BANK DEFENDANTS**

67.     Plaintiff CONSUL incorporates by reference all of the allegations contained in Paragraphs 1 through 66 above, as though set forth herein.

68.     In order to carry out the above-described shell game, said Defendants obtained control of and/or formed a number of entities to conceal their (GUSS, LIDIA and MANCUSO) involvement; conceal the location of the ACCOUNT and

COMPLAINT

Plaintiff's assets; and conceal the fact that they owned and/or controlled the entities involved in the transfer of funds and stock to and from Plaintiff and its ACCOUNT.  Plaintiff believed that it had opened an account with a legitimate stock broker located in Switzerland.   However, Plaintiff has subsequently discovered the following regarding Defendants, and each of them:

A.     As discussed in a decision dated February 12, 2007, appealed from a Hearing Panel's December 29, 2005 decision of the National Adjudicatory Council for the NASD, a copy of which is attached to Exhibit 20 as Exhibit "12" ("NASD DECISION"), involving Sterling Scott Lee ("Lee") and Dennis Todd Lloyd Gordon ("Gordon"), Complaint No. C06040027, Plaintiff discovered that in 1996, GUSS pled guilty and was convicted in the United States of money laundering.  As a result of the 1996 conviction, GUSS was disqualified from registration as a stock broker.

B.     As further discussed in the NASD DECISION, in a way to circumvent his disqualification from registration in the security industry, GUSS used his ex-wife, Kathia Santiago, Lee and Gordon and others to operate a company or its holding company, which GUSS controlled.  In or about 2007, Lee and Gordon were barred in all capacities for permitting an unregistered, statutorily disqualified individual to function as a principal of the company.

C.     This ruling did not prevent GUSS from advancing to his next scam.

With the NASD DECISION coming down in or about January 22, 2007, GUSS and Ajene Odeluga ("AJENE") were listed as officers and directors of Defendant EZBANC.

D.     On September 18, 2007, in a press release for the OTCBB:UCHB, UC Hub Group, Inc. ("UCH") announced that it intended on changing its name to EzBanc, Corp. and  stated the "new corporate name will serve the purpose of our aggressive branding policy as the leading developer of projects related to electronic and virtual financial services."  In addition, UCH announced that AJENE, who is also known as Ajene Watson would be joining it.

E.     In February 2010, GUSS acquired 80,000,000 shares of Omni Ventures, Inc. ("OMNI") a Kansas corporation and then transferred 75,317,955 shares to Globanc Corp., a company that according to OMNI's 10-k filed on January 12, 2012  was controlled by GUSS.  OMNI has been  accused on many websites as participating in pump and dump schemes.   In 2012, GUSS also became a director of OMNI.

F.     OMNI was disqualified by the State of Kansas for failure to file an annual report in 2014.  However, on December 27, 2017, Annual Reports for the years of 2014-2016 were filed on behalf of OMNI.  The principal office and address were listed at 1187 Coast Village Road, 1-465, Santa Barbara, California 93108.  The CEO, Secretary and CFO were listed as a person named Philippe

Hermann in Zug, Switzerland.   A man named "Philippe Hermann"

(HERRMANN defined above)  is also a representative and principal of RAINIER.

The telephone number of HERRMANN listed on the Kansas Secretary of State

Annual Report was 805-845-7177, which is the telephone number for Heritage

Equity Fund, LC.

G.     On November 1, 2017, Heritage Equity Fund LP filed a Foreign

Limited Partnership Application for Registration in California.  LIDIA was listed

as one of the General Partners with an address of 123-A El Paseo, Santa Barbara,

California.  PRVCY.com Inc., a New York corporation, was listed as the other

General Partner with an address of 1187 Coast Village Road, Suite 1-465, Santa

Barbara, California – the same address used by OMNI, LIDIA, GUSS and

MANCUSO's companies.

**B.     Formation and Operation of the Conspiracy.**

69.     Plaintiff CONSUL is informed and believes that Defendants, and

each of them, started the conspiracy as early as December 2016, if not earlier.  In

or about December 2016, GUSS attempted to negotiate a sale of shares of a

purported corporation using the name "Rainier AG" to a third party investor.

70.     Plaintiff is informed and believes that in or about December 2016, the

purported main activity of RAINIER was to be a brokerage in US OTC Markets

securities to non-US based clients.According to the corporate records of

Switzerland, on or about May 3, 2017, the purported address for RAINIER

changed to Neugasse 15, 6300 Zug.

71.     Prior to November 8, 2017, the purported statutory purpose for

RAINIER was:

> "Development, production and trading of equipment and systems, in
> particular for order processing systems for general cargo, collection, billing
> and sorting; can acquire, encumber and sell real estate."

72.     On November 8, 2017, a new statutory "purpose" of the corporation

was added as follows:

> "Provision of services throughout Switzerland in the areas of asset and
> investment advisory, financial and organizational planning, management
> services, all kinds of administrative work and provision of support services
> in the area of general financial and investment advisory services, and
> assumption of mandates in these areas, activities which require a license as
> a bank or securities dealer are expressly excluded;
> Offering payment products and virtual currencies, operating a block chain,
> providing cash and paperless payment services, facilitating cashless
> payments and substituting cash for cash, notably new payment systems,
> promoting paperless electronic payments, including development,
> processing and distribution of Products, services and systems for the
> settlement of payments and billing and related ancillary services,
> acquisition and management of investments and associated financial
> transactions;
> Acquisition, administration, brokering and transfer of patents, trademarks,
> licenses and technical knowledge; complete purpose description according
> to the Articles of Association."

73.     Nonetheless, the purported corporation RAINIER held itself out as a

corporation that provided services in the areas of asset and investment advisory,

financial and organizational planning, management services since 1971 when

RAINIER was only allegedly involved in such areas since the latter part of 2017.

74.     Apparently, the purported corporation RAINIER's license in Switzerland is only as an "asset manager" and RAINIER is not authorized in Switzerland to take custody of clients' funds.

75.     While RAINIER was changing its office's address, on May 16, 2017, LIDIA registered with the County of Santa Barbara a fictitious business name of "Rainier AG".  Thereafter, LIDIA opened a bank account with Bank of America. This would allow LIDIA to receive and hold funds for **a purported corporation calling itself "Rainier Ag"** thereby circumventing RAINIER's own licensing restrictions  as well as allow her to comingle the funds with her own and treat RAINIER as a mere instrumentality for her, GUSS and MANCUSO's own purposes and benefit.

76.     After COMPANY ONE submitted its application to Castro, on or about May 4, 2018, MANCUSO (the alleged account representative at RAINIER) reinstated Defendant EZBANC, a company that had been administratively dissolved and listed as inactive since on or about September 28, 2012.  GUSS -- at the address of 1187 Coast Village Road, PMB 1-465, Montecito, California – had been listed as the agent for service of process.  The listed registered agent for service of process after the reinstatement  is Embles Financial, Inc at the same address.  Since Embles Financial, Inc. no longer exists, GUSS filed a fictitious

business name statement in the name of "Embles Financial".

77.    As set forth above, each of these entities and the controlling individuals had a role in the Defendants' fraud and each of the Defendants herein knew that they were acting on behalf of the common fraudulent purpose.

## C.    Wrongful Acts in Furtherance of the Conspiracy.

78.    Since LARA had known Castro for approximately seven years, Defendants and each of them used LARA  as a middleman to help solicit Plaintiff. Castro told Plaintiff that he had a prior relationship with the people who operate RAINIER.  LARA checked the website for RAINIER, which stated the following:

> "Rainier AG was founded in 1971 and is headquartered in Zug, Switzerland. It is a privately owned, independent Swiss asset management firm offering wealth management, fiduciary and securities trading services to clients world-wide. In working with our international clients we strive to find a perfect balance between the centuries-old Swiss tradition of privacy and reliability in financial services with modern compliance requirements and technological advances. Rainier AG account-holders enjoy all the modern amenities offered by our major international custodian banks, along with the unparalleled personal attention of their private wealth managers.
> • Manage assets on behalf of customers
> • Trade in securities (stocks and shares and value rights) as well as their derivatives, banknotes and coins, money market instruments, precious metals, commodities
> • Open FX, CFD and commodity trading accounts for customers
> • Hold securities on deposit or manage securities' portfolios.
> Rainier AG is a Member firm of ARIF - Association Romande des Intermédiaires Financiers (www.arif.ch), an SRO officially recognized by the Swiss Financial Market Supervisory Authority (FINMA), with dual supervision pursuant to (1) independent asset management and; (2) the Anti-Money Laundering Act (AMLA). Founded in Geneva on March 15th 1999, ARIF is a private non-profit association of public utility, whose purpose is to assist in the prevention of and the fight against money

COMPLAINT

laundering in relation with the Swiss Federal Act on Combating Money Laundering and Terrorist Financing in the Financial Sector (MLA). ARIF is an SRO recognized by the Swiss Federal State according to Article 24 of the MLA. In 2009, the Swiss Financial Market Supervisory Authority (FINMA) recognized the self-regulatory provisions of ARIF (Code of Deontology) for independent asset managers, such as Rainier AG."

79.     Based upon RAINIER's representations,  the seemingly strong credentials, and the longevity of RAINIER that was represented online, Plaintiff thought that Defendants were a legitimate long-standing brokerage company.  In addition, MANCUSO, allegedly on behalf of RAINIER stated many of the same claims as set forth in the preceding paragraph, as follows:

A.     Between June 5, 2018 and early October 2018, by telephone, MANCUSO allegedly on behalf of RAINIER contacted LARA as a representative of Plaintiff.  In said telephone conversations, MANCUSO represented to LARA that: (a)    RAINIER had been in existence since 1971 in Switzerland, was a member of FINMA (a SWISS regulatory agency not to be confused with the "FINRA" entity in the United States); (b) RAINIER was compliant with FINMA's rules and all Swiss banking regulations,  (c)  RAINIER was experienced as a brokerage house and (d)  could also handle a public offering for certain cryptocurrency security tokens.  None of these representations were true.

B.     In addition, between June 5, 2018 and early October 2018, in telephone conversations with LARA, MANCUSO allegedly on behalf of RAINIER and other Defendants, represented to Plaintiff CONSUL:

(i).     That RAINIER was a licensed broker and would follow Plaintiff CONSUL's instructions;

(ii).    With respect to the money and stock entrusted to RAINIER, such stock would be sold only with RAINIER's knowledge and consent, and money would only be transferred upon CONSUL's instructions.

(iii).   RAINIER and its alleged employees would act as fiduciaries and trustees for the stock and monies being held on behalf of CONSUL and would safeguard CONSUL's assets.

(iv)     That CONSUL should transfer money to RAINIER's brokerage accounts, which it represented were in Switzerland.

(v)      That RAINIER would follow CONSUL's instructions with regard to the wire transfers and the stock trades, including promptly returning all of CONSUL's assets upon demand.

None of these representations were true.

C.      MANCUSO, on behalf of RAINIER, also authorized Plaintiff CONSUL to use the ACCOUNT that had been set up for COMPANY ONE without getting first the approval of COMPANY ONE.

80.     Furthermore, Defendants, and each of them, concealed from Plaintiff that:

A.      GUSS and MANCUSO were in control of RAINIER, and that

GUSS's girlfriend or wife, LIDIA, had a bank account in RAINIER's name that was apparently its only bank account.

B.     GUSS was a convicted felon that was unregistered and unqualified in the United States.

C.     That RAINIER did not have a bank or brokerage account in Switzerland to hold any of the monies or stock.  Rather, any monies sent to RAINIER were actually being sent to LIDIA who had an account as the RAINIER DBA, and the stocks were sent to either Caceis Bank, S.A., or Baader Bank for the benefit of GUSS, MANCUSO and/or LIDIA.

D.     That the stock was being held at BNY and PERSHING, and not in an account in Switzerland.

E.     That money would be held and/or transferred from an account that was not a RAINIER account, but from LIDIA's account and/or EZBANC account, an entity where GUSS and MANCUSO are officers, directors and/or representatives.

81.     Each of the Defendants was part of the conspiracy to defraud and intended to defraud Plaintiff for a common purpose with the intent of converting Plaintiff's stock shares ad money.

82.     Other fraudulent activities by Defendants are alleged in the Second Claim of Relief, which is incorporated herein by reference.

**D.    Resulting Damages**

83.    As a direct and proximate result of the conspiracy to defraud, Plaintiff was damaged in amount to be determined as trial, but which is estimated to be in excess of USD $3,500,000, including in the following respects, among others:

(a)    Losses due to the conversion of Plaintiff's money in the ACCOUNT.

(b)    Losses of the GOPH stock and their value; and

(c)    Losses of the MOBQ stock and their value.

84.    In engaging in the conspiracy to defraud, Defendants, and each of them, acted fraudulently, oppressively, maliciously and with a willful and conscious disregard of Plaintiff's rights.  Accordingly, Plaintiff is entitled to exemplary and punitive damages in an amount to be proven.

<u>**SECOND CLAIM OF RELIEF**</u>
**(FRAUD)**
**BY PLAINTIFF CONSUL AGAINST ALL DEFENDANTS EXCEPT THE BANK DEFENDANTS**

85.    Plaintiff CONSUL incorporates by reference all of the allegations contained in Paragraphs 1 through 84, above, as though set forth herein.

86.    On the alleged RAINIER website and its alleged LinkedIn page, the purported corporation "Rainer AG" represented itself to Plaintiff and others as follows:

"Rainier AG was founded in 1971 and is headquartered in Zug,

Switzerland. It is a privately owned, independent Swiss asset management firm offering wealth management, fiduciary and securities trading services to clients world-wide. In working with our international clients we strive to find a perfect balance between the centuries-old Swiss tradition of privacy and reliability in financial services with modern compliance requirements and technological advances. Rainier AG account-holders enjoy all the modern amenities offered by our major international custodian banks, along with the unparalleled personal attention of their private wealth managers.
• Manage assets on behalf of customers
• Trade in securities (stocks and shares and value rights) as well as their derivatives, banknotes and coins, money market instruments, precious metals, commodities
• Open FX, CFD and commodity trading accounts for customers
• Hold securities on deposit or manage securities' portfolios.
Rainier AG is a Member firm of ARIF - Association Romande des Intermédiaires Financiers (www.arif.ch), an SRO officially recognized by the Swiss Financial Market Supervisory Authority (FINMA), with dual supervision pursuant to (1) independent asset management and; (2) the Anti-Money Laundering Act (AMLA). Founded in Geneva on March 15th 1999, ARIF is a private non-profit association of public utility, whose purpose is to assist in the prevention of and the fight against money laundering in relation with the Swiss Federal Act on Combating Money Laundering and Terrorist Financing in the Financial Sector (MLA). ARIF is an SRO recognized by the Swiss Federal State according to Article 24 of the MLA. In 2009, the Swiss Financial Market Supervisory Authority (FINMA) recognized the self-regulatory provisions of ARIF (Code of Deontology) for independent asset managers, such as Rainier AG."

87.     In addition, MANCUSO, allegedly on behalf of RAINIER stated many of the same claims as set forth in the preceding paragraph, as follows:

A.     Between June 5, 2018 and early October 2018, by telephone, MANCUSO allegedly on behalf of RAINIER contacted LARA as a representative of Plaintiff.  In said telephone conversations, MANCUSO represented to LARA that RAINIER had been in existence since 1971 in Switzerland, was a member of

FINMA and compliant with FINMA's rules and all Swiss banking regulations, and that RAINIER was experienced as a brokerage house and could also handle a public offering for certain cryptocurrency security tokens.

B.      In addition, between June 5, 2018 and early October 2018, in telephone conversations with LARA, MANCUSO allegedly on behalf of RAINIER and other Defendants, represented to Plaintiff CONSUL:

(i).     That RAINIER was a licensed broker and would follow Plaintiff CONSUL's instructions;

(ii).    With respect to the money and stock entrusted to RAINIER, such stock would be sold only with RAINIER's knowledge and consent, and money would only be transferred upon CONSUL's instructions.

(iii).   RAINIER and its alleged employees would act as fiduciaries and trustees for the stock and monies being held on behalf of CONSUL and would safeguard CONSUL's assets.

(iv)    That CONSUL should transfer money to RAINIER's brokerage accounts, which it represented were in Switzerland.

(v)     That RAINIER would follow CONSUL's instructions with regard to the wire transfers and the stock trades, including promptly returning all of CONSUL's assets upon demand.

C.      MANCUSO, allegedly on behalf of RAINIER, also authorized

Plaintiff CONSUL to use the ACCOUNT that had been set up for COMPANY ONE without getting first the approval of COMPANY ONE.

88.     The above representations were untrue and made pursuant to a design and scheme by Defendants to defraud Plaintiff.  At the time the misrepresentations were made, Plaintiff was ignorant of their falsity and believed them to be true.

89.     Plaintiff is informed and believes and thereupon alleges that Defendants were aware of the actual facts which were, without limitation, the following:

A.     Even though the company was founded in 1971, the "brokerage services" which Plaintiff was being solicited to transfer money and stock, was in existence for less than a year.  In fact, to the extent that RAINIER exists, it is only used as a ruse and/or really is the alter ego of GUSS, LIDIA and/or MANCUSO who use it as a mere instrumentality for their own fraudulent purposes.

B.     That RAINIER was not registered with FINMA, but instead was only a voluntary member of a "self-regulated" organization.

C.     That RAINIER was not a licensed broker in Switzerland, or anywhere else.  RAINIER's license in Switzerland is only as an "asset manager" and RAINIER is not authorized in Switzerland to take custody of clients' funds.

D.     That the GOPH and MOBQ stock would be held in banks in the United States because RAINIER was not a licensed entity and GUSS, LIDIA

COMPLAINT

and/or MANCUSO to advance the fraudulent scheme could not hold the stock in their individual capacities.

E.      That bank accounts did not exist in the name of RAINIER in Switzerland, but instead under the name of LIDIA using the RAINIER DBA and held in the United States.

F.      That EZBANC was somehow the recipient of moneys and that disbursements would be made from it.

G.      That RAINIER would convert the assets of Plaintiff by refusing to follow Plaintiff CONSUL's instructions and turn over its assets.

H.      RAINIER and its alleged employees would not safeguard Plaintiff's assets.

I.      That RAINIER was undercapitalized.

90.     Furthermore, Defendants, and each of them, concealed from Plaintiff that:

A.      GUSS was a convicted felon that was unregistered and unqualified in the United States and was involved with RAINIER.

B.      That RAINIER did not have an account in Switzerland to hold any of the monies or stock.  Rather, any monies sent to RAINIER were actually being sent to LIDIA who had an account as the RAINIER DBA.

C.      That the stock was being held at BNY and PERSHING, and not in an

account in Switzerland.

D.     That money would be held and/or transferred from an account that was not a RAINIER account, but from EZBANC, an entity where GUSS and MANCUSO are officers, directors and/or representatives.

91.     In reasonable reliance on the misrepresentations made by Defendants, and each of them, and the failure of them to disclose all material facts, Plaintiff deposited into the brokerage ACCOUNT money and stock.

92.     As a direct and proximate result of Defendants' fraudulent misrepresentations and concealments as set forth above, Plaintiff has been damaged in an amount in excess of USD $3,500,000.

93.     In engaging in the conspiracy to defraud, Defendants, and each of them, acted fraudulently, oppressively, maliciously and with a willful and conscious disregard of Plaintiff's rights.  Accordingly, Plaintiff is entitled to exemplary and punitive damages in an amount to be proven.

**THIRD CLAIM OF RELIEF**
**(CONVERSION)**
**BY PLAINTIFF CONSUL AGAINST ALL DEFENDANTS EXCEPT THE BANK DEFENDANTS**

94.     Plaintiff CONSUL incorporates by reference all of the allegations contained in Paragraphs 1 through 93, above, as though set forth herein.

95.     Defendants, and each of them, converted CONSUL's stock, USD $125,000 in monies and proceeds from the sale of stock that Defendants were

required to transfer from the ACCOUNT.  Defendants have wrongfully exercised dominion and control over the ACCOUNT after Plaintiff CONSUL made a demand upon Defendants to return the property in the ACCOUNT

96.     As a proximate result of Defendants' wrongful conduct, they have converted Plaintiff CONSUL's 2,244,839 shares of stock in GOPH and 8,397,588 shares in MOBQ.

97.     The value of the converted funds at the time of the conversion was an amount in excess of USD $868,245.28 and Plaintiff is entitled to an award in said amount.

98.     In engaging in the conspiracy to defraud, Defendants, and each of them, acted fraudulently, oppressively, maliciously and with a willful and conscious disregard of Plaintiff's rights.  Accordingly, Plaintiff is entitled to exemplary and punitive damages in an amount to be proven.

## FOURTH CLAIM OF RELIEF
### (CONSTRUCTIVE TRUST)
### BY PLAINTIFF CONSUL AGAINST ALL DEFENDANTS

99.     Plaintiff CONSUL incorporates by reference all of the allegations contained in Paragraphs 1 through 98, above, as though set forth herein.

100.    This Claim for Relief seeks the return of shares of MOBQ and GOPH shares as described in this Complaint as presently held by the BANK DEFENDANTS for some or all of the other Defendants.  In addition, this Claim

for Relief seeks the return of monies held by the Defendants other than the BANK

DEFENDANTS that are the proceeds of deposits made by the Plaintiff or the

proceeds of stock sales conducted by the Plaintiff.

101.   This is an action seeking equitable redress for Defendants' illegal

conduct in converting Plaintiff's assets of money and stock, including, but not

limited to as a broker, custodian and/or trustee.  Plaintiff seeks the return of its

stock and monies and seeks return of it.

102.   A constructive trust is an equitable device by which a court adjudges

specific restitution of a received benefit.  Constructive trusts may be imposed

when a defendant has acquired legal title to property or money that they may not

be in good conscience retain the beneficial interest in the property, and in such

situation, equity converts the legal titleholder into a trustee holding the title for the

benefit of those entitled to the ownership.  Since Defendants have hidden who has

the property and are playing a shell game, all Defendants are being named herein.

103.   A constructive trust should be imposed for the purpose of preventing

unjust enrichment by the Defendants for the loss of the value of the stock and

money.

104.   Plaintiff believes and alleges that Defendants have deposited funds,

which, as alleged above, were fraudulently and illegally obtained from Plaintiff, in

a bank account or accounts held in the name of one or more of the Defendants.

COMPLAINT

105.   Defendants will gain an unconscionable advantage in the retention of the income from Plaintiff's property if they do not pay the value of the property. A constructive trust should be imposed to prevent unjust enrichment.

106.   By reason of the wrongful manner in which Defendants obtained said funds, the banks maintaining the deposited funds are involuntary trustees holding said funds in constructive trust for Plaintiff, with the duty to reconvey the same forthwith.

107.   Among the assets against which a constructive trust should be imposed are the assets consisting of: (a) 8,397,588 shares of MOBQ stock presently held by the BNY and/ or PC clearinghouses; and (b) 2,000,498 shares of GOPH stock presently held by the BNY and/or PC clearinghouses.

108.   In such event that it is found that said assets no longer exist in a bank account held by the Defendants, after having traced the funds, the entity, individual, person, group, organization, financial institution or agency shall be deemed an involuntary trustee holding said funds for the benefit of Plaintiff, with the duty to reconvey the same forthwith.

109.   In the event said stocks were sold or funds were used to purchase a product, home, stock or any other tangible or intangible item (hereinafter "item"), Defendants are constructive trustees of said items holding it for the benefit of the Plaintiff, with the duty to reconvey the same forthwith.

110.   By virtue of Defendants' wrongful conduct and breaches of fiduciary duties in wrongfully taking, retaining, and converting the stock and monies that belong to Plaintiff, the stock, any compensation paid if the stocks were sold, and the monies that belong to Plaintiff, but in the name of any of the Defendants, will be held in constructive trust for the benefit of Plaintiff.

111.   Demand has and will further be made for the turnover of said shares of GOPH and MOBQ.  The demands thus far made have been refused and ignored.  Said shares should be turned over to CONSUL as proven under law.

## FIFTH CLAIM OF RELIEF
### (RESULTING TRUST)
### BY PLAINTIFF CONSUL AGAINST ALL DEFENDANTS

112.   Plaintiff CONSUL incorporates by reference all of the allegations contained in Paragraphs 1 through 111, above, as though set forth herein.

113.   Plaintiff believes and alleges that Defendants have deposited funds, which, as alleged above, were fraudulently and illegally obtained from Plaintiff, in a bank account or accounts held in the name of one or more of the Defendants.

114.   By reason of the wrongful manner in which Defendants obtained said funds, the banks maintaining the deposited funds are involuntary trustees holding said funds in constructive trust for Plaintiff, with the duty to reconvey the same forthwith.

115.   In such event that it is found that said funds no longer exist in a bank account held by the Defendants, after having traced the funds, the entity, individual, person, group, organization, financial institution or agency shall be deemed an involuntary trustee holding said funds for the benefit of Plaintiff, with the duty to reconvey the same forthwith.

116.   In the event said funds were used to purchase a product, home, stock or any other tangible or intangible item (hereinafter "item"), Defendants are resulting trustees of said items holding it for the benefit of the Plaintiff, with the duty to reconvey the same forthwith.

### SIXTH CLAIM OF RELIEF
### (BREACH OF FIDUCIARY DUTY)
### BY PLAINTIFF CONSUL AGAINST ALL DEFENDANTS EXCEPT THE BANK DEFENDANTS

117.   Plaintiff CONSUL incorporates by reference all of the allegations contained in Paragraphs 1 through 116, above, as though set forth herein.

118.   As Plaintiff's alleged broker, custodian and trustee, Defendants owed Plaintiff a duty of care.

119.   Defendants breached their duty of care by engaging in the above pled wrongful conduct, including refusing to return Plaintiff's stock and monies in its brokerage ACCOUNT.

120.   At all times relevant hereto, Defendants, and each of them, owed Plaintiff fiduciary duties, including: (a) the duty of undivided loyalty; (b) the duty

COMPLAINT

to exercise due care; (c) the duty to make full disclosure; and (d) the duty to maintain client confidences.

121.    Beginning in or about May 2018, Defendants, and each of them, breached their fiduciary duties to Plaintiff by, among other things:

A.    Making false and misleading representations and false promises, as described above.

B.    Concealing, withholding and failing to disclose material facts, as described above.

C.    Refusing to allow Plaintiff access to its money and stock.

D.    Refusing to return Plaintiff's money and stock after Plaintiff terminate the brokerage agreement.

E.    Not keeping Plaintiff's money in a RAINIER account that is insured and protected.

F.    Using bank accounts of third persons that was not disclosed to Plaintiff.

G.    Representing that RAINIER was a licensed broker in Switzerland, when it was not.

H.    Failing to account for all monies and stock held in Plaintiff's ACCOUNT.

I.    Refusing Plaintiff access to its money and stock.

COMPLAINT

122.   As a direct and proximate result of these breaches of fiduciary duty, Plaintiff was damaged in an amount to be determined at trial, but which is estimated to be in excess of USD $3,500,000.

123.   By virtue of Defendants' breaches of fiduciary duties, Defendants and each of them, acted fraudulently oppressively, maliciously and with a willful and conscious disregard of Plaintiff's rights.  Accordingly, Plaintiff is entitled to exemplary and punitive damages in an amount to be proven.

## SEVENTH CLAIM OF RELIEF
### (NEGLIGENCE)
**BY PLAINTIFF CONSUL AGAINST ALL DEFENDANTS EXCEPT THE BANK DEFENDANTS**

124.   Plaintiff CONSUL incorporates by reference all of the allegations contained in Paragraphs 1  through 123, above, as though set forth herein, save those, if any that they elect to omit so that he can plead this matter in the alternative.

125.   Plaintiff is informed and believes, and thereon allege that Defendants, as the purported stockbrokers, have negligently failed to use reasonable care in controlling, and/or handling, and/or maintaining, and or disposing of Plaintiff's assets and funds.

126.   Said Defendants, and each of them, were under a duty to exercise ordinary care in controlling, and/or handling, and/or maintaining, and or disposing of Plaintiff's assets and funds.

127.   As a direct and proximate result of Defendants, and each of them, Plaintiff has been damaged in excess of USD $3,500,000.

## EIGHTH CLAIM OF RELIEF
### (ACCOUNTING)
### BY PLAINTIFF CONSUL ALL DEFENDANTS

128.   Plaintiff CONSUL incorporates by reference all of the allegations contained in Paragraphs 1 through 127, above, as though set forth herein.

129.   Plaintiff is informed and believes that Defendant commingled Plaintiff's assets with their own.

130.   Defendants were Plaintiff's brokers, custodians, fiduciaries and trustees from 2018 to the present.

131.   Defendants refuse to provide Plaintiff with a complete accounting.

132.   An accounting of all funds transferred, deposited, credited and/or debited to the accounts and an accounting of the sale of any stock is uncertain because Defendants refuse to provide the disposition of the ACCOUNT.

133.   Therefore, the Court should order Defendants to provide Plaintiff with a complete and accurate accounting of the ACCOUNT, including the money and securities.

## NINTH CLAIM OF RELIEF
### (INJUNCTIVE RELIEF)
### BY PLAINTIFF CONSUL AGAINST ALL DEFENDANTS

134.   Plaintiff CONSUL incorporates by reference all of the allegations contained in Paragraphs 1 through 133, above, as though set forth herein.

135.   As set forth above, Defendants, and each of them, have devised a scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations or promises.

136.   Defendants, and each of them, had Plaintiff transfer to it stock and money that belongs to Defendant, but being held by Defendants in trust.

137.   An injunction is needed to prevent the Defendants or others acting in concert with Defendants from transferring Plaintiff's property.

138.   Plaintiff is entitled to a permanent injunction enjoining Defendants, or anyone acting in concert with them or under their control, from transferring or disposing of any Plaintiff's stock, money or any other asset.

139.   Plaintiff seeks an order from this Court, granting a permanent injunction enjoying Defendants, and anyone acting in concert with them or under their control, from transferring or disposing of any Plaintiff's stock, money or any other asset, and granting such other and further relief as this Court deems just and proper.

### TENTH CLAIM OF RELIEF
### (DECLARATORY RELIEF)
**BY PLAINTIFF CONSUL AGAINST ALL DEFENDANTS**

140.   Plaintiff CONSUL incorporates by reference all of the allegations contained in Paragraphs 1 through 139, above, as though set forth herein.

141.   A dispute has arisen, and an actual controversy exists, between Plaintiff, on the one hand, and Defendants, and each of them, on the other hand, concerning the respective rights, duties, and obligations relating to the ACCOUNT.  Plaintiff contends that money and stock that were earmarked for the ACCOUNT belong to it.  Defendants contend that Plaintiff is not entitled to the money and stock in the ACCOUNT and is refusing to turn it over.

142.   Plaintiff desires a judicial determination of the respective rights and duties of Plaintiff and Defendants with respect to the ACCOUNT and the ownership of the money and stock earmarked for the account.

## ELEVENTH CLAIM OF RELIEF
### (INJUNCTIVE RELIEF RELATED TO VIOLATIONS OF THE SECURITIES EXCHANGE ACT OF 1934) BY PLAINTIFF CONSUL AGAINST THE BANK DEFENDANTS AND DOES 15-20

143.   Plaintiff CONSUL incorporates by reference all of the allegations contained in Paragraphs 1 through 142, above, as though set forth herein.

144.   As set forth above, the BANK DEFENDANTS, and each of them, are subject to regulation under the Securities and Exchange Act of 1934 (the "Exchange Act") with regard to Plaintiff's stock ACCOUNT.

145.   Plaintiff reported that its ACCOUNT and stock had been stolen by Defendants to the BANK DEFENDANTS in writing as set forth in a letter and attached exhibits (the "Letter") which is attached hereto as Exhibit 20 and is

incorporated herein by reference.  The BANK DEFENDANTS did not reply to the Letter and, to Plaintiff's knowledge have not made any investigation as to the theft and have not reported the theft pursuant to government regulations.  The Letter sets forth in detail Defendants wrongful actions, fraud, and conversation of Plaintiff's stock ACCOUNT with Exhibits providing supporting evidence.

146.   As such, the BANK DEFENDANTS have violated the Exchange Act, including, without limitation, 17 CFR Section 240.17f-1 which requires that stock that has been reported as stolen must be reported to the Securities Exchange Commission (the "SEC") and, more specifically, the Securities Information Center (the "SIC").

147.   An injunction is needed against the Bank Defendants to enforce the rules and regulations of the Exchange Act including, without limitation, the reporting requirements and to prevent the Defendants or others acting in concert with Defendants from transferring Plaintiff's property.

148.   Plaintiff seeks an order from this Court, granting a temporary restraining order, preliminary injunction and/or permanent injunction which:

A.     Enjoins Defendants from violating the rules and regulations of the Exchange Act;

B.     Mandates and orders Defendants to report the theft of Plaintiff's stock ACCOUNT to the SEC and SIC pursuant to the rules and regulations of the

Exchange Act including, without limitation, regulation 17 CFR Section 240.17f-1;

C.     Orders the ACCOUNT frozen and bars any sales or transfers of any stock or funds in the ACCOUNT until Plaintiff's ownership and control of the ACCOUNT can be confirmed;

D.     Enjoins anyone acting in concert with Defendants or under their control, from transferring or disposing of any Plaintiff's stock, money or any other asset;

E.     Mandates and orders that Plaintiff shall have the ownership and control of the stock ACCOUNT;

F.     Mandates and orders such further relief that this Court deems just and proper.

## TWELFTH CLAIM OF RELIEF
### (NEGLIGENCE RELATED TO VIOLATIONS OF THE EXCHANGE ACT AND BREACH OF 17 CFR SECTION 240.17f-1) BY PLAINTIFF CONSUL AGAINST THE BANK DEFENDANTS AND DOES 15-30

149.   Plaintiff CONSUL incorporates by reference all of the allegations contained in Paragraphs 1 through 148, above, as though set forth herein, save those, if any that they elect to omit so that he can plead this matter in the alternative.

150.   Said Defendants, and each of them, owe Plaintiff a duty of care including, without limitation, duties of care under the Exchange Act and

regulation 17 CFR Section 240.17f-1 with regard to Plaintiff's stock ACCOUNT. Said Defendants, and each of them, were under a duty to exercise ordinary care in controlling, and/or handling, and/or maintaining the ACCOUNT and Plaintiff's assets and funds and, as well, had special duties of care pursuant to the Exchange Act and its regulations.

151.   Said Defendants, and each of them, as pled above, have negligently failed to use reasonable care in controlling, and/or handling, and/or maintaining, the ACCOUNT and Plaintiff's assets and funds.

152.   As a direct and proximate result of said Defendants, and each of them, Plaintiff has been damaged in excess of USD $3,500,000.

WHEREFORE, Plaintiff prays for judgment against Defendants, and each of them, as follows:

ON THE FIRST CLAIM FOR RELIEF:

1.   For compensatory and special damages in a sum in excess of USD $3,500,000.

2.   For punitive and exemplary damages.

ON THE SECOND CLAIM FOR RELIEF:

3.   For compensatory and special damages in a sum in excess of USD $3,500,000 million.

4.   For punitive and exemplary damages.

COMPLAINT

ON THE THIRD CLAIM FOR RELIEF:

5.     For the return of all of Plaintiff's assets that have been converting, including, but not limited to the shares in the account, value of the funds converted with interest and the value of the stock converted, in amount sufficient to compensate Plaintiff CONSUL for its losses in a sum in excess of USD $3,500,000.

6.     For punitive and exemplary damages.

7.     For fair compensation for the time and money that Plaintiff has expended in pursuing the return and recovery of their converted funds and stock.

ON THE FOURTH CLAIM FOR RELIEF:

8.     That the funds held by Defendants in their bank account(s) acquired from the Plaintiff be determined to be held in constructive trust for the benefit of Plaintiff and returned to Plaintiff.

9.     That the stock held by Defendants in their bank account(s) acquired from the Plaintiff be determined to be held in constructive trust for the benefit of Plaintiff and returned to Plaintiff.

10.     That in the event the funds and/or stock are not in Defendants' bank account(s)  that said funds and/or stock be traced and that the individual person, group, organization, financial institution or agency holding said funds be determined to be holding said funds in constructive trust for the benefit of the

Plaintiff, with the duty to reconvey it forthwith.

11.     That in the event the funds and/or stock proceeds were used to purchase a tangible or intangible item, Defendants be held as constructive trustees of said item, holding it for the benefit of Plaintiff, with the duty to reconvey it forthwith.

ON THE FIFTH CLAIM FOR RELIEF:

12.     That the funds held by Defendants in their bank account(s) acquired from the Plaintiff be determined to be held in resulting trust for the benefit of Plaintiff and returned to Plaintiff.

13.     That the stock held by Defendants in their bank account(s) acquired from the Plaintiff be determined to be held in resulting trust for the benefit of Plaintiff and returned to Plaintiff.

14.     That in the event the funds and/or stock are not in Defendants' bank account(s)  that said funds and/or stock be traced and that the individual person, group, organization, financial institution or agency holding said funds be determined to be holding said funds in resulting trust for the benefit of the Plaintiff, with the duty to reconvey it forthwith.

15.     That in the event the funds and/or stock proceeds were used to purchase a tangible or intangible item, Defendants be held as resulting trustees of said item, holding it for the benefit of Plaintiff, with the duty to reconvey it

forthwith.

ON THE SIXTH CLAIM FOR RELIEF:

16.     For general, special, and compensatory damages in an amount to be proven in excess of USD $3,500,000.

17.     For punitive and exemplary damages.

ON THE SEVENTH CLAIM FOR RELIEF:

18.     For general and compensatory damages in an amount to be proven in excess of USD $3,500,000.

ON THE EIGHTH CLAIM FOR RELIEF:

19.     For an order requiring the accountings as described in the Ninth Claim for Relief.

ON THE NINTH CLAIM FOR RELIEF:

20.     For an order requiring that Defendants, and each of them, show cause, if any, why they should not be enjoined as set forth above during the pendency of this action;

21.     For further orders issue from this court for a temporary restraining order, a preliminary injunction, and a permanent injunction, enjoining and restraining Defendants, and each of them, their agents, servants, and employees, and all persons acting under, in concert with, or for them, from transferring, assigning, selling, conveying, encumbering, hypothecating, or otherwise disposing

of the property, funds, and/or assets acquired by said Defendants.

ON THE TENTH CLAIM FOR RELIEF:

22.    For a declaration regarding the respective rights, duties, and obligations of Plaintiff, and each of them, with respect to the ACCOUNT and the ownership of the money and stock earmarked for the account.

ON THE ELEVENTH CLAIM FOR RELIEF:

23.    For a restraining order, preliminary injunction and/or permanent injunction which:

A.    Enjoins Defendants from violating the rules and regulations of the Exchange Act;

B.    Mandates and orders Defendants to report the theft of Plaintiff's stock ACCOUNT to the SEC and SIC pursuant to the rules and regulations of the Exchange Act including, without limitation, regulation 17 CFR Section 240.17f-1;

C.    Orders the ACCOUNT frozen and bars any sales or transfers of any stock or funds in the ACCOUNT until Plaintiff's ownership and control of the ACCOUNT can be confirmed;

D.    Enjoins anyone acting in concert with Defendants or under their control, from transferring or disposing of any Plaintiff's stock, money or any other asset;

E.    Mandates and orders that Plaintiff shall have the ownership and

COMPLAINT

control of the stock ACCOUNT;

    F.    Mandates and orders such further relief that this Court deems just and proper.

ON THE TWELFTH CLAIM FOR RELIEF:

    24.    For General and Special damages, in an amount according to proof in excess of USD $3,500,000.

ON ALL CLAIMS FOR RELIEF:

    25.    For costs of suit;

    26.    For attorneys' fees and costs as are appropriate and proper under each relevant cause of action;

    27.    For such other and further relief as the Court deems just and proper.

**DEMAND FOR JURY TRIAL**

Plaintiff hereby requests a jury trial on all issues properly triable to a jury.

Dated:  March 20, 2019      LAW OFFICES OF ROBERT M. YASPAN

                      By _/s/ Robert M. Yaspan_____
                      ROBERT M. YASPAN
                      Attorneys for Plaintiffs